Daniel C. Girard (State Bar No. 114826)
Angelica M. Ornelas (State Bar No. 285929)
Simon S. Grille (State Bar No. 294914)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
dgirard@girardsharp.com
aornelas@girardsharp.com
sgrille@girardsharp.com

Norman E. Siegel (*pro hac vice*)
J. Austin Moore (*pro hac vice*)
Jillian R. Dent (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
siegel@stuevesiegel.com
moore@stuevesiegel.com
dent@stuevesiegel.com

*Co-Lead Interim Counsel*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTUIT FREE FILE LITIGATION | Case No. 3:19-cv-02546-CRB |
| This Document Relates to: All Actions | **DECLARATION OF HARRY BRIGNULL IN OPPOSITION TO DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION** |
| | REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED |

I, Harry Brignull, declare as follows:

1.     I hold a Doctor of Philosophy (PhD) degree in Cognitive Science from Sussex University in the United Kingdom where I researched the psychology of user behavior for the design of large interactive displays. I also have an MSc in Human-Centered Computer Systems from Sussex University. Since 2005, I have advised numerous organizations as a user experience specialist, including Spotify Technology, Pearson Education, HM Revenue & Customs, Smart Pension and The Telegraph, among others. In this capacity, I bring a set of methods and best practices for understanding user behavior and psychology, helping the organization design their software to ensure it is clear and easy to use while considering the needs of the users and the business together. Additionally, in prior roles I have provided User Centered Design (UCD) training to organizations like Nokia and British Airways. Attached as Exhibit 1 to this declaration is a true and correct copy of my resume.

2.     I am perhaps best known for my work in coining the term "Dark Patterns"—which are deceptive design techniques used in websites and mobile applications ("apps") to trick users into doing things unintentionally. For example, common dark patterns include imposing hidden costs that only appear at the last stage of a checkout process, or making it unnecessarily difficult to cancel a subscription service in which the user did not intend to enroll. In 2010, I formed the website darkpatterns.org as part of an initiative to bring public awareness to common types of dark patterns and help stamp out deceptive design practices. My initiative has been successful, with the concept of dark patterns now being well known internationally. For example, dark patterns are cited in various books on design, ethics and privacy[1], they are researched by a number of academic researchers[2], and they are the concept at the center of the bipartisan DETOUR (Deceptive Experiences to Online User Reduction) Act[3] introduced before Congress in April 2019.

---

[1] Further details are available at: https://www.google.com/search?tbm=bks&q=darkpatterns.org.

[2] *E.g.* Assistant Professor Colin Gray at Purdue University, Professor Woodrow Hartzog at Northeastern University, Professor Lior J. Strahilevitz at The University of Chicago.

[3] Further details: https://gizmodo.com/senators-introduce-bill-to-stop-dark-patterns-huge-plat-1833929276.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

3.     I have been cited as an expert on the subject of dark patterns by numerous media outlets, including *The Wall Street Journal*, *Vox*, *The New York Times*, *The Financial Times*, *The Verge*, *Gizmodo*, *The Atlantic*, *Fast Company*, *Ars Technica*, *British Broadcasting Corporation (BBC),* and *Consumer Reports*. I have also published articles relating to dark patterns and deceptive design practices as set forth in my resume. *See* Exhibit 1. I write this declaration in my capacity as an independent expert on dark patterns.

4.     I have been retained by counsel for Plaintiffs in this action to review Intuit's account creation and sign-in process relating to its TurboTax products and provide an opinion on whether the existence of the terms containing the arbitration clause were reasonably conspicuous to TurboTax users. In preparation for my work in this matter, I have reviewed the following case materials:

    a.  Consolidated Class Action Complaint (Document 80);

    b.  Intuit Inc.'s Motion to Compel Arbitration; Memorandum of Points and Authorities in Support; and Supporting Declarations of Ergang Sun and Jaimz Davis (Documents 97, 97-1, 97-2).

    c.  The Deposition Transcript of Ergang Sun dated December 18, 2019 ("Sun Dep. Tr."); and

    d.  Defendant Intuit's Amended Objections and Responses to Plaintiff's First Set of Requests for Production of Documents.

Additionally, I personally examined Intuit's account creation processes via its website at https://myturbotax.intuit.com/sign-up/.

***Visual Characteristics***

5.     In assessing whether an organization's terms and conditions as presented on a digital platform are conspicuous, and thus noticeable to a consumer, I first consider the visual characteristics assigned to the element being examined. Visual characteristics can make things eye catching for human visual perception. If something is relatively large or high contrast it becomes eye-catching, and is more likely to be noticed and understood. If it is relatively small or low contrast, it becomes less so.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
Case No. 3:19-cv-02546-CRB

1      6.      When a designer puts together a page, they employ these visual characteristics in a

2  systematic way. This is called "visual hierarchy." A writing principle called the "inverted pyramid" is

3  often used with the visual hierarchy—this ensures that the most important information is stated first

4  and most prominently, and the content proceeds with explanatory and supporting details in the order of

5  most to least important.

6      7.      Mr. Sun's declaration provides a screenshot of Intuit's account creation page as it was

7  presented to users in January – March 12, 2019. Sun Declaration, ¶¶ 8-9. For ease of reference, I have

8  included a copy of the same screenshot in Figure 1, below.



Figure 1: Intuit's account creation page as it was presented to users in January – March 12, 2019. Sun Declaration, ¶¶ 8, 9.

1       8.     In November 2019, I visited the URL referenced in Mr. Sun's declaration

2   https://myturbotax.intuit.com/sign-up/ so that I could review Intuit's account creation webpage as it

3   would be presented to a new user. It did not appear that the visual elements of the webpage including

4   the font and color scheme had changed since the 2018 tax filing period referenced in Mr. Sun's

5   declaration. A screenshot is provided below as Figure 2.



Figure 2: Screenshot of the TurboTax "Sign up" page, captured November 9, 2019.

    9.     I examined the font formatting used on the webpage, comparing the legal text containing

the links to Intuit's TurboTax Terms of Service, Turbo Terms of Use, and Privacy Statement (referred

to generally herein as "terms and conditions") against other text on the page. In the table below, I

describe the differences.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

|  | Form label text | Legal text |
|---|---|---|
| Example | "Email address" | "By clicking Create Account you agree to the Turbo tax terms [...]" |
| Text color | #404040 (Darker gray) | #757575 (Lighter gray) |
| Background color | #FFFFFF (White) | #FFFFFF (White) |
| Text contrast ratio | 4.6:1 (More prominent) | 10.36:1 (Less prominent) |
| Font size | 14px (Larger) | 12px (Smaller) |

10.     I calculated the text contrast ratio using WebAIM's Color Contrast Checker, a free tool commonly used for evaluating the contrast and color accessibility of a web page for WCAG (Web Content Accessibility Guidelines) compliance purposes.[4] Intuit chose to use a lighter shade of gray for the text associated with the terms and conditions. On the page's white background, this means it is lower contrast than the form label text, and therefore less prominent. At his deposition, Mr. Sun

████████████████████████████████████████████████████

████████████████████  Sun Dep. Tr. at pg. 62.

11.     For the font size, Intuit chose to use an italicized 12 pixel (px) font size for the hyperlinks to its terms and conditions, as opposed to the larger 14 pixel size used for the form labels directly above. Additionally, Intuit did not underline, highlight, or capitalize the hyperlinks in a manner that would invoke visual attention. Intuit's account recovery website screenshots and TurboTax mobile sign-in screenshots produced in Mr. Sun's declaration are substantially similar in these respects. *See* Sun Declaration, ¶¶ 11, 26. Again, these choices have the effect of reducing the prominence of the text containing the terms and conditions.

***Optional vs. Mandatory Presentation of Terms and Conditions***

12.     In assessing conspicuousness, I also examined whether the organization's terms and conditions are presented to users in an optional or mandatory manner. For example, it is common for organizations who want users to be presented with certain terms or conditions to make it a mandatory

---

[4] Available at: https://webaim.org/resources/contrastchecker/.

5

step in the user's process. This means that if a user wants to complete a process (such as signing up or

purchasing something), they have no choice but to see the document in question. This has been a

common practice for decades and is still used frequently today, as shown in figure 3, a screenshot of

the Windows 95 setup process (1995), and figure 4, a screenshot of the license agreement user

interface for macOS Catalina, the latest version of Apple's desktop operating system for macOS

computers (2019).



Figure 3: the Windows 95 license agreement user interface (source: guidebookgallery.org)

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   Figure 4: screenshot of the macOS Catalina license agreement user interface (captured 9-Nov-2019)

17        13.    In the digital design industry, the term "conversion rate" is used to describe the number

18   of people who complete an action against the number of people in a group. This is typically a

19   percentage. For example, in the case of the examples above, it is reasonable to assume that 100% of

20   the people who successfully complete Windows and macOS installation processes will have seen the

21   software license agreement (though they may not have scrolled through it or read it thoroughly).

22        14.    Organizations that do not require review of terms and conditions may do so in order to

23   limit disruption of the sign-in or enrollment process and limit the number of users who "drop out" of

24   the process prior to completion. From my review of the Intuit account creation and sign-in process,

25   Intuit chose not to present its terms and conditions in a mandatory manner, despite it being a common

26   practice in the software industry since the 1990s.

27
28

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

1  ***Mandatory Scrolling and Opt-In Checkboxes***

2       15.    Many organizations make even greater efforts to ensure users are presented with their

3  terms and conditions by implementing mandatory scrolling and opt-in checkboxes. For example, when

4  signing up for an account with Google, the user is shown a summary of the privacy policy,

5  communicating some of the most important aspects in concise, plain language. As shown in figures 5

6  and 6 below, this summary is shown as a mandatory step in the sign-up process and the user is

7  required to scroll through the summary then select two checkboxes (one for the Terms of Service and

8  another for the Privacy Policy).



Figure 5: Google's sign up process requires the user to scroll through the Privacy Policy summary (captured November 9, 2019).

8

Figure 6: Having scrolled to the bottom, the user must accept the Terms of Service and Privacy Policy (captured November 9, 2019).

16.     As reflected in its design decisions, Intuit chose to combine consent to its terms and conditions with the "Create Account" and "Sign In" buttons that the user must click to take the next step. While this means there is less effort required from the user (and likely a higher process completion rate for Intuit), in the absence of mandatory viewing users may not appreciate that clicking the button serves a *dual* purpose of purportedly binding them to terms and conditions contained in three separate hyperlinks.

17.     Mr. Sun ███████████████████████████████████████████
██████████████████████████████████████████████ Mr. Sun ████
████████████████████████████████████████████████████████

9

1 ████████████████████████████████████████████████████ Sun. Dep.

2 Tr. at pgs. 110, 111, 119.

3 *Positioning of the "Terms of Service" Text and Link*

4      18.     When a user views a page of content on a website or in an app, the box within which

5 they view content is called their "viewport." Some devices have a relatively small viewport (*e.g.*,

6 Apple iPhone 4), which reduces the amount of content that can be seen at once. Other devices have a

7 relatively large viewport (*e.g.*, Apple iMac 27" Retina), allowing more to be seen. Users are usually

8 able to configure the content size so that if they have poor eyesight, they can make everything bigger

9 and easier to see. Viewport size and ability to configure content display size typically have an impact

10 on the amount of content that can be seen on-screen at once. Smaller viewports, or larger content

11 settings mean that content can be pushed below the bottom of the viewport (known as "below the

12 fold"), requiring the users to scroll if they want to see that content.

13      19.     In my review of the positioning of TurboTax website terms and conditions, Intuit chose

14 to position the links to the terms below the sign-in button. This means some users will never see the

15 link to the terms at all. For some website users, it is possible that their viewport or content settings will

16 "push" the link to the terms below the bottom of the viewport ("below the fold"), while the "create

17 account" or "sign in" button remains visible within the viewport. Those users therefore can click the

18 button required to take the next step without ever seeing the links to the terms and conditions, as

19 reflected in figures 7 and 8. Mr. Sun ████████████████████████████████████

20 ████████████████████████████████████████████████████ Sun. Dep.

21 Tr. at pgs. 64-68.

Figure 7: a screenshot from a MacBook laptop showing that the design of the sign-up page can hide the link to the terms "below the fold" (captured 11-Nov-2019).

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



Figure 8 a screenshot from an iPhone 11 Pro Max showing that the design of the sign-up page can hide the link to the terms
"below the fold" (captured 11-Nov-2019).

20.    The TurboTax mobile app layout seems to work differently, as indicated by the

screenshot provided in Mr. Sun's declaration. *See* Sun Declaration, ¶¶ 25-26.  Here, there appears to

be less risk of the text appearing outside the user's viewport. However, in the mobile app the text is

positioned below the primary button, which means users may stop reading when they get to the

primary button and click on it, thus missing out on the content that appears below.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

*Analytics Software and the Insights it Provides*

21.    "Web analytics" is the name for a type of tool used with websites and apps to measure and understand user behavior. Like all digital companies, Intuit has analytics set up on its websites and apps and they have published articles describing their capabilities in this area.[5] Intuit responded to a request for production seeking its analytics with the following information:

| App type | Logins | TOS Clicks |
|---|---|---|
| Mobile App | ███████ | ███████ |
| Web | ███████ | ███████ |

*See* Intuit's Responses to Requests of Production of Documents, Exhibit A, TT Clickstream Data.

The table above shows the number of users who logged in ("logins") against the number of who clicked on the TurboTax's Terms of Service ("TOS Clicks") during the period from January 1, 2019 through April 30, 2019. ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████    At his deposition, Mr. Sun ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████    Sun. Dep. Tr. at pgs. 108, 110-112.

*The Impact of Using Multiple Hyperlinks and Similarly-Named Terms on the TurboTax website*

22.    According to Mr. Sun's declaration, from January – March 12, 2019, Intuit's terms and conditions were presented in the form of three links positioned below the "Create Account" and "Sign In" buttons on TurboTax's website. These links were named "TurboTax Terms of Use," "Turbo Terms of Use," and "Privacy Statement." Sun Declaration, ¶¶ 5-9.

---

[5] For example: https://www.blastam.com/intuit-ga-premium-case-study, https://www.zdnet.com/article/intuit-buys-data-analytics-startup-as-part-of-ai-expansion-efforts/ and https://techcrunch.com/2013/10/23/intuit-acquires-level-analytics-a-consulting-firm-with-a-specialty-in-data-analytics/

23.     The "TurboTax Terms of Use" linked to terms containing the arbitration agreement that Intuit is seeking to enforce,[6] while the similarly-named "Turbo Terms of Use" linked to terms purporting to govern users' use of the Intuit website. After March 12, 2019, Intuit renamed the "TurboTax Terms of Use" link on its website to "TurboTax Terms of Service"—which linked to the same terms and conditions. Sun Declaration, ¶ 18.[7]

24.     Both before and after March 12, 2019, Intuit included multiple hyperlinks with similar names that do not clearly communicate their difference. This design creates an unnecessary risk of user error. Users may click one of the links, read the content, mistakenly believe they have read all of the legal terms, and then proceed through the process, unaware that there are more terms in the other document that they did not notice and open.

25.     This risk and burden of work could be avoided by placing all of the legal terms in a clearly named, single document. Further effort could be made by providing a summary of the key information, in the manner of Google as reflected in figure 6.

---

[6] The "TurboTax Terms of Use" linked to a document entitled "Intuit Terms of Service for TurboTax Online Tax Preparation Services – Tax Year 2018." Sun Declaration, ¶ 6.

[7] According to Mr. Sun's declaration, the TurboTax mobile app named the same hyperlink "License Agreement." Sun Declaration, ¶ 28. From my review, Intuit has not provided an explanation as to why the same terms and conditions were referred to separately as "*TurboTax Terms of Use*" "*TurboTax Terms of Service*" and "*License Agreement*" depending on the time-period and platform in which they were presented to the user.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

1   ***Mobile App Users Have to Take Unnecessary Additional Steps to Access Intuit's Terms of Service***

2        26.    Although not made clear in his declaration, Mr. Sun ████████████████████

3   ██████████████████████████████████████████████████████████████████████████

4   Specifically, Mr. Sun ██████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████████████████

8   ████████████████████        Sun Dep. Tr. at pgs. 82-84.



Figure 9 screenshots depicting the behavior of the "License Agreement" link in the TurboTax mobile app.

21        27.    Mr. Sun ████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████████

23   ███████████████████████████████████████        Sun Dep. Tr. at pgs. 83-84. The end

24   result is user confusion because it is not clear which of the ten links, if any, the user should click to

25   access the applicable agreement. Consequently, this design adds a needless additional step in the process

26   and creates an unnecessary risk that users will never find or access their applicable agreement.

15

*Conclusions*

28.     Based on the foregoing, it is my conclusion that Intuit's terms and conditions presented on the TurboTax website and mobile app were designed to be inconspicuous and were presented in a manner that made them difficult for users to notice, read and understand. While I cannot deduce Intuit's motivations for doing so, it is my opinion that when an organization rejects design choices that would ensure users are presented with its terms and conditions, the organization is accepting the substantial probability that users will be unaware they are agreeing to those terms when they create or sign into their accounts. Likewise, the organization will have no means to prove users were presented with its terms and conditions, as the organization chose not to use any of the readily available design techniques that would have provided such proof.

29.     Specifically with respect to Intuit:

    a.   The Intuit designers appear to have attempted to boost the completion rate of the TurboTax sign up process by designing it to be quick and easy with minimal distractions, which would explain why Intuit did not adopt standard design techniques to ensure users are presented with Intuit's terms and conditions in a conspicuous manner.

    a.   On the website and mobile app, text associated with the Terms of Service and Terms of Use is smaller than most other text on the page, and is not highlighted in any manner, making it less likely for users to notice it. Intuit's choices in designing the TurboTax website and mobile app were such that even reasonably diligent consumers are likely to have been unaware of the existence of additional terms.

    b.   On the mobile app, the terms and conditions cannot be accessed directly by clicking the link "License Agreement." Instead, users are taken to a webpage in a separate in-application web browser and from there have to select and determine which of ten potentially applicable agreements pertains to them. Intuit's design choice in this respect, ██████████████████████████, virtually guarantees that the applicable terms and conditions were not presented to users in a conspicuous manner.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

c.  On the website and mobile app, the terms and conditions are not presented as mandatory steps in the sign-up process. Neither are mandatory scrolling and checkboxes used to ensure users are made aware of the terms and conditions. This means that users can skip past these items, unaware of their existence.

d.  On the website, the text associated with the Terms of Service and Terms of Use is positioned below the primary button on the page, meaning users may continue through the account creation or sign-in process without ever seeing the hyperlinks to Intuit's terms and conditions. While on the mobile app there appears to be less risk of the text being outside the user's viewport, the text is positioned below the primary button, which means users may stop reading when they reach the primary button and never see the hyperlinks linking to the terms and conditions.

e.  Intuit's use of two different terms documents for the terms and conditions on the website ("TurboTax Terms of Use/Service" and "Turbo Terms of Use") creates a burden of work for users to click into and read both. It also creates a risk that some users may read just one and mistakenly believe they have learned all the legal terms, thus missing out on key information in the other document they overlooked.

30.  Like most organizations, analytics software is used by Intuit to track and understand user behavior online. Intuit's analytics data showed that ████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████ Although the click-through rate was surely known to Intuit, the company opted not to implement design choices that would increase the visibility of its terms or make their viewing a mandatory step in the sign-in process as in the Microsoft, Apple and Google examples described earlier, which would ensure 100% of users would have seen the agreements. Instead, Intuit chose to make the legal agreements non-mandatory, low prominence and potentially below the fold. These design choices work together to substantially decrease the percentage of users who see the legal agreements.

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 2nd day of January, 2020 in Brighton, England.

Harry Brignull

DECLARATION OF HARRY BRIGNULL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT INTUIT'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:19-cv-02546-CRB

# Exhibit 1

To Declaration of Harry Brignull

# Harry Brignull

Expert Witness in Deceptive Design Practices

## Career Summary

I have a PhD in Cognitive Science and have provided user experience consultancy services since 2005. I have worked with Spotify, Pearson, HMRC, Smart Pension, Lloyds, The Telegraph and many other organisations.

I'm best known for my work in coining the term "Dark Patterns" and setting up darkpatterns.org to help stamp out deceptive design practices. I have recently started offering expert witness services in this area.

I'm also an accomplished public speaker, having presented at UX London, UX Cambridge, Conversion Conference and Product Tank. If you're interested in learning more about me, you can watch this interview or listen to this podcast.

## Employment History

### Head of User Experience Innovation, Smart Pension (April 2019 - present)

Smart Pension is an award-winning Fintech start-up based in London. I'm currently building an innovation team for Smart Pension in Brighton, focussing on innovative new features and products for the Smart Platform.

### Head of User Experience, Smart Pension (February 2018 - April 2019)

I was Head of UX in the London office at Smart Pension for over a year. During this time, I created a new User Experience (UX) team - defining the roles, hiring, introducing processes and best practices.

### Senior User Research Consultant, Spotify (January 2017 - January 2018)

I worked at Spotify with a number of different squads in the Iron Bank tribe, primarily focusing on premium revenue experiences (e.g. international checkouts & upsells, telco partner user onboarding, cancelation and more).

## Senior User Researcher, Department for Business, Energy and Industrial Strategy (BEIS) (September - December 2016)

I worked at BEIS as a Freelance Senior User Researcher. My main focus was carrying out formative "discovery" research for the Small Business Commissioner (Enterprise act, 2016) and Payment Practices Reporting (Small Business, Enterprise and Employment act, 2015). This role also included a fair amount of planning and interaction design.

## Senior User Researcher, Clearleft / Pearson (March - August 2016)

I worked with Clearleft as a Freelance UX Lead on a graph network database management system ("LOMT") for Pearson, which they are using to manage the complex relationship between educational materials (such as textbooks), standards (such as the Global Scale of English) and Curricula (such as Common Core). My work included early stage formative research followed by usability testing later in the project. I also worked very closely with the UI designer, collaboratively sketching user journeys to be prototyped and iterated.

## Senior User Researcher, HM Revenue & Customs (January - March 2016)

I carried out a discovery research project for the Pension Lifetime Allowance UX at HMRC. This involved extensive interviews with pension holders, advisors and providers, all of whom had very different perspectives on a controversial new tax on Pensions in the UK.

## User Experience Lead, Lloyds Pharmacy (Jan 2008 – Feb 2011)

I provided a range of UX services to Lloyds Pharmacy Online Doctor, on a project that involved overhauling the patient consultation experience. This role was more technical than most UX projects, involving close work with the clinical team to draft medical questionnaires and algorithms. I also carried out iterative user research to ensure the proposed consultation experience was well suited to the target user groups.

## Senior User Experience Consultant, Clearleft (Feb 2011 - Apr 2013)

Working at Clearleft was a challenging role: client expectations were very high, projects were fast moving and I typically played a hybrid role of planner, user researcher, information architect and sometimes even change management consultant.

This role was both strategic and hands-on: as well as providing consultancy and running workshops with clients, I turned my hand to various qualitative user research methods (.e.g. usability testing, diary studies, interviews), and I often single-handedly carried out the early stage design process, from initial whiteboard sketches through to interactive prototypes in InVision, Marvel or Axure.

During my time at Clearleft, my clients included Dennis publishing, NRDC, SavingsChampion, Family Investments, Kraft, Haymarket, Firefly Solutions, and Nutsonline.com.

## User Experience Lead, Madgex (Jan 2008 – Feb 2011)

Madgex's primary offering is a white label Job Board platform, provided to clients as a fully outsourced service. The platform is currently used on about 150 live sites and receives 2 million job seekers per week, in aggregate. Well known clients include The Guardian, The Times, Star Tribune, Haymarket and Centaur.

My role at Madgex was three-pronged. Firstly, I was involved in bringing about organisational change and enabling Madgex to become a fully "user experience oriented" company. This involved delivering training and stakeholder workshops. Secondly, I was involved in the day-to-day planning, research and design of all new products, including the new Madgex Job Board platform (V3) and CV publishing platform ("CV Search & Match"). Thirdly, I was involved in the continual, iterative improvement of all existing user interfaces, taking input from user research findings and monitoring conversion rate uplifts.

## User Experience Consultant, Flow Interactive (Jan 2007 – Dec 2008)

This role involved a varied mix of user research and design activities. In other words, as well as running interviews, workshops and contextual enquiries, I was also responsible for writing personas, creating user journeys, paper prototyping, wireframing and building interactive prototypes. Projects at Flow often involved a number of design iterations, beginning at early concept stages and evaluating progressively higher fidelity prototypes to improve usability and ensure the product meets the needs of the target audience.

During my time at Flow I was also responsible for writing and delivering training courses in User-Centred Design to Nokia, British Airways and other clients.

## Usability Consultant, Amberlight Partners (Sept 2005 – Jan 2007)

At Amberlight I worked for a wide range of clients including $O_2$, The Financial Services Authority, and BAA. I was the primary point of contact with my clients, from proposal writing through to project closure and onward business development. Studies ranged from qualitative Morae-based user testing to eye-tracking, ethnography, diary studies, focus groups and card sorting, among other things.

When providing design recommendations I would typically develop wireframes in Visio, and deliver highly visual presentations together with detailed findings-log documentation.

### Usability Researcher, Oyster Partners (May 2005 – Sept 2005)

In this role I specialised in designing, arranging and moderating large (40-60 user) quantitative laboratory studies, typically run concurrently in multiple countries; and presenting findings and design recommendations to clients. Clients included Vodafone, Samsung, and others. Activities included the use of databases to capture and analyse performance data, and the design of coding schemes to analyse observation logs, using an in-house system similar to Noldus Observer. Tools used included Techsmith's Morae and bespoke hardware-based video capture equipment.

### Research Fellow, Interact Lab, Sussex University (Oct 2000 - Aug 2004)

The Dynamo project was a 4-year initiative funded by the EPSRC. On this project we designed a multi-user public display system that supported the interconnection of personal devices (e.g. Laptops, Smartphones), allowing co-present groups to share and collaborate over media and documents.

My work involved the use of a range of methods including ethnography, depth interviews, prototyping, storyboarding, expert evaluation, and video analysis. Public speaking was also a notable aspect of this role, which involved lecturing, running seminars and giving conference presentations.

# Selected Publications

Brignull, H (2019) Dark Patterns: a library of deceptive design techniques. Retrieved from: https://www.darkpatterns.org/

Brignull, H (2013) Dark Patterns: inside the interfaces designed to trick you. Retrieved from: https://www.theverge.com/2013/8/29/4640308/dark-patterns-inside-the-interfaces-designed-to-trick-you

Brignull, H (2011) Dark Patterns: Deception vs. Honesty in UI Design. Retrieved from https://alistapart.com/article/dark-patterns-deception-vs-honesty-in-ui-design/

Brignull, H (2010) Dark Patterns: User Interfaces Designed to Trick People (Presentation at UX Brighton) Retrieved from: https://www.youtube.com/watch?v=zaubGV2OG5U

Brignull, H., Izadi, S., Fitzpatrick, G., Rogers, Y. and Rodden, T. (2004) The Introduction of a Shared Interactive Surface into a Communal Space. In Proc. of CSCW 2004 ACM, Chicago.

Lock, S. & Brignull, H. (2004) 'Chapter 8: An infrastructure for constructing distributed, multi-device based interactive applications.' in Seffah & Javahery "Multi-Device User Interfaces: Engineering and Application Frameworks" Wiley, London.

Izadi, S, Brignull, H., Rodden, T., Rogers, Y. and Underwood, M. (2003) Dynamo: A public interactive surface supporting the cooperative sharing and exchange of media. In Proc. UIST ACM, Vancouver.

# Education

### PHD in Cognitive Science, Sussex University (2000-2005)

'Understanding and Designing for the Voluntary Adoption of Community Displays'

My PhD brought together research from CSCW, ethnography, sociology and HCI, and investigated the nature of voluntary uptake of large shared display systems in public spaces, deriving design recommendations. The main research method used was contextual field research.

### MSc (Distinction) in Human Centred Computer Systems, Sussex University (1999-2000)

My MSc research involved the application of techniques from psychology, software engineering and cognitive science to the design, implementation and evaluation of interactive computing systems. I received the Searchspace best thesis award for my research into interface design for handheld devices.

### Psychology BA (1st), Sussex University (1996-1999)

During this degree I specialised in subjects including Applied Cognitive Psychology and Artificial Intelligence.

# References in the Press and on the Web

Mathur, Acar, Friedman, Lucherini, Mayer, CHetty & Narayanan (2019): Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites

Financial Times Magazine (May 2019): When manipulation is the digital business model

Gizmodo (April 2019): Senators Introduce Bill to Stop 'Dark Patterns' Huge Platforms Use to Trick Users

Purdue University UX Pedagogy and Practice Lab (Apr 2019): UXP2 Dark Patterns

Norwegian Consumer Council (June 2018): Deceived by Design: How Tech Companies Use Dark Patterns to Discourage Us From Exercising Our Rights to Privacy (PDF)

UX Podcast (February 2017): #150 Dark Patterns with Harry Brignull

Fast Company (December 2016): The Year Dark Patterns Won

The New York Times (May 2016): When Websites Won't Take No for an Answer

Ars Technica (Jul 2016): Dark Patterns are designed to trick you (and they're all over the Web)

Smashing Magazine (March 2018): Ethical Design: The Practical Getting-Started Guide

Trine Falbe, Kim Andersen & Martin Michael Frederiksen (Late 2017): White Hat UX eBook

Smashing Magazine (April 2019): Privacy UX: Common Concerns And Privacy In Web Forms, Better Cookie Consent Experiences, Better Notifications And Permission Requests

Dataethics.eu: Data Ethics Tools for Companies and Organisations

Ethical.net: Ethical Alternatives & Resources