Warren Postman (#330869)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Keith A. Custis (#218818)
  kcustis@custislawpc.com
CUSTIS LAW, P.C.
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067
(213) 863-4276

Benjamin Whiting (*pro hac vice forthcoming*)
  ben.whiting@kellerlenkner.com
Ellyn Gendler (#305604)
  ellyn.gendler@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

*Attorneys for Intervenors*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE INTUIT FREE FILE LITIGATION<br><br>This Document Relates to: All Actions | Case Nos.:  3:19-cv-02546-CRB<br><br>**MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**Judge:**      Hon. Charles R. Breyer<br>**Date:**        December 17, 2020<br>**Time:**        10:00 a.m.<br>**Courtroom:**  6 – 17th Floor |

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2        **PLEASE TAKE NOTICE** that on December 17, 2020 at 10:00 a.m. or as soon thereafter

3    as the matter may be heard, proposed Intervenors Sabrina Alvey, Arlan Ashcraft, Mary Backes,

4    Sandra Childress, Megan Mairs, Amber Millikan, Christy Mueller, Scott Siebert, and Tiffany

5    Whatley will and hereby do move this Court, pursuant to Federal Rule of Civil Procedure 24, to

6    intervene in this action.  Intervenors also will and hereby do ask this Court to deny preliminary

7    approval of the class settlement proposed by interim class counsel and Defendant Intuit Inc. on

8    November 12, 2020.

9        Intuit required each Intervenor to execute its Terms of Service before using Intuit's online

10   tax filing product, TurboTax, and Intuit itself recently insisted to this Court that its Terms of Service

11   require its customers to individually arbitrate the claims brought by Intervenors.  Accordingly, each

12   Intervenor, alongside tens of thousands of Intuit's customers, filed a demand for individual

13   arbitration against Intuit.  But now, rather than proceed with its customers' individual arbitrations

14   as its Terms of Service require, Intuit has entered into a proposed settlement agreement with the

15   class representatives in this action—who themselves have been compelled to arbitration—which

16   would enjoin Intervenors' arbitrations and waive their claims unless Intervenors navigate a

17   burdensome opt-out process without the assistance of their hired counsel, all for wholly inadequate

18   consideration.  Accordingly, because the parties' motion for preliminary settlement approval

19   would, if granted, immediately impair Intervenors' substantive rights, because the proposed class

20   cannot be certified, and because the proposed settlement is not fair, reasonable, or adequate, the

21   Plaintiff-Intervenors request that this Court issue an order:

22       1.  Allowing them to intervene in this action under Federal Rule of Civil Procedure 24;

23       2.  Denying the motion for preliminary approval of the proposed settlement agreement,

24           Dkt. 162; and

25       3.  Granting such other relief as the Court deems just and proper.

26       This motion is based on this notice of motion, the attached memorandum of points and

27   authorities, the declaration of Warren Postman, all records on file with this Court, and such

28   further oral and written arguments as may be presented at, or prior to, the hearing on this matter.

1

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 3

I.    Intuit Eliminates Consumer-Fraud Class Actions by Compelling Arbitration ................... 3

II.   Barred from Court, Intuit Customers Initiate Arbitrations.................................... 4

III.  Intuit Switches Course and Tries to Avoid Arbitration ...................................... 5

IV.   Intuit Tries to Impede the Arbitrations Through a Class Settlement ......................... 6

ARGUMENT ......................................................................................................... 8

I.    Intervention is Proper ................................................................................ 8

II.   The Proposed Settlement Violates Arbitration Claimants' Contractual and Statutory
      Rights .......................................................................................................... 9

          A.    The Proposed Settlement Violates Arbitration Claimants' Rights Under the
                Terms .......................................................................................... 9

          B.    Enjoining Separately Pending Arbitrations Would Violate the FAA................ 10

III.  The Proposed Settlement Cannot Satisfy the Requirements for Preliminary Approval
      Under Rule 23 ............................................................................................. 12

          A.    The Proposed Class Does Not Meet the Requirements for Class Certification  12

          B.    The Proposed Settlement Is Not Fair, Reasonable, or Adequate...................... 14

IV.   Arbitration Claimants Would Not Object to a Settlement with a Less Burdensome Opt-
      Out Process, but Intuit Will Not Agree to Such a Process Because the Burdens Are the
      Primary Benefit of the Settlement to Intuit ....................................................... 24

CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ........................................................ 16, 20

*Acosta v. Trans Union, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) .................................................................. 22, 24

*Am. Online, Inc. v. Superior Court*,
  90 Cal. App. 4th 1, 108 Cal. Rptr. 2d 699 (2001) ............................................ 21

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................... 12

*Arnold v. United Artists Theatre Circuit, Inc.*,
  158 F.R.D. 439 (N.D. Cal. 1994) ...................................................................... 13

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ............................................................................. 14

*Camilo v. Ozuna*,
  No. 18-CV-02842-VKD, 2019 WL 2141970 (N.D. Cal. May 16, 2019) ............ 15

*Camping Constr. Co. v. Dist. Council of Iron Workers*,
  915 F.2d 1333 (9th Cir. 1990) ........................................................................... 11

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
  647 F.3d 893 (9th Cir. 2011) ........................................................................... 8, 9

*In re Cmty. Bank of N. Va.*,
  418 F.3d 277 (3d Cir. 2005) ................................................................................ 9

*Dohrmann v. Intuit Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ............................................................... 4, 6, 13

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................. 12

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ....................................................................................... 11

*Ferrington v. McAfee, Inc.*,
  No. 10-CV-01455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ............... 23

*In Re Galena Biopharma, Inc. Secs. Litig.*,
  No. 3:14-cv-367-SI, 2016 WL 10860009 (D. Or. Feb. 8, 2016) ........................ 18

**CASES (cont.)**                                                               **PAGE(s)**

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) .................................................................. 20

*Gomes v. Eventbrite, Inc.*,
   No. 5:19-CV-02019-EJD, 2020 WL 6381343 (N.D. Cal. Oct. 30, 2020) ........................... 8, 9

*Hadley v. Kellogg Sales Co.*,
   No. 16-CV-04955-LHK, 2020 WL 836673 (N.D. Cal. Feb. 20, 2020) ............... 15, 16, 18, 24

*Haight v. Bluestem Brands, Inc.*,
   No. 6:13-cv-1400-Orl-28KRS, 2015 WL 12835994 (M.D. Fla. June 1, 2015) ..................... 23

*Haight v. Bluestem Brands, Inc.*,
   No. 6:13-cv-1400-Orl-28KRS, 2015 WL 12830482 (M.D. Fla. May 14, 2015) ................... 23

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ................................................................ 13

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
   No. 3:12-CV-06003-CRB, 2014 WL 7240144 (N.D. Cal. Dec. 19, 2014) ........................... 15

*Jolly v. Intuit Inc.*,
   No. 20-CV-04728-CRB, 2020 WL 5434503 (N.D. Cal. Sept. 10, 2020) ............................. 13

*JPA Furniture Inc. v. Glob. Check SVC.*,
   No. 08 CV 0978 BEN (BLM), 2009 WL 10672499 (S.D. Cal. May 18, 2009) .................... 24

*Kakani v. Oracle Corp.*,
   No. C 06-06493 WHA, 2007 WL 1793774 (N.D. Cal. June 19, 2007) ................................. 21

*Knight v. Concentrix Corp.*,
   No. 4:18-cv-07101-KAW, 2019 WL 3503052 (N.D. Cal. Aug. 1, 2019) ............................. 17

*Koby v. ARS Nat'l Servs., Inc.*,
   846 F.3d 1071 (9th Cir. 2017) ............................................................... 22

*Livingston v. MiTAC Digital Corp.*,
   No. 18-CV-05993-JST, 2019 WL 8504695 (N.D. Cal. Dec. 4, 2019) ................................. 19

*Marcotte v. Micros Sys.*,
   No. CV14-01372 LB, 2014 WL 5280875 (N.D. Cal. Oct. 14, 2014) ................................... 10

*Martin v. FedEx Ground Package Sys., Inc.*,
   No. 06-cv-6883, 2008 WL 11389034 (N.D. Cal. July 8, 2008),  .................................. 7, 21

*Mirfasihi v. Fleet Mortg. Corp.*,
   356 F.3d 781 (7th Cir. 2004) ............................................................... 20, 21

**CASES (cont.)**                                                                          **PAGE(s)**

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ................................................................................................... 11

*In Re MyFord Touch Consumer Litig.*,
    No. 13-cv-03072-EMC, 2018 WL 10539267 (N.D. Cal. June 7, 2018) ......................... 17, 21

*Newman v. AmeriCredit Fin. Servs., Inc.*,
    No. 11cv3041 DMS (BLM), 2014 WL 12789177 (S.D. Cal. Feb, 3, 2014) ...................... 16

*O'Connor v. Uber Techs., Inc.*,
    201 F. Supp. 3d 1110 (N.D. Cal. 2016) .................................................................. 14, 18, 23

*Pa. Bureau of Corr. v. U.S. Marshals Serv.*,
    474 U.S. 34 (1985) ................................................................................................... 11

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ................................................................................... 17

*Peruta v. Cty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ..................................................................................... 8

*In re Piper Funds, Inc., Inst. Gov't Income Portfolio Litig.*,
    71 F.3d 298 (8th Cir. 1995) ..................................................................................... 10

*In re Portal Software Inc., Secs. Litig.*,
    No. C–03–5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ................................ 20

*Rimler v. Postmates, Inc.*,
    No. CGC-18-567868 (S.F. Super. Ct. Nov. 26, 2019) ..................................................... 20

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ............................................................................. 12, 15

*Saeyoung Vu v. Fashion Inst. of Design & Merch.*,
    No. CV 14-08822 SJO (EX), 2015 WL 13545194 (C.D. Cal. Dec. 14, 2015) ...................... 23

*Smothers v. NorthStar Alarm Servs., LLC*,
    No. 2:17-cv-00548-KJM-KJN, 2019 WL 3080822 (C.D. Cal. July 15, 2019) ...................... 16

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .............................................................................. 12, 15

*In re TD Ameritrade Accountholder Litig.*,
    266 F.R.D. 418 (N.D. Cal. 2009) ......................................................................... 20, 22

*Trauth v. Spearmint Rhino Companies Worldwide, Inc.*,
    No. EDCV 09-1316-VAP-DTBX, 2010 WL 11468628
    (C.D. Cal. July 26, 2010) ......................................................................................... 18

1

**CASES (cont.)**                                                                                   **PAGE(s)**

2

*True v. Am. Honda Motor Co.*,

3
　　No. EDCV07-287-VAPOPX, 2009 WL 838284 (C.D. Cal. Mar. 25, 2009)......................... 18

4
*United States v. Park Place Assocs., Ltd.*,
　　563 F.3d 907 (9th Cir. 2009)........................................................................................ 10

5
*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Litig.*,

6
　　MDL No. 2672 CRB (JSC), 2018 WL 6198311 (N.D. Cal. Nov. 28, 2018)................... 16, 20

7
*Willner v. Manpower Inc.*,

8
　　No. 11-CV-02846-JST, 2014 WL 4370694 (N.D. Cal. Sept. 3, 2014).................................. 15

9
*Zepeda v. U.S.I.N.S.*,
　　753 F.2d 719 (9th Cir. 1983)........................................................................................ 8

10
**STATUTES**

11
9 U.S.C. § 2 .......................................................................................................................... 10

12
15 U.S.C. § 7001 .................................................................................................................. 17

13
28 U.S.C. § 1651 .................................................................................................................. 10

14
28 U.S.C. § 2072 .................................................................................................................. 11

15
Cal. Bus. & Prof. Code §§ 17200 *et seq.* .......................................................................... 4

16
Cal. Civ. Code § 1633.5 ....................................................................................................... 17

17
Fed. R. Civ. P. 23 ................................................................................................................. 20

18
Kan. Stat. Ann. § 50-636 .................................................................................................... 4

19
N.Y. Gen. Bus. Law § 349 ................................................................................................... 4

20
**OTHER AUTHORITIES**

21
Addendum to Free File (Eighth) Mem. of Understanding (Dec. 26, 2019)................................. 22

22
Federal Trade Commission*, .com Disclosures How to Make Effective Disclosures*

23
　　*in Digital Advertising*, (March 2013)................................................................. 22

24
FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of*
　　*Settlement Campaigns* (September 2019) ...................................................... 19

25

26
Intuit's Mem. Supp. Mot. Summ. Adjudication, *TurboTax Free Filing Cases*,

27
　　JCCP No. 5067 (L.A. Super. Ct. July 13, 2020).................................................... 22

28

1

**OTHER AUTHORITIES (cont.)**                                                                 **PAGE(s)**

Intuit's Opp'n to Prelim. Inj., *Intuit Inc. v. 9,933 Individuals*,
    No. 20STCV22761 (L.A. Super. Ct. Nov. 6, 2020).................................................. 9

N.D. Cal. Procedural Guidance for Class Action Settlements § 4 ......................................... 19, 21

Tentative Ruling Re: Pls.' Mot. Prelim. Approval, *Marciano v. DoorDash Inc.*,
    No. CGC-18-567869 (S.F. Super. Ct. Apr. 24, 2020) ...................................... 17, 20

Tr. of Proceedings, *In re MyFord Touch Consumer Litig.*,
    No. 13-CV-03072-EMC (N.D. Cal. June 22, 2018), ECF No. 454 ................................. 17, 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Intuit wants to have it both ways.  Facing serious allegations that it defrauded low-income taxpayers, Intuit happily enforced its Terms of Service (the "Terms") to force this putative class action out of court and require that consumers bring their claims in individual arbitrations.  Over interim class counsel's argument to the contrary, the Ninth Circuit enforced Intuit's contract to the letter (and beyond), holding that all claims for relief, legal and equitable, must be arbitrated.  But now that tens of thousands of consumers (the "Arbitration Claimants") have individually retained Keller Lenkner LLC to arbitrate their claims, Intuit pretends as if only Intuit can enforce the Terms. First, Intuit argued that the American Arbitration Association ("AAA") should send the Arbitration Claimants to small claims court, where many could not seek injunctive relief or be represented by a lawyer.  When AAA refused to close the arbitrations, Intuit sued its customers in state court to stop their arbitrations.  When the state court rejected Intuit's request, Intuit returned to the interim class counsel it defeated in this action and negotiated a settlement designed to burden the Arbitration Claimants' ability to proceed with arbitrations.

Intuit has been remarkably forthright about its intent.  Even though the Arbitration Claimants represent fewer than 0.8% of the proposed class, Intuit has said it will not proceed with the class settlement unless it includes them.  Moreover, Intuit will terminate the entire settlement unless the Arbitration Claimants' arbitrations are immediately enjoined.  And although the proposed settlement would allow class members to submit claims electronically, class members would be able to get out of the settlement only if they submit a physical "wet ink" signature along with a unique ID number that many of them will never see.

Intuit's goal is obvious: the company wants to enjoy all the benefits of class proceedings without bearing the burdens.  Class proceedings benefit plaintiffs (and burden defendants) by dramatically increasing the efficiency with which large groups of consumers can obtain a remedy for lower-value claims.  But class proceedings also benefit defendants (and burden plaintiffs). Unlike in bilateral litigation, a plaintiff's failure to respond to a class settlement offer constitutes acceptance, such that a silent class member loses her rights even if she never expressly agrees to release her claims.  In that sense, a class settlement notice is a self-actuating settlement offer.  Intuit

denied consumers the benefits of a class action and forced them to pursue their claims individually through a far less efficient process.  But now that the Arbitration Claimants have hired counsel and borne significant costs to pursue their arbitrations, Intuit wants to resurrect the defense-side benefit of a class resolution by sweeping the Arbitration Claimants into a facially inadequate settlement and impeding their ability to opt out.  This self-serving effort should be rejected for two reasons.

First, the proposed settlement violates the Arbitration Claimants' contractual and statutory rights.  The Terms require that Intuit as well as consumers resolve all disputes in arbitration.  Intuit is now willing to waive its rights under that agreement (for purposes of settlement only, of course).  But Intuit cannot waive the Arbitration Claimants' right to avoid the burdens of a class proceeding in court.  Further, Intuit has conditioned the settlement on this Court enjoining separately pending arbitrations, which would be a clear violation of the Federal Arbitration Act ("FAA").

Second, the proposed settlement cannot meet the requirements for a class settlement, particularly in light of the heightened scrutiny that applies to pre-certification settlements like this one.  Interim class counsel is conflicted because Intuit has asked them to trade off the interests of consumers who want to arbitrate their claims to benefit consumers who do not.  The overwhelming majority of class members stood to obtain nothing from this action because this case has already been compelled to arbitration and most absent class members are not willing to pursue their claims in that forum.[1]  But the class members who have pursued arbitrations can anticipate a substantial recovery.  Intuit has admitted that claimants who proceed with arbitrations can expect to recover more than those who do not.  Indeed, Intuit has already offered some Arbitration Claimants settlements averaging hundreds of dollars, and most have refused those offers as inadequate.

Intuit went to interim class counsel with a simple deal: Agree to a settlement that would give all class members a one-size-fits-all payment of about $28—regardless of the expected value of their claims—and you can petition for millions of dollars in fees with no objection from us.

---

[1] Although absent class members could not expect any recovery from this action after they were compelled to arbitration, they can still obtain meaningful restitution through one of the government enforcement actions now pending against Intuit.  As explained in the *amicus* brief filed by the Office of the Los Angeles City Attorney and the Office of the County Counsel of Santa Clara, the proposed settlement could imperil those remedies too.  *See* ECF 176-1 at 11-15.

Refuse this offer and you will get nothing.  In return, Intuit demanded a set of requirements that would burden the Arbitration Claimants' ability to proceed with arbitration—including an injunction against the arbitrations, a "wet ink" signature, and a unique ID number—before they can avoid the sort of class-action resolution Intuit promised not to employ.  These requirements violate this District's Procedural Guidance for Class Action Settlements and are routinely rejected by courts.  But Intuit could not afford to be subtle about the nature of the bargain it has struck: it needs these impermissible burdens in order to accomplish the primary purpose of the deal, which is to interfere with the Arbitration Claimants' arbitrations.

Intuit's game is obvious for another reason: the Arbitration Claimants would not object to inclusion in a class settlement if it offered an <u>unimpeded</u> choice to preserve their right to arbitration.  Specifically, the Arbitration Claimants would not object to the settlement if class members who individually retained counsel could communicate their desire to opt out through counsel.  Counsel regularly update each client about the status of his or her case and will advise each client on how to proceed regarding any settlement.  If the Court allows the Arbitration Claimants to communicate through their separately retained counsel, undersigned counsel would ask each Arbitration Claimant to make an individual choice regarding whether to participate in the settlement and then would communicate that choice to the Court.  But Intuit will never agree to those terms because it is relying on a burdensome opt-out process to obstruct and confuse the Arbitration Claimants into losing their rights without affirmative consent.  That is the very process Intuit promised by contract not to use.  This Court should not endorse Intuit's "contracts for me but not for thee" hypocrisy.

## **BACKGROUND**

## I.    **Intuit Eliminates Consumer-Fraud Class Actions by Compelling Arbitration**

TurboTax, an Intuit product, is the nation's leading online tax-preparation and filing software.  TurboTax occupies about two-thirds of the online tax filing market.  *See* Decl. of Warren Postman ¶ 21, Ex. B.  TurboTax's success was based in large part on a "free to fee" scheme in which Intuit lured low-income taxpayers to its website with the promise of free tax-filing services, and then deceived them into paying for tax filing products they could have obtained for free.  *See generally id.*, Ex. B.

No fewer than eight class-action lawsuits have been filed alleging consumer-protection claims against Intuit. *See generally* Docket, *In re Intuit Free File Litig.*, No. 3:19-cv-02546-CRB (N.D. Cal. May 12, 2019). Eager to avoid facing these claims in court, Intuit moved to compel arbitration under the Terms. The Terms state that "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify." Terms ¶ 14, Postman Decl. Ex. A. As Intuit told this Court, "the Terms clearly and unmistakably required" that claims be resolved in arbitration rather than court. Intuit's Mot. to Compel Arbitration at 2, Dkt. 97. Intuit also represented that "[n]othing in either the Terms or California law prevents plaintiffs from obtaining public injunctive relief via arbitration." *Id.* at 17. The Ninth Circuit agreed, finding that consumers' claims must be resolved in arbitration. *See Dohrmann v. Intuit Inc.*, 823 F. App'x 482, 483–85 (9th Cir. 2020).

## II.     Barred from Court, Intuit Customers Initiate Arbitrations

Starting in October 2019, tens of thousands of consumers filed arbitrations against Intuit. Postman Decl. ¶ 5. Each Arbitration Claimant individually retained Keller Lenkner LLC and filed his or her own demand for individual arbitration with AAA, pursuing consumer-fraud and antitrust claims. *Id.* ¶¶ 6–8. The value of the Arbitration Claimants' consumer-fraud claims varies significantly depending on state law. For example, a violation of Kansas's consumer-protection act comes with a statutory penalty, which cannot be waived by contract, of up to $10,000 per violation. KAN. STAT. ANN. § 50-636. A violation of New York's consumer-protection law carries a statutory penalty of $500 per violation or treble damages up to $10,000. N.Y. GEN. BUS. LAW § 349. By contrast, California's Unfair Competition Law imposes no statutory penalties and provides only for restitution. CAL. BUS. & PROF. CODE §§ 17200 *et seq.* Including the statutory penalties from across the country, the average amount in controversy for each Arbitration Claimant is $2,700. *See* Postman Decl. ¶ 9.[2]

---

[2] Class-action plaintiffs tend to ignore state-specific statutory remedies in order to ease their path to class certification—yet another advantage of class proceedings for defendants.

The individual arbitrations imposed by Intuit's Terms require Intuit and its customers to pay various fees.  For customers to bring an arbitration in the first place, AAA requires a filing fee from the consumer.  *See id.* ¶ 11, Exs. C, D.  That filing fee is either $200 or $50 (AAA recently amended its fee schedule to lower its fees).  *Id.*  Collectively, the Arbitration Claimants submitted about $8 million in filing fees.  *Id.* ¶ 12.  Under the Terms, Intuit agreed to reimburse each claimant's filing fee so long as his or her claims are not frivolous.  Terms ¶ 14.  Intuit also owes AAA filing fees of $300 or $75 per arbitration.  Postman Decl., Exs. C, D.  And Intuit is responsible for a $1,400 case management fee and a $1,500 arbitrator compensation fee per arbitration.  *Id.*

Although the logistics of pursuing tens of thousands of arbitrations against Intuit is no small feat, counsel is not new to this process.  By investing millions of dollars in human resources, proprietary software, and other infrastructure, Keller Lenkner has built a process to vindicate the rights of individuals who, like Intuit's consumers, are denied the right to bring class-action claims.  *See id.* ¶ 28.  In the last two years, Keller Lenkner has secured over $190 million in recoveries for more than 100,000 individual arbitration clients (almost $2,000 per claimant on average).  *Id.* ¶ 29.

### III.    Intuit Switches Course and Tries to Avoid Arbitration

Faced with tens of thousands of individual arbitrations, Intuit canceled its membership in the arbitration fan club.  Intuit first raised a litany of challenges with AAA.  Intuit challenged the way Arbitration Claimants filed demands and the fees Intuit owed under AAA rules.  *See id.* ¶ 43, Ex. I.  Intuit baselessly asserted that the Arbitration Claimants' claims were "frivolous."  *See id.*  Intuit attacked AAA's ability to administer arbitrations neutrally.  *See id.*  Intuit asserted that it could unilaterally force nearly every Arbitration Claimant out of arbitration and into small claims court, where the Arbitration Claimants would face significant disadvantages.  *See id.* ¶ 44.  And Intuit even threatened AAA with "legal risk" if it did not close the Arbitration Claimants' arbitrations.  *See id.*, Ex. I at I-44.  AAA rejected each challenge multiple times.  *See id.* ¶ 45.

When its saber-rattling failed to stop AAA from moving the arbitrations forward, Intuit sought an injunction in California state court requiring the Arbitration Claimants to bring claims in small claims court.  *See id.* ¶¶ 50–51.  The court rejected Intuit's request, reasoning that the plain language of the Terms gave only the consumers the option to elect small claims court, not Intuit,

and that the Arbitration Claimants' antitrust claims fell outside the jurisdiction of state small claims court and would have to proceed in arbitration in all events. *See id.*, Ex. J. As the court explained:

> When Intuit wrote a broad arbitration agreement with a class action waiver, it gained the protection from large class action verdicts. But it gave up the real administrative efficiencies that class actions bring. . . . In this case, Intuit is a bit like the dog that caught the car. It got the Consumers' claims out of class litigation and into arbitration, then realized that this was a large class and that resolving the claims individually would be hopelessly expensive.
>
> The question presented to the court here is whether Intuit has a viable way out if its own box. And the answer is no.

*Id.* at 15.

## IV. Intuit Tries to Impede the Arbitrations Through a Class Settlement

Intuit and Keller Lenkner scheduled a mediation for July 2020. *See id.* ¶ 16. At Intuit's request, the Arbitration Claimants made an initial demand shortly before the mediation. *Id.* ¶ 17. In response, Intuit called off the mediation, saying the parties were "too far apart" but that it expected it would mediate in the future with the Arbitration Claimants. *Id.* ¶ 18, Ex. E.

But after successfully compelling this case to arbitration, *see Dohrmann*, 482 F. App'x 482, Intuit recognized it could get a better deal from interim class counsel. The settlement would offer $40 million to resolve 19 million class members' claims. *See* Mot. at 6. Based on the predicted claims rate, class members submitting a claim would receive about $28 to release all claims from 2015 through 2020, even though the average amount paid to Intuit in a <u>single</u> year was about $100. *See id.* at 16–17. Tellingly, Intuit has been offering substantially more to settle certain Arbitration Claimants' claims. To date, Intuit has made 101 settlement offers to Arbitration Claimants; each time, it offered 100% of out-of-pocket damages for <u>each</u> year the claimant had a claim. *See* Decl. of Stephen M. Bundy ¶ 3.f, Postman Decl., Ex. F. Because the claims typically covered three or more years, the offers were generally six to 15 times higher than the proposed settlement. Postman Decl. ¶ 19. Even then, only 23 of 101 Arbitration Claimants accepted. *Id.* For most Arbitration Claimants, given the time and money spent pursuing these claims, a 100% refund is not enough.[3]

---

[3] The settlement offers contained a confidentiality provision. But Intuit nonetheless disclosed the above information in a public filing. *See* Postman Decl., Ex F.

Intuit has acknowledged one reason why the Arbitration Claimants' claims are far more valuable than the absent class members' claims: The Arbitration Claimants can command a "premium to reflect Intuit's potential arbitration costs." Bundy Decl. ¶ 3.f. But there are other reasons as well. Most significantly, many Arbitration Claimants have pursued claims for statutory damages under the consumer-protection laws of their respective states and treble damages under the federal antitrust laws, which together allow for recovery of significantly more than out-of-pocket damages, as well as attorneys' fees. *See* Postman Decl. ¶¶ 6–8. And any settlement with an Arbitration Claimant must also reflect Intuit's agreement to reimburse each AAA filing fee of either $50 or $200. Terms ¶ 14. Thus, each Arbitration Claimant can expect to recover significantly more than an absent class member who does not pursue arbitration.

Intuit has made clear that undermining the Arbitration Claimants' arbitrations is an essential feature of the proposed settlement. First, while the Arbitration Claimants make up fewer than 0.8% of the class, Intuit will terminate the settlement if some undisclosed portion of the Arbitration Claimants are able to opt out of it. *See* Settlement Agreement at 32, ECF 162-1 ("Settlement Agreement").[4] Second, although a class member can participate in the settlement by submitting an electronic form online, opting out of the settlement requires that a class member handwrite or print out an opt-out request (no form is provided), include a unique settlement ID number that is unlikely to make it past class members' spam folder, sign in "wet ink" and then stamp and mail the request to the settlement administrator. *See id.* at 26. Third, Intuit will terminate the settlement if it does not obtain an immediate injunction staying ongoing arbitrations. *See id.* at 32. Though Intuit tells this Court the stay is needed for orderly administration of the settlement, Mot. at 21, it told the California Court of Appeal it wants a stay to avoid paying arbitration fees, Postman Decl. ¶ 54.

---

[4] The Arbitration Claimants do not know how many of them would need to opt out before Intuit could walk away from the settlement. Intuit and interim class counsel agreed on that number in a "side letter." Mot. at 10. Because it clearly is pertinent to their rights, *Martin v. FedEx Ground Package Sys.,* Inc., No. 06-cv-6883, 2008 WL 11389034, at *8 (N.D. Cal. July 8, 2008), the Arbitration Claimants asked to see the letter, but interim class counsel denied the request. Postman Decl. ¶¶ 38–41, Ex. H.

1                                    **ARGUMENT**

2        The motion for preliminary approval should be denied because the proposed settlement both

3 violates the rights of the Arbitration Claimants and fails to meet the class certification and

4 settlement requirements of Federal Rule of Civil Procedure 23.

5 **I.**      **Intervention is Proper**

6        The intervenors are nine Intuit consumers, each of whom (1) hired Keller Lenkner LLC,

7 (2) is currently pursuing individual arbitrations against Intuit, and (3) opposes the proposed

8 settlement (the "Intervenors").  Intervenors have an obvious interest justifying intervention.  Most

9 simply, the motion for preliminary approval <u>seeks an injunction</u> against Intervenors, and it is a basic

10 principle of due process that a party should be given the opportunity to be heard before being

11 subjected to an injunction.  *See Zepeda v. U.S.I.N.S.*, 753 F.2d 719, 727–29 & n.1 (9th Cir. 1983).

12 Interim class counsel has agreed.  *See* CMC Hr'g Tr. 19:19-20 ("[I]t seems like [intervenor's

13 counsel] should be heard."), Postman Decl., Ex. N.

14        Intervenors also easily satisfy the standard for intervention as of right under Federal Rule

15 of Civil Procedure 24(a)(2), because they have (1) a "significant protectable interest" relating to

16 the subject of the action; (2) the disposition of the action might "impair or impede" their ability to

17 protect that interest; (3) their application is timely; and (4) the existing parties might not adequately

18 represent the applicant's interest.  *Peruta v. Cty. of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016).

19        <u>Significant protectable interest</u>: An interest is significantly protectable if it is protectable

20 under "some law" and has a relationship with the claims at issue.  *Citizens for Balanced Use v.

21 Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).  The parties seek an injunction

22 overriding the Intervenors' contractual right to arbitration and a settlement process that could

23 release both the arbitration rights and the underlying statutory rights of Intervenors.  Intervenors

24 therefore have a significantly protectable legal interest at issue in this litigation.  *See Gomes v.

25 Eventbrite, Inc.*, No. 5:19-CV-02019-EJD, 2020 WL 6381343, at *3 (N.D. Cal. Oct. 30, 2020).

26        <u>Settlement would impair the ability to protect interests</u>: The motion for preliminary approval

27 could "impair or impede" the ability of the arbitration claimants to prosecute their claims by  (1)

28 enjoining the arbitrations (2) purporting to release the claims at issue in the arbitrations,

(3) imposing a burdensome opt-out process, and (4) limiting the ability to rely on assistance of chosen counsel. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (noting that the first two prongs are satisfied by the very nature of Rule 23 litigation).

The motion to intervene is timely: At the request of Intuit and interim class counsel, this Court set the deadline to intervene as November 30, 2020, the date of this filing.

Intervenors' interests are not adequately protected by the existing parties: Establishing inadequacy of representation presents a "minimal" burden, and applicants succeed if they "can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898. The Intervenors easily exceed that burden here; among other things, the parties seek an injunction—i.e., they are directly adverse. *See Gomes*, 2020 WL 6381343, at \*4.

## II.    The Proposed Settlement Violates Arbitration Claimants' Contractual and Statutory Rights

The proposed settlement violates both the contractual and statutory rights of the Arbitration Claimants.

### A.    The Proposed Settlement Violates Arbitration Claimants' Rights Under the Terms

The Terms are unequivocal that "any dispute" must be "resolved by binding arbitration rather than in court." Terms ¶ 14. The only exception is that consumers may bring qualifying claims in small claims court. *Id.* Intuit now wants to create a new "settlement" exception that gives Intuit the right to resolve disputes currently being arbitrated through a class-wide settlement in the very Court it previously fought to avoid. No such exception exists.

When Intuit faced this argument in state court, it did not dispute that including the Arbitration Claimants in a class settlement breaches the plain meaning of its arbitration agreement. *See* Intuit's Opp'n to Prelim. Inj. at 14–15, *Intuit Inc. v. 9,933 Individuals*, No. 20STCV22761 (L.A. Super. Ct. Nov. 6, 2020). Instead, Intuit brushed aside its breach by saying that a right to arbitration can be waived, that Intuit is waiving it, and that the Arbitration Claimants are free to waive it too. *Id.* at 14. That Intuit now wants to waive its right to arbitration, however, is irrelevant unless the consumers also waive their right to arbitration. The Arbitration Claimants have not waived their right to avoid class proceedings in court, and the unnecessarily burdensome hurdles

do not provide class members an opportunity to adequately exercise their free choice to waive that right. *See Marcotte v. Micros Sys.*, No. CV14-01372 LB, 2014 WL 5280875, at *4 (N.D. Cal. Oct. 14, 2014); *cf. United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 921 (9th Cir. 2009) ("[A]ny party arguing waiver of arbitration bears a heavy burden of proof.").[5]

## B. Enjoining Separately Pending Arbitrations Would Violate the FAA

The FAA requires that agreements to arbitrate be respected as "valid, irrevocable, and enforceable." 9 U.S.C. § 2. But Intuit has asked this Court to render the arbitration agreement with the Arbitration Claimants unenforceable by enjoining the arbitrations pending judicial proceedings. Mot. at 21–25. Unless and until an Arbitration Claimant affirmatively agrees to waive their right to arbitrate, enjoining that Claimant's ongoing arbitration would be a violation of the FAA.

That the injunction would be temporary is of no import. Setting aside that the entire purpose of arbitration is to <u>avoid</u> delay, the FAA's requirement that arbitration agreements be enforced contains no caveats that agreements must "eventually" be enforceable; they must be enforceable at all times. That is why courts have specifically rejected the notion that a district court may enjoin arbitration to facilitate administration of a class-action settlement. *In re Piper Funds, Inc., Inst. Gov't Income Portfolio Litig.*, 71 F.3d 298, 302-303 (8th Cir. 1995) (reversing a temporary injunction against a pending arbitration because "[claimant's] contractual and statutory right to arbitrate may not be sacrificed on the altar of efficient class action management").

Intuit and interim class counsel ask this Court to enjoin tens of thousands of ongoing arbitrations under the All Writs Act. Pls.' Mot. for Prelim. Approval of Class Action Settlement at 21-22, ECF No. 162 ("Motion"). But the All Writs Act gives courts the authority to issue writs only as necessary (1) "in aid of their respective jurisdictions," and (2) "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Nothing about the ongoing, valid arbitrations encroaches

---

[5] Intuit sued a group of Arbitration Claimants in state court before Judge Terry Green, seeking to stay those claimants' arbitrations. Postman Decl. ¶ 50. On October 28, 2020, those claimants also requested a preliminary injunction preventing Intuit from including them in any settlement agreement. *Id.* ¶ 56. But Intuit signed the agreement before the motion could be heard on November 20, 2020. *Id.* ¶ 57. After learning that Intuit already signed the proposed settlement, Judge Green denied the request for an injunction as moot. *Id.* ¶¶ 57–59.

on this Court's jurisdiction.  The Arbitration Claimants are not attempting to deplete any monies from the proposed settlement fund, and the fact that Intuit would <u>like</u> the arbitrations to stop does not mean they interfere with the Court's jurisdiction.  Moreover, enjoining arbitrations so Intuit can pursue a settlement is not "agreeable to the usages and principles of law."  The Arbitration Claimants have a substantive right under the FAA to enforce their arbitration agreement.  "Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling."  *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

The motion for preliminary approval also relies on cases invoking Rule 23(d) to enjoin other state and federal court actions.  *See* Mot. at 22–23.  As an initial matter, nearly all the cited cases enjoin court proceedings, not arbitrations; and none explains how enjoining an arbitration could be reconciled with the FAA.  Language adopted from a proposed order submitted by settling parties, and never considered or analyzed in an adversarial posture, does not justify using Rule 23 to override the FAA.  As defendants have successfully argued for years, there is no class action exception to FAA; quite the opposite.  *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). No provision in the Federal Rules of Civil Procedure (including Rule 23) may "abridge, enlarge, or modify any substantive right."  28 U.S.C. § 2072(b).  And the Arbitration Claimants' contractual and statutory rights are substantive in nature.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("The [FAA creates] a body of federal <u>substantive law</u> of arbitrability . . . ." (emphasis added)).  To the extent a conflict exists between Rule 23 and contractually protected rights under the FAA, the FAA must prevail.[6]

---

[6] Rather than explain how procedural rights under Rule 23 could override the substantive rights afforded by the FAA, the motion for preliminary approval appeals to a policy argument: that it would be unfair to let the arbitrations proceed because Intuit would have to pay fees and expenses for the arbitrations. *Id*. at 22–25.  Putting aside the oddity of interim class counsel supporting cost savings for Intuit at the expense of absent class members, Intuit suffers no irreparable harm, as a matter of law, just by paying fees. *See Camping Constr. Co. v. Dist. Council of Iron Workers,* 915 F.2d 1333, 1349 (9th Cir. 1990) ("The district court's principal error lies in its assumption that unnecessarily undergoing arbitration proceedings constitutes irreparable injury.  That is simply not the case.").  Intuit agreed to pay those fees and expenses when it drafted the Terms and forced its customers to agree to them; it is not irreparably injured by the need to comply with its own contract.

III.    **The Proposed Settlement Cannot Satisfy the Requirements for Preliminary Approval Under Rule 23**

Preliminary approval of a class settlement requires a court to find that the proposed class satisfies the requirements of Rule 23(a) and that the settlement is fair, reasonable, and adequate. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). While class settlements are always subject to rigorous review, courts must pay heightened attention where the class is being certified solely for settlement purposes. *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049-50, n.13 (9th Cir. 2019). Here, Intuit negotiated the proposed settlement with counsel who had already been deprived of the ability to pursue class-action litigation. And it likely did so in haste to preempt the Arbitration Claimants' attempts to seek a declaration of their rights in state court. As a result of this hasty reverse auction, the proposed settlement is riddled with dubious provisions, inconsistencies, and errors, and it cannot meet the requirements for class certification or settlement approval.

A.    **The Proposed Class Does Not Meet the Requirements for Class Certification**

The parties here cannot meet the basic elements for certifying a litigation class because interim class counsel and the class representatives have a significant conflict with the Arbitration Claimants and the class representatives' claims are not typical of the class.

1.    **Interim class counsel and class representatives have a significant conflict**

For a court to certify a class under Rule 23, the class representatives must "fairly and adequately protect the interests of the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). The adequacy requirement therefore is not met if "the named plaintiffs and their counsel have any conflicts of interest with putative class members." *Id.*; *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). Here, a significant conflict between absent class members and the Arbitration Claimants renders both the class representatives and interim class counsel inadequate for purposes of class certification.

The Arbitration Claimants have been pursuing arbitrations for months (some for more than a year), asserting a broader set of claims than the class representatives here. Those arbitrations are ongoing, with millions of dollars having already been spent by the Arbitration Claimants to move

forward.  By Intuit's own admission, the Arbitration Claimants stand to recover <u>at least</u> hundreds of dollars on average if they proceed with arbitration.  Yet interim class counsel and Intuit have lumped all absent class members into a single class receiving a one-size-fits-all payout expected to be about $28.  That structure trades off the value of the Arbitration Claimants' claims to benefit the rest of the class.  Moreover, the class representatives and interim class counsel have agreed to seek an injunction <u>against</u> the Arbitration Claimants.  In bilateral litigation, an attorney could never seek an injunction against one client to benefit another client.  The conflict is no less stark here.

The conflict is highlighted further by the procedural posture of this case: the Ninth Circuit already rejected interim class counsel's effort to pursue class-action litigation.  *Dohrmann*, 823 F. App'x at 483.  Absent a class settlement, no class litigation exists for interim class counsel to pursue.  Yet with interim class counsel holding no cards, Intuit nonetheless offered them a $40 million settlement, including a clear-sailing provision, so they could seek up to $10 million in fees.  Was this an act of pity by Intuit, or did Intuit demand something in return?  The answer is obvious: Intuit demanded, as an express condition of the deal, that interim class counsel agree to a host of provisions tailored to burden the Arbitration Claimants.

### 2.  The class representatives' claims are not typical because they fail to assert valuable claims pursued by the Arbitration Claimants

The class representatives' claims also are not typical of the Arbitration Claimants' claims.  Typicality requires that the claims of the named plaintiffs must arise from the same legal theories as those of the absent class members.  *See Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994).  Otherwise, "[c]onflicts of interest may arise when one group within a larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative."  *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010).

Here, the proposed representatives' claims—which consist solely of claims under California consumer-protection law—simply do not include other claims held by tens of thousands of individuals pursuing claims in arbitration.  First, each Arbitration Claimant is pursuing antitrust claims, which this Court held are colorable.  *Jolly v. Intuit Inc.*, No. 20-CV-04728-CRB, 2020 WL 5434503, at *5 (N.D. Cal. Sept. 10, 2020).  The class representatives never have asserted antitrust

1    claims (either in this court or in arbitration).  Moreover, the Arbitration Claimants have pursued

2    claims for statutory damages under the consumer-protection laws of their respective states, many

3    of which allow recovery for statutory damages far greater than out-of-pocket damages, as well as

4    attorneys' fees.  Intuit itself has argued (when litigation tactics called for a different position) that

5    "Keller Lenkner's clients also differ in the expected value of their claims on the merits, due to the

6    facts of their individual cases and the differences between the various state laws that Keller Lenkner

7    asserts are applicable to their clients' claims."  Bundy Decl. ¶ 3.b, Postman Decl., Ex. F.  Indeed.

8         Finally, tens of thousands of Arbitration Claimants have paid either $200 or $50 to initiate

9    arbitration.  Postman Decl. ¶ 5.  Under the Terms, each claimant has a straightforward contract

10   claim against Intuit for reimbursement of those fees.  The proposed settlement appears to release

11   those claims, yet does not include compensation for them—the expected payout for participating

12   class members is just $28 regardless of whether the class member has a contract claim.  The class

13   representatives therefore are not typical, because they are not pursuing many of the claims they are

14   trying to settle.  *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1131 (N.D. Cal. 2016).

15        **B.  The Proposed Settlement Is Not Fair, Reasonable, or Adequate**

16        The proposed settlement is not fair, adequate, or reasonable.  The opt-out process is unduly

17   burdensome, the settlement allocation is woefully insufficient for the Arbitration Claimants, and

18   the settlement contains a host of features that courts in this District have repeatedly rejected.

19             **1.  A pre-certification settlement agreement is subject to heightened scrutiny**

20        When class settlements are negotiated before a class is certified, courts apply a "higher level

21   of scrutiny for evidence of collusion or other conflicts of interest."  *In re Bluetooth Headset Prod.*

22   *Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  Courts must watch for signs that class counsel and

23   representatives have permitted their own interests to outweigh those of the class, *id.* at 947, and the

24   analysis cannot place "dispositive weight on the parties' self-serving remarks."  *Id.* at 948.[7]  While

25

26   [7] In this setting, courts also place little weight on the presence of a neutral mediator.  *Bluetooth*,
     654 F.3d at 948.  Moreover, counsel for Arbitration Claimants asked to participate in the mediation,
27   but Intuit denied the request, ensuring that counsel could not explain to the neutral mediator the
     Arbitration Claimants' unique interests.  *See* Postman Decl. ¶¶ 33–37.
28

signs of collusion or conflicts can vary, two established red flags are: (1) a "clear sailing" agreement wherein a defendant "will not object to a certain fee request by class counsel," *Roes, 1-2*, 944 F.3d at 1049 (quoting *Allen*, 787 F.3d at 1224); and (2) a broad release of liability from all existing claims, "without regard to whether such claims are in any way related" to claims in the complaint. *Staton*, 327 F.3d at 947.

Here, the most obvious red flag is that Intuit negotiated a settlement with the interim class counsel it already defeated—and that Intuit candidly admits it will not proceed with the settlement unless it obtains relief from the Arbitration Claimants' arbitrations. Moreover, the proposed settlement suffers from both of the red flags identified above. Intuit agreed to a clear-sailing provision. Settlement Agreement at 19–20, ECF 162-1. And the proposed settlement includes a disturbingly broad release, whereby a class member who does not opt out would release absolutely any and all claims "that relate to or arise out of <u>any</u> claims that were or <u>could have been alleged</u>" by <u>any</u> member of the class. *See id.* at 15, 30–31 (emphasis added). Such a broad release is especially troubling here, where the Arbitration Claimants have brought colorable antitrust claims against Intuit in other venues, but the underlying complaint here does not. Courts in this District routinely deny settlement approval on this ground alone. *See In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 3:12-CV-06003-CRB, 2014 WL 7240144, at *5 (N.D. Cal. Dec. 19, 2014) ("The Court is unable to say that it is 'fundamentally fair, adequate and reasonable' to release claims unrelated to the gravamen of this case, claims whose scope and potential merit—and therefore value to the shareholders—cannot possibly be determined at this juncture."); *Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2020 WL 836673, at *2 (N.D. Cal. Feb. 20, 2020) (denying settlement approval where agreement released all claims "arising out of or <u>related in any way</u> to the transactions" because the it would release claims not "based on the identical factual predicate as that underlying the claims in the settled class action"); *Camilo v. Ozuna*, No. 18-CV-02842-VKD, 2019 WL 2141970, at *12 (N.D. Cal. May 16, 2019) (denying preliminary approval because and overly broad release is an obvious deficiency"); *Willner v. Manpower Inc.*, No. 11-CV-02846-JST, 2014 WL 4370694, at *7 (N.D. Cal. Sept. 3, 2014) (concluding that the release was overly broad because it released any claims "related in any way" to any claim in the lawsuit).

Remarkably, the parties appear to recognize that a release of this breadth is impermissible. The Motion for Preliminary Approval tells this Court that "[t]he Settlement release applies to claims arising out of the <u>same factual predicate</u> that were or could have been asserted in this action." Motion at 11 (emphasis added). The Motion therefore assures the Court that the release is consistent with the established requirement that a settlement "cover[] only those claims that are based on the <u>identical factual predicate</u> as that underlying the claims." *Id.* (quoting *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Litig.*, MDL No. 2672 CRB (JSC), 2018 WL 6198311, at *5 (N.D. Cal. Nov. 28, 2018)) (emphasis added). Although counsel assumes the error was inadvertent, the Motion's description of released claims simply is not accurate. The definition of "Released Claims" in the Settlement Agreement and Proposed Order encompasses all claims that "could have been alleged" by any class member, <u>regardless of whether they arise from identical factual predicates</u>. Settlement Agreement at 15. The parties seem to know the governing standard, but have misdescribed the actual terms of the Settlement Agreement in asserting that they meet it.

### 2.   The proposed settlement's opt-out process is unduly burdensome

Courts routinely deny class settlements that impede class members' ability to opt out. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2020 WL 836673, at *8 (N.D. Cal. Feb, 20, 2020); *Smothers v. NorthStar Alarm Servs., LLC*, No. 2:17-cv-00548-KJM-KJN, 2019 WL 3080822, at *8 (C.D. Cal. July 15, 2019); *Newman v. AmeriCredit Fin. Servs., Inc.*, No. 11cv3041 DMS (BLM), 2014 WL 12789177, at *6 (S.D. Cal. Feb, 3, 2014). The proposed settlement contains a litany of unreasonable hurdles to opting out.

<u>The proposed agreement requires a physical "wet ink" signature</u>: To opt out, a putative class member must draft a request for exclusion and sign it with a physical "wet ink" signature; the settlement agreement does not allow for electronic signatures. *See* Settlement Agreement at 26 ("Opt-outs must bear original or PDF copy of class member's hand-written signature."). Courts have repeatedly observed that a "wet ink" signature requirement is unreasonably burdensome. *See Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020) (noting that the wet-ink requirement was "an obvious attempt to make it as hard as possible for petitioners to opt out,

1   thus binding them to the [class] settlement"); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783–84 (7th

2   Cir. 2014) (noting that it was "hard to resist the inference that [the Defendant] was trying to

3   minimize" submissions); *In Re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2018 WL

4   10539267, at *1 (N.D. Cal. June 7, 2018) (denying preliminary approval where proposed settlement

5   "require[d] a claimant seeking [to file a claim] to submit a physical signature rather than an

6   electronic attestation");  Tentative Ruling Re: Pls.' Mot. Prelim. Approval at 7–8, *Marciano v.*

7   *DoorDash Inc.*, No. CGC-18-567869 (S.F. Super. Ct. Apr. 24, 2020) (noting that the "wet-ink"

8   signature requirement "seems onerous"), Postman Decl., Ex. M.

9        There is simply no reason why a proposed settlement would require a "wet ink" signature

10   other than to make opting out of the settlement more burdensome.  The purpose of the opt-out

11   process should be to accurately determine the intent of the class member requesting exclusion.  But

12   electronic signatures are at least as reliable a method of confirming intent as a wet ink signature.

13   Indeed, under California law, an electronic signature is, as a matter of law, as valid as a wet-ink

14   signature.  *See* CAL. CIV. CODE § 1633.5.  And federal law requires that "[n]otwithstanding any

15   statute, regulation, or other rule of law . . .  a signature, contract, or other record relating to [a

16   transaction affecting interstate commerce] may not be denied legal effect, validity, or enforceability

17   solely because it is in electronic form."  15 U.S.C. § 7001.  Intuit is happy to bar consumers from

18   a class action based on electronic assent (through a mouse click) to its Terms.  *See* Intuit's Mot. to

19   Compel Arbitration at 7–8, Dkt. 97.  And it would accept electronic submission for class members

20   who <u>participate</u> in the settlement.  *See* Settlement Agreement at 25.  The only reason to require a

21   wet-ink signature is to make opting out harder.  *See* Tr. of Proceedings, 30:20-22, 31:5-6, *In re*

22   *MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC (N.D. Cal. June 22, 2018), ECF No. 454

23   ("[G]iven the demands of the modern world, we just know there is going to be a fall off [from a

24   physical signature requirement]. . . . [T]he net effect is going to be it just further suppresses the

25   response rate."); *Knight v. Concentrix Corp.*, No. 4:18-cv-07101-KAW, 2019 WL 3503052, at *6

26   (N.D. Cal. Aug. 1, 2019) (rejecting defendant's argument that putative class members must opt in

27   via wet ink, noting that "documents are routinely sent and signed electronically…even taxes").

28

1    The proposed agreement allows claims to be filed online, but requires opts outs to be mailed

2    in hard copy: For putative class members who want to participate in the settlement and file a claim,

3    the settlement agreement provides a pre-written form that can be submitted online. Settlement

4    Agreement at 57. To opt out, a class member must type and print out (or handwrite) an opt-out

5    request and mail the request to the Settlement Administrator; email is not allowed, and the request

6    cannot be submitted online. *Id.* at 58.

7        There are many reasons why the disparate requirements for opting out or participating are

8    improper. First, class members are by definition low-income taxpayers. Requiring that they print

9    an opt-out letter and mail it in is reason alone to reject the proposed settlement. *Hadley*, 2020 WL

10   836673, at *8 (denying preliminary approval of settlement because the opt-out procedure was

11   "needlessly burdensome for class members" where "class members who wish to submit an opt-out

12   form must 'download an Opt-Out Form from the Settlement Website . . . complete the form, and

13   mail it to the Class Administrator'"). Second, there is no reason why an opt-out letter cannot be

14   provided electronically rather than by mail. *O'Connor*, 201 F. Supp. 3d at 1132 n.19 (questioning

15   "the parties' refusal to provide for an easier Rule 23 opt-out mechanism (e.g. using e-mail, opt out

16   forms, or hyperlinks), which would not require drivers to send a written letter by traditional mail to

17   the administrator in order to opt out"); *Trauth v. Spearmint Rhino Companies Worldwide, Inc.*,

18   No. EDCV 09-1316-VAP-DTBX, 2010 WL 11468628, at *16 (C.D. Cal. July 26, 2010) ("Plaintiffs

19   fail to provide a request for exclusion or an opt-out form.") And third, it is improper to make opting

20   out of a settlement more burdensome than participating in it. *True v. Am. Honda Motor Co.*, No.

21   EDCV07-287-VAPOPX, 2009 WL 838284, at *9 (C.D. Cal. Mar. 25, 2009) (denying settlement

22   approval because "[o]pting out should be as convenient as remaining a part of the class") ; *cf. In Re*

23   *Galena Biopharma, Inc. Secs. Litig.*, No. 3:14-cv-367-SI, 2016 WL 10860009, at *1 (D. Or. Feb.

24   8, 2016) (denying preliminary approval because hand delivery or mailing requirement was unduly

25   burdensome and unnecessary where counsel will receive electronic notice anyways).

26       Unique settlement ID: Under the proposed settlement, opting out requires a unique

27   settlement ID. Settlement Agreement at 58. That requirement alone is reason to deny the

28   settlement, as the standards in this District for class-action settlements provide that "no extraneous

information" should be required to opt out of a settlement.  *N.D. Cal. Procedural Guidance for Class Action Settlements* § 4; *see also Livingston v. MiTAC Digital Corp.*, No. 18-CV-05993-JST, 2019 WL 8504695, at \*6 (N.D. Cal. Dec. 4, 2019) (denying settlement approval because "class members do not need to provide their telephone numbers and addresses, contrary to what is currently indicated in the Exclusion Form that class members will use to opt out of the Settlement").  Intuit cannot dispute that the unique settlement ID is extraneous, because that number is not required to participate in the settlement.  *See* Settlement Agreement at 26, 63–65.  If a settlement ID number is not needed to participate in the settlement, then it is by definition "extraneous information" for purposes of deciding class membership.[8]

The requirement is particularly egregious because most class members will likely never see their settlement ID numbers.  Although the parties' submissions do not actually explain how the unique ID will be provided to class members, counsel assumes it will be included in the email notice the parties propose to send to class members.  But the majority of such email notices are likely to be blocked and deleted by spam filters.  In fact, a recent study by the FTC found that emails sent by settlement administrators are opened by only 14% of recipients.  *See* FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* at 30 (September 2019), available at https://kl.link/3lnghg2.

The proposed agreement forbids opting out through counsel:  In the context of this case, the settlement is also unreasonable because it prohibits class members from protecting their right to continue arbitration by opting out through their individually retained counsel.  Settlement Agreement at 26.  Intuit knows that the Arbitration Claimants have each individually signed engagement agreements retaining Keller Lenkner.  Intuit may speak through its directly retained counsel in this Court.  Where an Arbitration Claimant has individually decided that she wants to pursue arbitration and does not want to participate in the settlement, she should have the same right

---

[8] In an added layer of extraneity, opting out (but not filing a claim) requires the arbitration case number in addition to the settlement ID number.  Not only is this requirement on its face unnecessary, it is also impracticable; for thousands of Arbitration Claimants who are pursuing arbitrations, an arbitration case number has not yet been assigned.  Postman Decl. ¶ 10.

1    as Intuit to have directly retained counsel speak for her in this proceeding.  That the proposed

2    agreement strips a member's right to respond through counsel is alone a sufficient reason to find

3    the agreement unfair and inadequate.  *See* Order Re Mot. For Prelim. Approval of Class Settlement

4    at 4, 8, *Rimler v. Postmates, Inc.*, No. CGC-18-567868 (S.F. Super. Ct. Nov. 26, 2019), Postman

5    Decl., Ex. L (denying preliminary approval of a class settlement that prohibited, without

6    explanation, class members' counsel from directly opting out class members who wished to opt

7    out); *see also* Tentative Ruling at 7–8, *Marciano* (same), Postman Decl., Ex. M.

8                                                    * * *

9           The proposed settlement allows class members to submit claims online with a pre-drafted

10   claims form and for claims to be released by default.  But it imposes hurdle upon hurdle for a

11   putative class member to opt out—a class member must draft an opt-out request, sign it in wet ink,

12   find an email message with the unique settlement ID number (if it has not already been deleted by

13   a spam filter), find the administrator's address, and then pay to mail in the opt-out request.  And all

14   this must be done by the individual herself, rather than through directly retained counsel.  The

15   purpose of this process is clear: it "is an obvious attempt to make it as hard as possible for petitioners

16   to opt out, thus binding them to the [class] settlement."  *Abernathy*, 438 F. Supp. 3d at 1067.

17                   **3.   The settlement consideration is unreasonable and inadequate**

18          "Basic" to the process of deciding whether a proposed settlement is fair, reasonable, and

19   adequate "is the need to compare the terms of the compromise with the likely rewards of litigation."

20   *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 422 (N.D. Cal. 2009); *In Re:*

21   *Volkswagen Litig.*, 2018 WL 6198311, at *7.  This analysis includes "whether the apportionment

22   of relief among class members takes appropriate account of differences among their claims, and

23   whether the scope of the release may affect class members in different ways that bear on the

24   apportionment of relief."  FED. R. CIV. P. 23(e)(2)(D) (Advisory Committee's note to 2018

25   amendment); *see also Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 782–84 (7th Cir. 2004); *In re*

26   *Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 808 (3d Cir. 1995);

27   *In re Portal Software Inc., Secs. Litig.*, No. C–03–5138 VRW, 2007 WL 4171201, at *6 (N.D. Cal.

28   Nov. 26, 2007).  The proposed consideration here is neither adequate nor equitable.

The Parties' proposed settlement purports to release the claims of 19 million class members for $40 million, or $2.10 per class member. Based on the claims rate estimated by the parties, participating class members would receive about $28. *See* Mot. at 16–17. That is not adequate, even accounting for the risks of litigation, for any individual who is willing to pursue claims in arbitration. First, many states impose statutory penalties of hundreds or thousands of dollars for each consumer-fraud violation of the type alleged here.[9] *See supra* at 4–5. *See Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 1793774, at *8 (N.D. Cal. June 19, 2007) (denying preliminary approval of a class settlement where workers' rights varied state by state). Second, the Parties have improperly failed to ascribe any value to potentially meritorious claims covered by the proposed release, including: (i) Sherman Act antitrust claims raised by the Arbitration Claimants, which the Parties do not even address, and (ii) additional claims of class members who paid Intuit to file taxes in more than one year in which they were eligible for Free File; the Parties argue that claims for multiple tax years are worthless because "eligible free-filers who paid a TurboTax fee in more than one year . . . <u>arguably</u> should have known they would be charged in the subsequent year(s)." Mot. at 14 (emphasis added). Although Intuit may believe it has strong defenses to the antitrust claims and may believe that consumer-fraud claims for multiple tax years are weak, "colorable legal claims are not worthless merely because they may not prevail at trial." *Mirfasihi*, 356 F.3d at 783. Finally, the parties have not identified or explained what they believe to be Intuit's maximum litigation exposure, which prevents this Court from evaluating the reasonableness of their settlement discounts. *MyFord Touch Consumer Litig.*, 2018 WL 10539267, at *1 (denying preliminary approval of settlement that failed to estimate maximum damages and noting that "[t]he Court cannot evaluate the fairness of the settlement without understanding the maximum likely verdict value of the claims asserted"); *Martin*, 2008 WL 11389034, at *8 (denying preliminary

---

[9] Although Intuit's Terms of Service have a California choice-of-law clause, courts regularly disregard such clauses in consumer-protection cases when a defendant's choice of law would give the plaintiff weaker remedies than are provided by the plaintiff's home state. *See, e.g.*, *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 14, 108 Cal. Rptr. 2d 699 (2001), *as modified* (July 10, 2001 (finding choice of law provision unenforceable where "remedies provided by each [State's consumer-protection statutes] were materially different").

1   approval of settlement that did "not describe the basis for counsel's estimate of class damages [or]

2   inform class members of the total damages that might be recoverable"); N.D. Cal. Proc. Guidance

3   for Class Action Settlements § 1.e. (motion for preliminary approval should state "the potential

4   class recovery if plaintiffs <u>fully</u> prevailed on <u>each</u> of their claims") (emphasis added).

5       The proposed settlement's non-economic relief fares no better.  Intuit already has agreed

6   voluntarily to implement several of the changes proposed by the settlement: it has committed not

7   to de-index the Free File Program website, *see* Addendum to Free File (Eighth) Mem. of

8   Understanding (Dec. 26, 2019), available at http://zpr.io/HifUn; it claims in court filings that it

9   already sends reminder emails to previous Free File users and discloses the Free File Program on

10  its website (though not on the homepage), *see* Intuit's Mem. Supp. Mot. Summ. Adjudication at 7,

11  10, *TurboTax Free Filing Cases*, JCCP No. 5067 (L.A. Super. Ct. July 13, 2020).  And it must

12  already comply with the law, *see* Federal Trade Commission, *.com Disclosures How to Make*

13  *Effective Disclosures in Digital Advertising* at 1, (March 2013) ("This document provides FTC staff

14  guidance concerning . . . the laws the FTC enforces."), available at http://zpr.io/HifU6.   The

15  settlement notice will disclose the Free File Program, but the FTC's study suggests that the vast

16  majority of the class will never see the notice.  *See Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071,

17  1080 (9th Cir. 2017) (reversing settlement approval when "the settlement's injunctive relief [was]

18  of no real value" and did "not obligate [the defendant] to do anything it was not already doing.").

19      Regardless, even if the settlement consideration were adequate for the majority of class

20  members, there is no question it is far too low for a significant, identifiable group of class members:

21  Intervenors and other Arbitration Claimants who are pursuing their claims in individual arbitration.

22  Nearly 40,000 class members have paid non-refundable filing fees of at least $50 each, and $200

23  for many, to commence arbitrations.  *See* Postman Decl. ¶¶ 11–13.  Assuming that the proposed

24  settlement released their contract claims, it would thus <u>cost</u> those individuals as much as $150 each

25  unless they could navigate the burdensome opt-out process.  *See, e.g.*, *In re TD Ameritrade*

26  *Accountholder Litig.*, 266 F.R.D. at 423 (rejecting settlement for which a significant subclass would

27  receive no benefit); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 387–89 (C.D. Cal. 2007)

28  (rejecting settlement that "wantonly compromise[d] the claims" of a significant subclass).

The Arbitration Claimants also stand to recover far more in individual arbitration than in the proposed settlement. *See* Postman Decl. ¶ 29 (Keller Lenkner's clients who pursue individual claims have typically received 10 to 20 times higher than the amounts paid to participating class members). The motion asserts that the proposed settlement "is a favorable result in comparison to what class members could realistically recover through trial or arbitration." Mot. at 15. But the Motion does not support that statement, perhaps because a class representative filed a demand for arbitration <u>less than two weeks</u> before the parties reached a deal, and in the midst of ongoing negotiations. *See* Settlement Agreement at 8–9. On the other hand, Intuit customers who have actively pursued their claims in arbitration have been offered settlements of six to 15 times as much as the proposed class settlement, before even reaching preliminary hearings. Postman Decl. ¶ 19. No rational class member would settle for $28 a claim that she paid $200 just to initiate where, as here, she is likely to recover far more than $28 in her individual case. The one-size-fits-all proposed settlement inequitably favors one group of class members—those who are not pursuing arbitration—at the express expense of another—the Arbitration Claimants. Courts regularly send such settlements back to the drawing board. *See O'Connor*, 201 F. Supp. 3d at 1131 (denying preliminary approval, in part, because "the Settlement Agreement at the eleventh hour folds in new claims and class members at the expense of litigation pending in other courts, while attributing almost no value to those claims, in order to induce Uber to settle the cases at bar").[10]

### 4.   The settlement contains errors that suggest should give the Court pause

Perhaps because the parties were rushing to finalize a settlement before they were enjoined from including the Arbitration Claimants, the Motion and supporting documents are riddled with inconsistencies and errors that should, taken in the aggregate, give this Court pause. For example:

---

[10] *See also Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399, at *8–10 (N.D. Cal. Apr. 6, 2012) (denying approval that assigned no consideration to a subgroup's meritorious claims); *Saeyoung Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2015 WL 13545194, at *6 (C.D. Cal. Dec. 14, 2015) (denying approval because "one-size-fits-all approach…is 'grounds to doubt'" fairness); *Haight v. Bluestem Brands, Inc.*, No. 6:13-cv-1400-Orl-28KRS, 2015 WL 12830482, at *11 (M.D. Fla. May 14, 2015), *report and recommendation adopted*, No. 6:13-cv-1400-Orl-28KRS, 2015 WL 12835994 (M.D. Fla. June 1, 2015) (denying approval that bargained away all but one claim irrespective of the number of violations).

Motion to Intervene and in Opposition to Preliminary Settlement Approval
Case No: 3:19-cv-02546-CRB

- The Settlement Notice would tell class members they can expect to receive more money from the settlement than the Motion predicts. *Compare* Mot. at 16–17 (predicting payment between $19 and $56) *with* Settlement Notice at 53 (telling class members they can expect $15 to $75). *See Hadley*, 2020 WL 836673, at *5 (holding that "[n]otice is inadequate if it misleads potential class members" and noting "inconsistencies between the various forms that render the notice to class members inadequate").

- The settlement class purports to release the claims of individuals who may not be allowed to file a claim. *Compare* Agreement at 16 (class includes anyone who paid for taxes but could have filed for free) *with id*. at 64 (to file a claim, class members must also affirm an expectation to file taxes for free). *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007) (cannot provide relief to only certain class members).

- The Settlement appears to contemplate that class members who cannot be reached by email will receive a "postcard" notice. *See* Intrepido-Bowden Decl. ¶¶ 10.b, 18, Dkt. 162-4. But the parties have not submitted the postcard notice for the Court to review. *JPA Furniture Inc. v. Glob. Check SVC.*, No. 08 CV 0978 BEN (BLM), 2009 WL 10672499, at *1 (S.D. Cal. May 18, 2009).

- As noted, the Motion for Preliminary Approval incorrectly describes the scope of release included in the Proposed Order and Settlement Agreement. *See supra* at 15–16.

- The Settlement requires any party pursuing arbitration to provide a "case number" for their arbitration before they can opt out, but this is impossible for tens of thousands of individuals who have not yet been assigned a case number. *See supra* at 18.

## IV. Arbitration Claimants Would Not Object to a Settlement with a Less Burdensome Opt-Out Process, but Intuit Will Not Agree to Such a Process Because the Burdens Are the Primary Benefit of the Settlement to Intuit

For the many reasons stated above, the motion for preliminary approval should be denied. That said, the Arbitration Claimants would withdraw their objections to the proposed settlement if Intuit eliminated the burdensome obstacles to opting out.

If Intuit wanted accurately to determine the Arbitration Claimants' intent rather than interfere with their arbitrations, it would not willfully ignore statements made through the Arbitration Claimants' known counsel. In state court, Intuit has emphasized that counsel may not make a settlement decision for their clients or effectuate a "mass opt out." But those arguments attack an obvious strawman. Counsel will not make any settlement decision for any client, let alone do so on a mass basis. If a class is certified that includes the Arbitration Claimants, undersigned counsel will ensure that every Arbitration Claimant is provided the Court-approved settlement

1    notice.  Postman Decl. ¶ 30.  Counsel will update each client individually about the status of his or

2    her arbitration and offer counsel's advice on how to proceed.  *Id.*  And each client will make an

3    individual decision.  *Id.*  For each client who chooses to participate in the settlement, counsel will

4    assist that client in submitting a claim (and will waive any right to attorneys' fees).  *Id.* ¶ 31.  For

5    each client who chooses not to participate in the settlement, counsel will communicate that client's

6    individual decision to the Court.  *Id.* ¶ 32.

7          When Intuit speaks to this Court, it is permitted to do so through counsel.  When the class

8    representatives speak to this Court, they are permitted to do so through counsel.  Indeed, the parties

9    are seeking preliminary approval of a class settlement based solely on interim class counsel's

10   representation that the lead plaintiffs agreed to the settlement.  Interim class counsel did not submit

11   any signature from the lead plaintiff, let alone a "wet ink" signature—the Settlement Agreement is

12   signed only by counsel.  If the lead plaintiff can agree to a class-wide settlement through counsel,

13   the Arbitration Claimants should be able to communicate their desire simply to opt out of the

14   settlement through counsel.

15         The only interest Intuit could have in refusing to allow the Arbitration Claimants to speak

16   through counsel is making it harder for the Arbitration Claimants to preserve their rights.  Intuit

17   fully understands that these are low-income taxpayers who pursuing claims of modest value during

18   a global pandemic, and that the burdensome opt-out process it designed will "just further suppress[]

19   the response rate."  Tr. of Proceedings, 30:20-22, 31:5-6, *In re MyFord Touch Consumer Litig.*,

20   No. 13-CV-03072-EMC.  The Arbitration Claimants would not object to a class settlement if Intuit

21   would remove the burdens to their opting out.  The fact that Intuit will never agree to a class

22   settlement absent those burdens should tell the Court all it needs to know about the nature of the

23   proposed settlement.

24                                    **CONCLUSION**

25         For the reasons stated above, the motion for preliminary approval should be denied.

26

27

28

1

2     Dated: November 30, 2020                  Respectfully submitted,

3

4                                               /s/Warren Postman

5      Keith A. Custis (#218818)                 Warren Postman (#330869)
         kcustis@custislawpc.com                  wdp@kellerlenkner.com
6      CUSTIS LAW, P.C.                          KELLER LENKNER LLC
       1999 Avenue of the Stars                  1300 I Street, N.W., Suite 400E
7      Suite 1100                                Washington, D.C.  20005
       Los Angeles, California 90067             (202) 749-8334
8      (213) 863-4276

9                                               Benjamin Whiting (*pro hac vice forthcoming*)
                                                  benjamin.whiting@kellerlenkner.com
10                                              Ellyn Gendler (#305604)
                                                  ellyn.gendler@kellerlenkner.com
11                                              KELLER LENKNER LLC
                                                150 N.  Riverside Plaza, Suite 4270
12                                              Chicago, Illinois 60606
                                                (312) 741-5220
13

14                                              *Attorneys for Intervenors*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion to Intervene and in Opposition to Preliminary Settlement Approval
Case No: 3:19-cv-02546-CRB