# Exhibit F

Matthew Benedetto (SBN 252379)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Ave. Suite 2400
Los Angeles, CA  90071
Telephone:  (213) 443-5300
Facsimile:  (213) 443-5400
matthew.benedetto@wilmerhale.com

Jonathan E. Paikin (*pro hac vice*)
David Gringer (*pro hac vice*)
Benjamin Chapin (*pro hac vice*)
Kevin M. Lamb (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jonthan.paikin@wilmerhale.com
david.gringer@wilmerhale.com
benjamin.chapin@wilmerhale.com
kevin.lamb@wilmerhale.com

*Attorneys for Plaintiffs Intuit Inc. and
Intuit Consumer Group LLC*

Rodger R. Cole (SBN 178865)
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:  (650) 988-8500
Facsimile:  (650) 938-5200
rcole@fenwick.com

Molly R. Melcher (SBN 272950)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  (415) 875-2300
Facsimile:  (415) 281-1350
mmelcher@fenwick.com

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN THE COUNTY OF LOS ANGELES

| | |
|---|---|
| INTUIT INC. and<br><br>INTUIT CONSUMER GROUP LLC,<br><br>                            Plaintiffs,<br><br>    v.<br><br>9,933 INDIVIDUALS,<br><br>                            Defendants. | Lead Case No. 20STCV22761<br>(Consolidated with Case No. 20STCV37714)<br><br>**DECLARATION OF STEPHEN McG. BUNDY IN SUPPORT OF INTUIT'S OPPOSITION TO DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION**<br>Judge:          Hon. Terry Green<br>Dept.:            14<br>Hearing Date:   November 20, 2020<br>Hearing Time:   8:45 a.m.<br>Reservation No.: 337964070146<br>Complaint Filed: June 12, 2020 |

I, Stephen M. Bundy, declare as follows:

1.      I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently testify to them.

2.      I am a lawyer and Professor of Law, Emeritus at the Law School of the University of California at Berkeley.  Throughout my academic career, my central concerns have been professional responsibility and legal ethics, complex litigation, and alternative dispute resolution.  I regularly taught the required professional responsibility course.  My complex litigation and alternative dispute resolution courses also had substantial legal ethics content, focusing on the ethics of negotiation and settlement.  I have also taught professional ethics to practicing lawyers, in both public and private law offices and in continuing legal education programs.  I have extensive experience as a lawyer in private practice dealing with ethical issues, on behalf of clients, lawyers, and law firms, both private and public.  I have testified as an expert many times on legal ethics issues by declaration, deposition and at trial.  I recently completed serving as Chair of the California State Bar's Committee on Professional Responsibility and Conduct, and currently serve as Special Advisor to that Committee.  A copy of my curriculum vitae is attached hereto as Exhibit A.

3.      In making this declaration, I have assumed the following facts:

a.      Keller Lenkner represents approximately 125,000 individual clients who presently have lodged or filed demands with the American Arbitration Association ("AAA") against Intuit.  Keller Lenkner claims to represent each of those clients on an individualized, rather than a collective, basis. The clients' demands were submitted in stages: a first and second wave totaling 10,497 individual demands in October 2019 and January 2020; a third wave of 34,754 additional demands in March 2020; and fourth and fifth waves totaling 88,785 demands in October 2020.

b.      In this action, Keller Lenkner, representing roughly 41,000 clients, is seeking an injunction that would bar Intuit from entering into a class-action settlement that includes any Intuit customers who are represented by Keller Lenkner and "currently engaged in arbitration" against Intuit. For purposes of this opinion, I assume that this injunction would prevent all of Keller Lenkner's clients from receiving or accepting an offer made as part of the settlement of a federal class action, even if the client, advised by Keller Lenkner, would find the offer preferable to continuing their claim in arbitration.

c.      The claims of Keller Lenkner's clients are at different stages of the arbitration process.  The roughly 89,000 claims submitted last month in the fourth and fifth waves have been lodged with the AAA but the $200 initial filing fees have not been paid—hence, those claims are not yet deemed filed under the AAA Rules.  Of the more than 45,000 claims in the first, second and third waves, approximately 8,300 were withdrawn after Intuit pointed out their lack of merit.  For thousands of other clients, Keller Lenkner has advanced the $200 initial fee required for those claims to be deemed filed under the AAA Rules.  Intuit has paid the filing fees for the first three waves of cases, totaling nearly $13 million.  In a smaller number of those cases, the AAA has initiated arbitration, requiring Intuit to pay its case management fee of $1,400 per case.  Finally, in a still smaller number of cases, the AAA has appointed arbitrators and Intuit has paid the $1,500 for arbitrator's compensation.

d.      Keller Lenkner's clients also differ in the expected value of their claims on the merits, due to the facts of their individual cases and the differences between the various state laws that Keller Lenkner asserts are applicable to their clients' claims.  A preliminary review of the 45,000 first, second and third wave claims by Intuit determined that approximately 12,000 were frivolous on their face.  Keller Lenkner has now withdrawn approximately 8,300 of those claims, but the remainder are still on file.  In addition, Intuit has identified tens of thousands of claimants whose claims are likely to fail on the merits because of their tax filing history and has informed Keller Lenkner about those claims.  If Keller Lenkner's pre-filing investigation of the 89,000 fourth and fifth wave claims was comparable to that conducted on earlier waves, then it is likely that (a) many thousands of those claims are frivolous or will fail on the merits and (b) Keller Lenkner does not yet know which individual clients fall into that category.

e.      Finally, Keller Lenkner's 125,000 clients also vary in the extent to which they can credibly threaten to impose on Intuit the costs which Intuit is contractually obligated to pay to support the arbitration, including the $2,900 per case in case management fees and arbitrator compensation.  For some clients, that threat is no longer credible, because Intuit has already paid some or all of those costs.  For others, the client's case is so weak that, were the client to pursue a claim, the client would run a substantial risk of being held financially responsible for some or all of those costs under the AAA Rules and the arbitration provision in the TurboTax Terms of Service.

f.      For all these reasons, many of Keller Lenkner's arbitration clients could benefit from considering, and participating in, a class action settlement of claims against Intuit reached in federal court in compliance with Rule 23 of the Federal Rules of Civil Procedure, even if the monetary terms of that settlement do not provide class members with a substantial non-merits based premium reflecting Intuit's costs of arbitration.  Some clients would be likely to accept such a settlement because of weaknesses in their claims that might lead to no recovery in arbitration, or even an award of sanctions against them.  Others would accept such a settlement because they would rather have the money now, are averse to risk, or regard it as a fair compromise.  This assumption is supported by evidence about the actual preferences of current Keller Lenkner clients.  Intuit offered 101 of those clients an individualized settlement proposal in which each would receive in settlement any sums paid to Intuit to file their taxes in years where they were eligible to file using the TurboTax Free File program (that is, the full amount of their potential out of pocket damages).  After consulting with Keller Lenkner, 23 of those 101 clients (22.77%) accepted the offer, even though the settlement included no premium to reflect Intuit's potential arbitration costs.  It is reasonable to assume that, all other things being equal, many Keller Lenkner clients would be even more likely to accept such an offer if made as part of a class action settlement that had already received preliminary fairness approval from a federal court.

g.      Keller Lenkner will realize substantially more financial benefit from an individual claim that is settled outside of litigation than from one that is settled as part of a class action. The terms of Keller Lenkner's retention agreement with its clients in this matter are not known.  In a similar litigation in Minnesota, however, the firm's standard retention agreement provided that in the event of any resolution of an individual claim before the commencement of an arbitration or court case in which the client was a named party the firm would receive a $750 flat fee.  Conversely, in the event of a class settlement, the firm would receive no fee of any kind.  Declaration of Warren Postman in Opposition to CenturyLink's Motion to Disqualify Counsel and Require Corrective Notice ¶¶ 42, 85, *In re CenturyLink Sales Practices and Securities Litigation*, MDL No. 17-2795 (MJD/KMM), May 15, 2020).  Assuming that the fee agreements in this case contain similar provisions, Keller Lenkner has a strong financial incentive to disfavor any of its clients settling as part of a class action.

4.  **Opinion 1: Keller Lenkner's Conflict of Interest**

        a.      Keller Lenkner has a duty of undivided loyalty to each of its clients.  That duty forbids Keller Lenkner from taking an action for the benefit of one client that is adverse to another client's interests.  *Flatt v. Superior Court*, 9 Cal. 4th 275, 289 (1994).  The duty of loyalty is not limited to disloyal acts: it also bars Keller Lenkner from placing itself in a position where disloyalty may be required, whether by favoring one client's interest over another or by reconciling them in a situation where both should be fully enforced.  *Flatt,* 9 Cal 4th at 289; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1043 (2002).  The lawyer is equally forbidden from taking action adverse to a client to serve the lawyer's own financial or reputational interest.  An action is adverse to a client's interest when it is "unfavorable in the sense of something that generally could cause injury even if in any particular case it does not do so"—actual injury is not required.  California Formal Opinion No. 2011-182 (relying on *Ames v. State Bar*, 8 Cal. 3d 910, 917 (1973)).

        b.      Consistent with the duty of loyalty, a lawyer may not represent a client if the representation is directly adverse to another client, California Rule of Professional Conduct ("CRPC") 1.7(a), or if "there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to…another client…or by the lawyer's own interests, CRPC 1.7(b), unless the client gives informed written consent.  Informed written consent to a potential conflict is effective only "after the lawyer has communicated and explained" in writing "(i) the relevant circumstances and (ii) the material risks, including any actual and reasonably foreseeable adverse consequences of the proposed course of conduct."  CRPC 1.0.1(e)-(e-1).  Even a fully informed written consent cannot excuse a conflict unless "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."  CRPC 1.7(d)(1).

        c.      The professional rules are also highly sensitive to the risk of conflict of interest in the context of settlement.  The decision whether to accept a settlement is for the client, not the lawyer.  Under the California Rules of Professional Conduct, "[a] lawyer shall abide by a client's decision whether to settle a matter."  CRPC 1.2.  To protect the client's right to decide, a lawyer must communicate to the client "all amounts, terms and conditions" of any written settlement offer in a civil matter.  CRPC 1.4.1.  Once those terms have been communicated to the client, the lawyer must

"exercise independent judgment and render candid advice" about whether to accept the offer, framed with attention to the specifics of the client's claim and expressed interests.  CRPC 2.1.  Where the settlement is on behalf of two or more clients, any aggregate settlement of those claims requires all clients' informed written consent, following disclosure of each client's participation in the settlement. CRPC 1.8.7.  These rules reflect an awareness that the financial and personal interests of individual clients and of the lawyer often differ with respect to the question of settlement, as they do here, and that when such conflicts exist, the client's individual power of decision must be protected.

> d.      Keller Lenkner's advocacy for an injunction that would bar all its clients from being included in the terms of a class action settlement violates its duty of undivided loyalty to those clients who could benefit from considering or participating in such a settlement.  On the assumed facts, many Keller Lenkner clients fall into that category.  Because those clients could benefit from such a settlement, the relief sought is adverse to them.  Moreover, the conflict is actual—Keller Lenkner's advocacy of the injunction foreseeably will result in harm to those clients.  This course of action is especially troubling because Keller Lenkner also has a substantial financial interest in maximizing the number of clients who pursue individual arbitration (where substantial fees can be obtained) and minimizing the number who settle in a class action, where Keller Lenkner would receive no compensation.

> e.      It does not matter that Keller Lenkner may reasonably believe the injunction would benefit some of its clients: the duty of loyalty does not permit Keller Lenkner to place the interests of those clients ahead of the interests of those who could be harmed by the injunction.  Nor would it matter if Keller Lenkner reasonably believed that the injunction tended to enhance the aggregate value of all its clients' claims.  Keller Lenkner has not been appointed to represent a class.  It therefore must treat its clients as individuals, not as an aggregate, and cannot properly trade off the interests of some clients to maximize its or its clients' total financial return from the litigation.

> f.      The fact that each of Keller Lenkner's clients may have a contractual right not to participate in a class action settlement does not alter the conflict analysis.  That is so because each client is entitled to decide for him or herself whether to insist on that right or to waive it, and there are a substantial number of Keller Lenkner clients who could benefit from waiving it in order to participate in

a class action settlement.   Keller Lenkner's duty to those clients requires it to preserve their ability to benefit from waiving that right.  Instead, the injunction that Keller Lenkner is seeking would eliminate that ability, and abort the process by which they could receive a class action settlement offer and reach their own decision on whether to accept it.

g.       Keller Lenkner's concern may be that its clients would be making a "mistake" by entering into a future merits-based class action settlement when they could realize more money by seeking an individual settlement that trades on Intuit's costs of defense.  But under the professional rules, the decision to settle is for the client, not the lawyer.  The remedy for client error is the lawyer's advice, not the lawyer's veto.  The proposed injunction, however, deprives all Keller Lenkner's clients of the right to decide the question of settlement, without regard to whether they would benefit from exercising that right.  This conflict is particularly troubling because the proposed injunction is not necessary to protect those who might later individually decide to opt out of a class settlement.  Keller Lenkner can protect each of its clients' individual right to make an informed decision by advising each of them about the class settlement when and if it occurs.

h.       Assuming that Keller Lenkner sought written client consent to this conflict, that consent cannot have cured it, for two reasons.  First, such a consent would have required a written explanation of the injunction, the conflicts to which it gave rise, and "the material risks, including any actual and reasonably foreseeable adverse consequences" of seeking the injunction for those clients who could benefit from a class action settlement.  But Keller Lenkner simply has not learned enough about the position of each of its individual clients to provide each client with an individuated explanation of those risks and consequences.  Without such an explanation, the client's consent cannot be adequately informed.  Second, even if fully informed, such a consent cannot excuse an actual conflict of this kind, because Keller Lenkner could not "reasonably" believe that seeking an injunction that harms some clients is consistent with providing "competent and diligent representation to each [of them]."  CRPC 1.7(d)(1).

5.       **Opinion 2: Class Action Notice and Rule 4.2**

a.       A class action notice from a federal court directed to each of Keller Lenkner's individual clients would not violate California Rule of Professional Conduct 4.2.  Rule 4.2—the so-

called "no contact" rule—prohibits a lawyer representing a client from communicating, "directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." CRPC 4.2 (a). The prohibition on indirect communications "is intended to address situations where a lawyer seeks to communicate with a represented person through an intermediary such as an agent, investigator or the lawyer's client." *Id.* Comment [3]. The Rule does not prohibit lawyer "communications otherwise authorized by law or a court order." CRPC 4.2(c)(2).

b.     Rule 4.2 does not apply here because a class action notice from a federal court is neither a "direct" communication by a lawyer nor an "indirect" communication through an intermediary acting at the lawyer's direction. Rather, it is a communication from the court, an independent governmental entity with fiduciary obligations to the class. Thus, Rule 23(c)(2)(B) states that in an action certified under Rule 23(b)(3) "the court must direct" notice to class members. Similarly, where notice of a class action settlement is required under Rule 23(e)(1) "the court must direct notice" to all class members who would be bound by the settlement. Consistent with that view, the model class action notices from the Federal Judicial Center expressly state that "the court sent you this notice" and that it is "not a solicitation from a lawyer." *See, e.g.*, Federal Judicial Center, Products Liability Class Action Certification and Settlement: Full Notice (a copy of which is attached as Exhibit B to this declaration).[1]

c.     If, implausibly, a class action notice from the court were somehow deemed a lawyer communication within the meaning of Rule 4.2(a), it would nevertheless fall within the explicit exception in Rule 4.2(c)(2) permitting communications "otherwise authorized by law or court order."

d.     The conclusion that a class action notice from a federal court is not prohibited by Rule 4.2 is also sound policy. Class action notice is required to be clear, concise and "in plain, easily understood language," Fed. R. Civ. P. 23(c)(2)(B), and should be sent only after the district court "has given careful attention to the content and format of the notice…and any claim form class members must submit to obtain relief." Fed. R. Civ. P. 23 Advisory Committee Note on Rules—2018 Amendment. Because of these legal and procedural protections, notice approved and sent by a federal court does not

---

[1] https://www.fjc.gov/sites/default/files/2016/ClaAct04.pdf (last accessed November 4, 2020).

involve the risks of partisan overreaching or interference with the lawyer-client relationship that Rule 4.2 is intended to address.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on November 6, 2020 in Berkeley, California.

Stephen McG. Bundy

BUNDY DECLARATION ISO INTUIT'S OPPOSITION TO DEFS.' MOTION FOR PRELIMINARY INJUNCTION