1   RODGER R. COLE (CSB No. 178865)
    rcole@fenwick.com
2   FENWICK & WEST LLP
    801 California Street
3   Mountain View, CA  94041
    Telephone:    650.988.8500
4
    MOLLY R. MELCHER (CSB No. 272950)
5   mmelcher@fenwick.com
    FENWICK & WEST LLP
6   555 California Street, 12th Floor
    San Francisco, CA  94104
7   Telephone:    415.875.2300

8   JONATHAN E. PAIKIN (*pro hac vice*)
    jonathan.paikin@wilmerhale.com
9   DAVID GRINGER (*pro hac vice*)
    david.gringer@wilmerhale.com
10  KEVIN M. LAMB (*pro hac vice*)
    kevin.lamb@wilmerhale.com
11  WILMER CUTLER PICKERING
        HALE AND DORR LLP
12  1875 Pennsylvania Ave. NW
    Washington, DC  20006
13  Telephone:    202.663.6000

14  Attorneys for Defendant
15  INTUIT INC.

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18                      SAN FRANCISCO DIVISION

19

20
                                          Master File No.: 3:19-cv-02546-CRB
21  IN RE INTUIT FREE FILE LITIGATION
                                          **DEFENDANT INTUIT INC.'S**
22  This Document Relates to:  All Actions   **OPPOSITION TO MOTION TO**
                                          **INTERVENE AND MOTION FOR**
23                                        **LEAVE TO FILE BRIEF OF AMICI**
                                          **CURIAE**
24
                                          Date:    December 17, 2020
25                                        Time:    10:00 a.m.
                                          Ctrm:   6, 17th Floor
26                                        Judge:  Hon. Charles R. Breyer
27                                        Date Action Filed:  May 1, 2019

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

**SUMMARY OF ARGUMENT**

2

Court-appointed Interim Class Counsel and Defendant Intuit Inc. ("Intuit") have reached

3

an arm's-length, negotiated resolution after hard-fought litigation that provides substantial

4

monetary and non-monetary relief to a class of over 19 million customers.  The settlement is

5

therefore entitled to a presumption of fairness.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg.,*

6

*Sales Practices, & Prods. Liab. Litig.*, 2017 WL 672820, at *10 (N.D. Cal. Feb. 16, 2017).

7

There is no basis for non-parties Keller Lenkner, purportedly on behalf of nine individual

8

intervenors ("Nine Movants"), and the Los Angeles City Attorney ("LACA") and the Santa Clara

9

County Counsel (together, "*Amici*") to attempt to insert themselves in the settlement approval

10

proceedings to advance their own interests at the expense of the broader settlement class.  The

11

Nine Movants' intervention is unnecessary because the Court, Class Counsel, and Federal Rule of

12

Civil Procedure 23 (including the objection and opt-out processes) already ensure that their

13

interests (like those of the rest of the class) will be adequately represented and protected.  *See*

14

*Raquedan v. Centerplate of Del. Inc.*, 376 F. Supp. 3d 1038, 1041-42 (N.D. Cal. 2019) (quoting

15

*Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015)).  Likewise, *Amici* are not parties to the

16

Settlement and may continue to seek relief against Intuit in their own state court action.

17

The opt-out process—the primary focus of the Nine Movants' intervention—is fair to all

18

class members.  Keller Lenkner's principal complaint about the settlement seems to be that it

19

requires that law firm to provide each of its clients with the opportunity to make an

20

individualized, informed decision about the settlement, consistent with federal law and the rules

21

of professional conduct.  *See In re CenturyLink Sales Practices & Sec. Litig.*, 2020 WL 3513547,

22

at *7 (D. Minn. June 29, 2020).  Similarly, the temporary stay of parallel proceedings by class

23

members against Intuit is authorized by the All Writs Act and protects absent class members from

24

unknowingly waiving their rights before they have had an opportunity to consider the terms of the

25

Settlement and decide whether to opt out.  28 U.S.C. § 1651(a).

26

*Amici* and the Nine Movants provide no basis for denying relief to over 19 million

27

settlement class members.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 5

    A.    The Settlement And Motion For Preliminary Approval .......................... 5

    B.    Keller Lenkner's Mass Arbitrations ..................................................... 6

    C.    Keller Lenkner's Attempts To Interfere With The Settlement .............. 7

ARGUMENT ...................................................................................................................... 8

I.    THE MOTION TO INTERVENE SHOULD BE DENIED BECAUSE THE NINE MOVANTS' INTERESTS ARE ADEQUATELY REPRESENTED ............................... 8

II.    THE COURT SHOULD DENY THE NINE MOVANTS' REQUESTED RELIEF BECAUSE THE SETTLEMENT MEETS THE STANDARDS FOR PRELIMINARY APPROVAL ......................................................................... 10

    A.    The Terms Of The Settlement Are Fair, Reasonable, And Adequate .................. 10

        1.    The Settlement Provides Significant Monetary Relief ............................. 11

        2.    The Settlement Provides Significant Non-Monetary Relief ..................... 13

        3.    The Settlement Agreement Does Not Foreclose All Further Actions ....... 14

    B.    The Opt-Out Process Ensures Individualized Decisions By Class Members And Orderly Administration Of The Claims Process ........................................... 16

        1.    The Process Acts As A Bulwark Against Keller Lenkner Prioritizing Its Own Financial Interests Over Those Of Its Clients .......... 16

        2.    The Potential Value Of Arbitration Claims Does Not Justify Allowing Keller Lenkner To Reflexively Opt Out All Its Clients ............ 18

        3.    The Settlement Identification Number Helps Ensure Orderly Administration Of The Settlement ............................................. 19

    C.    Enjoining Parallel Proceedings Pending A Valid Opt-Out Will Protect The Settlement Class Without Impairing Class Members' Right To Arbitration ........ 20

    D.    The Arbitration Provision Does Not Preclude Preliminary Approval .................. 23

CONCLUSION ................................................................................................................. 25

1

## TABLE OF AUTHORITIES

**Page(s)**

2

**CASES**

3

*31,011 Individuals v. Intuit, Inc., et al.*,
   No: 20STCV37714 (L.A. Super. Ct. Oct. 1, 2020)....................................................7

4

*Abbott Labs. v. Superior Court of Orange Cty.*,
   9 Cal. 5th 642 (2020) ............................................................................................15

5

6

*Allstate Ins. Co. v. Elzanaty*,
   929 F. Supp. 2d 199 (E.D.N.Y. 2013) ...................................................................22

7

*Bank of Am., N.A. v. UMB Fin. Servs., Inc.*,
   618 F.3d 906 (8th Cir. 2010)..................................................................................22

8

9

*Campbell v. Facebook, Inc.*,
   951 F.3d 1106 (9th Cir. 2020)................................................................................13

10

*Chinitz v. Intero Real Est. Serv.*,
   2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) .........................................................14

11

12

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
   647 F.3d 893 (9th Cir. 2011)....................................................................................9

13

*Cody v. SoulCycle, Inc.*,
   2017 WL 8811114 (C.D. Cal. Sept. 20, 2017)........................................................8

14

*Couser v. Comenity Bank*,
   125 F. Supp. 3d 1034 (S.D. Cal. 2015)..................................................................24

15

16

*G. F. v. Contra Costa Cty.*,
   2015 WL 7571789 (N.D. Cal. Nov. 25, 2015) .......................................................11

17

*Gomes v. Eventbrite, Inc.*,
   2020 WL 6381343 (N.D. Cal. Oct. 30, 2020).........................................................9

18

19

*Hallie v. Wells Fargo Bank, N.A.*,
   2015 WL 1914864 (N.D. Ind. Apr. 27, 2015) .......................................................17

20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)................................................................................21

21

22

*In re CenturyLink Sales Practices & Sec. Litig.*,
   2020 WL 869980 (D. Minn. Feb. 21, 2020) ................................................. *passim*

23

*In re CenturyLink Sales Practices & Sec. Litig.*,
   2020 WL 3512807 (D. Minn. June 29, 2020) ............................................... *passim*

24

25

*In re Diet Drugs*,
   282 F.3d 220 (3d Cir. 2002)...................................................................................21

26

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020) .........................................................17

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

2

**TABLE OF AUTHORITIES**
(Cont'd)

**Page(s)**

3

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000)............................................................................12

4

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*,
    910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, *In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014)...........................................................................17

5

6

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015).............................................................................14

7

8

*In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.*,
    71 F.3d 298 (8th Cir. 1995)...............................................................................23

9

*In re Syngenta Ag Mir 162 Corn Litig.*,
    2018 WL 1726345 (D. Kan. Apr. 10, 2018) ....................................................18

10

*In re TracFone Unlimited Serv. Plan Litig.*,
    112 F. Supp. 3d 993 (N.D. Cal. 2015) ......................................................5, 19, 24

11

12

*In re Uponor, Inc., F1807 Plumbing Fitting Prods. Liab. Litig.*,
    2012 WL 13065005 (D. Minn. Jan. 19, 2012) ............................................21, 22

13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 672820 (N.D. Cal. Feb. 16, 2017) .................................................1, 10

14

15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    229 F.Supp.3d 1052 (N.D. Cal. 2017) .........................................................11, 21

16

17

*Intuit Inc. v. 9,933 Individuals*,
    No. 20STCV22761 (L.A. Super. Ct. Nov. 6, 2020).......................................24, 25

18

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012)..............................................................................12

19

20

*Lee v. JPMorgan Chase & Co.*,
    2014 WL 12580237 (C.D. Cal. Nov. 24, 2014)...........................................19, 24

21

*Makekau v. State*,
    943 F.3d 1200 (9th Cir. 2019).............................................................................21

22

23

*Perry v. Proposition 8 Official Proponents*,
    587 F.3d 947 (9th Cir. 2009)............................................................................9, 10

24

*Raquedan v. Centerplate of Del. Inc.*,
    376 F. Supp. 3d 1038 (N.D. Cal. 2019) ..........................................................2, 9

25

26

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009).........................................................................10, 12

27

*Serv. Emps. Int'l Union, Local 1021 v. Cnty. of San Joaquin*,
    202 Cal. App. 4th 449 (2011) ............................................................................24

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

## TABLE OF AUTHORITIES
### (Cont'd)

2

**Page(s)**

3    *Spann v. J.C. Penney Corp.*,
        211 F. Supp. 3d 1244 (C.D. Cal. 2016) ...............................................................14

4
     *Sterrett v. Sonim Techs., Inc.*,
5        2020 WL 6342941 (N.D. Cal. Oct. 29, 2020) .........................................................8

6    *Stott v. Capital Fin. Servs., Inc.*,
        277 F.R.D. 316 (N.D. Tex. 2011) .........................................................................22
7
     *United States v. N.Y. Tel. Co.*,
8        434 U.S. 159 (1974) ..............................................................................................21

9    *Volt Info. Scis. Inc. v. Board of Trs. of Leland Stanford Junior Univ.*,
        489 U.S. 468 (1989) ..............................................................................................22
10
     *Wilson v. Tesla, Inc.*,
11       2019 WL 2929988 (N.D. Cal. July 8, 2019) ................................................5, 19, 24

12   *Zepeda v. PayPal, Inc.*,
        2014 WL 1653246 (N.D. Cal. Apr. 23, 2014), *objections overruled*,
13       2014 WL 4354386 (N.D. Cal. Sept. 2, 2014) ..........................................................8

14   **STATUTES**

15   9 U.S.C. § 2 ...................................................................................................................22

16   28 U.S.C. § 1651(a) .........................................................................................4, 5, 21, 22

17   **RULES**

18   Federal Rule of Civil Procedure 23 ........................................................................ *passim*

19   Federal Rule of Civil Procedure 24(a)(2) .......................................................................8

20   Federal Rule of Civil Procedure 26(f) ............................................................................5

21   **OTHER AUTHORITIES**

22   Chandrasekher & Horton, *Arbitration Nation*,
        107 Cal. L. Rev. 1, 55-56 (2019) ..........................................................................11

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

Fenwick & West LLP
Attorneys at Law

1

**INTRODUCTION**

After extensive hard-fought litigation, negotiation, and multiple mediations between Intuit's counsel and Court-appointed interim class counsel ("Class Counsel," and, together with Intuit, the "Parties"), the Parties reached a settlement that will provide substantial monetary and non-monetary relief to over 19 million Intuit customers (the "Settlement").  As the result of arm's-length negotiations with Class Counsel, the Settlement is "entitled to an initial presumption of fairness."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 672820, at *10 (N.D. Cal. Feb. 16, 2017) (citation and quotation marks omitted).  Yet three non-parties now attack this Settlement at the preliminary approval stage in the interests of their own deeply flawed actions against Intuit and with no regard for the interests of the broader settlement class.  Their attack poses an existential threat to relief for over 19 million class members, as the Parties have agreed that the Settlement cannot proceed *unless* Keller Lenkner's ability to conduct mass opt outs—which is unethical—is constrained *and* this Court temporarily enjoins parallel proceedings against Intuit to ensure orderly settlement proceedings.

Keller Lenkner purports to intervene on behalf of nine individual intervenors ("Nine Movants")[1] cherry-picked from among its 125,000 purported clients—whom it treats as a *de facto* class despite never having been appointed class counsel—and seeks to protect the law firm's interests in pursuing arbitration proceedings so that it may collect exorbitant attorneys' fees.  Keller Lenkner hardly appears before this Court as an honest broker.  This intervention comes on the heels of Keller Lenkner's unsuccessful attempt in state court to enjoin the Parties from agreeing to any settlement, which the state court dismissed as inappropriate interference with this Court's authority.  *See* Cole Decl. ¶¶ 25-34.  Professor Stephen Bundy, a noted expert on legal ethics, has opined that Keller Lenkner's attempts to avoid settling *any* of its 125,000 clients' claims at all costs—whether through an injunction or by now contemplating mass opt outs— breach fundamental rules of professional conduct.  *See* Bundy Decl. ¶¶ 9-15.  Likewise, a district

---

[1] Keller Lenkner cites no authority in support of its attempt to proffer these nine cherry-picked intervenors to represent the purported "rights" of its 125,000 purported clients who apparently had no interest in intervening in this action.  The fact that Keller Lenkner seeks to intervene in this action with just nine of the 125,000 people they purport to represent underscores the self-serving motivation behind their interference with the Settlement.

FENWICK & WEST LLP
ATTORNEYS AT LAW

court in Minnesota recently found that "[t]he sheer number of Keller's clients given the size of the law firm and the strong financial incentive that Keller faces in recommending opt outs raise questions about whether each of its client's opt-out requests were made individually and intelligently." *In re CenturyLink Sales Practices & Sec. Litig.* ("*CenturyLink*"), 2020 WL 3512807, at *4 (D. Minn. June 29, 2020).

*Amici* seek to act in parallel to their own actions against Intuit, which face the prospect of dismissal on the merits in a matter of months and, even should they survive, will drag on for several years before any relief could conceivably issue. *See* Gringer Decl. ¶¶ 15-20. *Amici* attempt to torpedo relief for a *nationwide* class purportedly to serve the interests of only California residents, who account for a fraction of the over 19 million class members who could benefit from the Settlement. *See* Cole Decl. ¶ 7; Gringer Decl. ¶¶ 6-7; *see also* Dkt. No. 176 ("Am. Prop. Br.").

For all their bluster, Keller Lenkner and *Amici* provide no valid basis for their intrusion on the preliminary approval proceedings or for their contention that the Settlement—negotiated at arm's length with Class Counsel and providing significant relief to a class of over 19 million taxpayers—is inadequate and unfair.

Keller Lenkner's intervention is unnecessary and disruptive because the Court, Class Counsel, and Federal Rule of Civil Procedure 23 already ensure that the interests of the class, including the Nine Movants, will be adequately represented and protected throughout the settlement approval process. As courts in this circuit consistently recognize, "in the class action settlement context, a putative intervenor's concerns may 'largely be addressed through the normal objection process.'" *Raquedan v. Centerplate of Del. Inc.*, 376 F. Supp. 3d 1038, 1041-42 (N.D. Cal. 2019) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015)).

*Amici*'s and the Nine Movants' criticisms of the Settlement read as a self-interested declaration that they can achieve better litigation results (for themselves) than the agreement reached by Class Counsel. So be it. *Amici* are not parties to the Settlement and may continue to seek relief against Intuit, including additional injunctive relief and statutory penalties. Likewise, the Nine Movants may, of course, opt out of the Settlement pursuant to the Federal Rules and

1    pursue their claims against Intuit in arbitration.  The Settlement also does not foreclose the

2    Federal Trade Commission or State Attorneys General from bringing actions against Intuit—

3    although no such claims have been filed to date and none of these agencies or officials have

4    sought to intervene in this action.

5        *Amici* and the Nine Movants' criticism of the Settlement's relief ignores the fact that

6    experienced Class Counsel agreed to the Settlement after discovery and lengthy negotiations with

7    Intuit, including exploration of Intuit's defenses.  Motion for Preliminary Approval of Class

8    Action Settlement at 15.  The Nine Movants contend that the monetary relief is inadequate and

9    could be bested in arbitration, but merely saying that does not make it true.  In fact, participating

10   class members are expected to recover 20% to 50% of the average fees a taxpayer paid to use

11   TurboTax online in a year they were eligible to file for free with the TurboTax Free File Program,

12   without incurring the risk or burdens of arbitration.  Remarkably, the Nine Movants suggest that

13   no "rational" class member who has initiated arbitration against Intuit "would settle for $28 a

14   claim that she paid $200 to initiate."  Mot. to Intervene at 23.  In fact, the arbitration filing fees

15   were paid not by any individual arbitration claimant but rather were advanced by Keller Lenkner,

16   which can only recoup its investment by recovering in arbitration, rather than through the present

17   proceedings.  Cole Decl. ¶ 17.

18       Moreover, the Settlement's non-monetary relief addresses in detail the conduct underlying

19   the Nine Movants' and *Amici*'s claims against Intuit.  It also overlaps with injunctive relief that

20   *Amici* have themselves sought.  Gringer Decl. ¶¶ 8-14.  This relief will also enter into effect in

21   time for the upcoming tax season, whereas the relief sought by *Amici* will only be issued, if at all,

22   several years into the future.  *Id.* ¶¶ 15-16.

23       The opt-out process set forth in the Settlement is consistent with processes routinely

24   approved by courts and, moreover, protects individual class members by preventing Keller

25   Lenkner from opting out all its clients without providing them with individualized legal advice

26   and seeking their informed consent—as Keller Lenkner has an established track record of doing.

27   *See, e.g.*, Cole Decl. ¶¶ 25-26; Bundy Decl. ¶ 4(i).  As the court in the *CenturyLink* case held,

28   after noting that Keller Lenkner "gave the same blanket advice to opt out to all 22,000 of its

FENWICK & WEST LLP
ATTORNEYS AT LAW

clients," requirements such as personal signatures on opt-out requests "avoid[] a third party or lawyer representing that they have [a] class member's authority, without the class member making an informed, individual decision." *CenturyLink*, 2020 WL 3512807, at *3.  In any event, it is difficult to understand how the Nine Movants can argue that sending a signed opt-out request containing basic identifying information would be "unduly burdensome" for them, given that they have shouldered the much greater burden of intervening in federal class action proceedings to attack the Settlement.  *See* Mot. to Intervene at 16.

The Nine Movants are also wrong to imply that the potential value of the arbitration claims justifies opting all of Keller Lenkner's clients out of the Settlement.  As a threshold matter, the Nine Movants can only speak as to their own interests because they do not represent Keller Lenkner's approximately 125,000 other clients in any legal capacity.  And their own interests with respect to the Settlement are already adequately protected by the opt-out process, of which they are clearly able to avail themselves.  At bottom, the Nine Movants are advocating for *Keller Lenkner's financial interest* in opting out its clients, yet this interest is entirely irrelevant to the fairness and adequacy of the Settlement.

As a substantive matter, Keller Lenkner's clients have claims that are no more valuable than those of other class members, whether in terms of their susceptibility to Intuit's strong defenses or the relative modesty of the alleged damages.  And the purportedly superior value of the claims of Keller Lenkner's clients derives not from the claims themselves, but purely from the assumed success of Keller Lenkner's ethically dubious plan to deluge Intuit with as many claims as it can possibly harvest through social media and other means.  There is also no small irony in the fact that the Nine Movants complain of a "one-size-fits-all proposed settlement" (Mot. to Intervene at 23), while Keller Lenkner seeks a "one-size-fits-all" opt out for its clients, in breach of its ethical obligations.  Bundy Decl. ¶ 4(i).

Separately, there is no merit to the Nine Movants' argument that the All Writs Act does not authorize this Court to issue a temporary stay of all parallel proceedings by class members against Intuit—a stay *without which Intuit retains the right to withdraw from the Settlement*, as the Parties have agreed.  The All Writs Act provides that federal courts may "issue all writs

1  necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

2  principles of law." 28 U.S.C. § 1651(a). A proposed class settlement is the paradigmatic case for

3  this Court's exercise of its authority under the All Writs Act. It protects absent class members

4  from unknowingly waiving their rights before they have had an opportunity to consider the terms

5  of the Settlement and decide whether to opt out. It also protects Intuit from the possibility of

6  improper double recoveries while the opt-out process is ongoing. Lastly, it prevents the parties

7  from unnecessarily incurring millions of dollars in arbitration fees while class members consider

8  whether to proceed in arbitration or instead participate in the Settlement.

9      Finally, the Nine Movants' argument that the Settlement violates the TurboTax Terms of

10  Service ("Terms") is simply wrong. Courts routinely approve class action settlements where the

11  parties have agreed to arbitration and a class action waiver. *See, e.g.*, *Wilson v. Tesla, Inc.*, 2019

12  WL 2929988 (N.D. Cal. July 8, 2019); *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp.

13  3d 993, 999 (N.D. Cal. 2015). And the Settlement does not preclude the Nine Movants from

14  continuing to exercise their right to arbitrate pursuant to the Terms, as they may simply opt out.

15      In sum, *Amici* and the Nine Movants provide no basis for denying relief to over 19 million

16  settlement class members. Intuit respectfully requests that this Court approve the Motion for

17  Preliminary Approval of Class Action Settlement (the "Motion").

### FACTUAL BACKGROUND

19  **A.     The Settlement And Motion For Preliminary Approval**

20      The Settlement Agreement is the product of the extensive negotiations between Intuit's

21  counsel and Class Counsel beginning in September 2019 and continuing through November 2020.

22  Cole Decl. ¶¶ 3-6. The parties first met and discussed settlement at their Rule 26(f) conference

23  on September 25, 2019, and then pursued settlement discussions, including factual presentations

24  and exchanges of information, on an ongoing basis. *Id.* ¶ 3. They held an initial mediation with

25  the Honorable Edward A. Infante (Ret.) on June 22, 2020. *Id.* ¶ 4. The parties did not settle at

26  the first mediation, but they continued to exchange factual presentations and written submissions

27  and discussed potential approaches to a class settlement, both informally and during multiple joint

28  and individual conferences with Judge Infante. *Id.* ¶¶ 5-6. On November 11, 2020, the parties

Fenwick & West LLP
Attorneys at Law

held a second formal mediation with Judge Infante and agreed to terms. *Id.* ¶ 6.

As outlined in the Motion, Plaintiffs seek preliminary approval of a $40 million settlement with Intuit to compensate taxpayers who were eligible to file a federal return for free under the IRS Free File Program but paid to use Intuit's TurboTax services and products. *See* Dkt. No. 162 at 1, 6. All class members may participate by completing a simple claim form, which requires only that they attest that they understood they could file for free under the Free File Program but nevertheless paid a fee to use TurboTax. *Id.* at 1. Considering customary claim rates, Class Counsel estimate that the recoveries provided will afford compensation in an amount that equates to 20% to 50% of the average TurboTax fees paid by participating settlement class members to use TurboTax online in a year they were eligible to file for free. *Id.* at 17. The Settlement also provides significant non-monetary relief to the settlement class, including but not limited to, Intuit's agreement to ensure its marketing practices related to its Free Edition product conform to the Federal Trade Commission's ("FTC") online marketing guidelines and to continue disclosing the Free File Program—along with taxpayer qualifications to file for free—on the TurboTax website. *See* Dkt. No. 162-1 at § III (a). The proposed notice to the settlement class also prominently discloses that taxpayers with incomes of $69,000 or less can file for free and provides a link to the IRS Free File portal. *Id.*

**B.      Keller Lenkner's Mass Arbitrations**

Keller Lenkner has developed a business model of trawling behind class actions like this one. Cole Decl. ¶¶ 14-18. After harvesting tens of thousands of individual clients through social media, the firm threatens to file thousands of arbitration demands—triggering millions of dollars in potential arbitration fees—unless the defendant agrees to a huge payment to Keller Lenkner, some of which will go to their clients. *Id.* ¶ 16. Keller Lenkner invests in these arbitrations by "advanc[ing] arbitration filing fees on behalf of its clients," and it "does not recover the filing fees and collects no attorney's fees unless it obtains recovery for its clients." *CenturyLink*, 2020 WL 3513547, at *2. In the event of a class settlement, Keller Lenkner likewise "earns no attorney's fees if clients fail to opt out." *Id.* at *1. As a result, Keller Lenkner has a strong financial incentive to undermine *any* class settlement and instead obtain a separate settlement for its clients

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  to recoup its sunk costs and maximize the return on its investment—regardless of what is in each

2  of its individual clients' best interests.  Keller Lenkner has followed the same playbook here.

3      Based on the same underlying allegations at issue in this case, Keller Lenkner has

4  submitted successive waves of arbitration demands against Intuit with the American Arbitration

5  Association ("AAA") since October 2019.  Cole Decl. ¶ 18.  Keller Lenkner "advanced" the

6  initial arbitration fees for the claimants, paying more than $8 million so far to the AAA.  *Id.* ¶ 17.

7  Of the first three waves totaling more than 45,000 demands, Keller Lenkner has withdrawn

8  roughly 8,300 demands that were shown to be patently frivolous.  *Id.* ¶ 21.  Keller Lenkner

9  recently filed two additional waves of demands on behalf of 88,786 clients, but without paying

10 the filing fees for those claims.  *Id.* ¶ 19.

11     **C.**    **Keller Lenkner's Attempts To Interfere With The Settlement**

12     In the last several months, Keller Lenkner has made several unsuccessful attempts to

13 interfere with the Parties' settlement negotiations.  *Id.* ¶¶ 25-34.  Many of those attempts occurred

14 before settlement was even reached, much less before Keller Lenkner knew the terms of the

15 Settlement, underscoring that the Keller Lenkner law firm objects to the existence of *any* class

16 settlement here, likely because it threatens the law firm's ability to recover on its investment.  *Id.*

17     In an effort to halt proceedings in this Court, on October 1, 2020, Keller Lenkner filed a

18 complaint in Los Angeles County Superior Court.  The complaint sought an order "prevent[ing]

19 Intuit from entering into a class-action settlement that would resolve the claims of customers …

20 who have filed individual arbitration demands, without those customers' affirmative consent."

21 Compl. (Prayer for Relief), *31,011 Individuals v. Intuit, Inc., et al.*, No: 20STCV37714 (L.A.

22 Super. Ct. Oct. 1, 2020).  On October 19, 2020, Keller Lenkner filed an *ex parte* request for a

23 temporary restraining order ("TRO") to enjoin Intuit from concluding a settlement with Class

24 Counsel that would "resolve the claims of customers who . . . have initiated arbitrations against

25 Intuit . . ."  Cole Decl. ¶ 26.

26     On October 20, 2020, Judge Green of the Los Angeles Superior Court denied the TRO

27 request.  *Id.* ¶ 27.  Undeterred, on October 28, 2020, Keller Lenkner filed a motion for

28 preliminary injunction seeking to "enjoin Intuit from including Keller Lenkner Clients in a class-

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   wide settlement in court." *Id.*  Following the filing of the Motion and the Settlement Agreement,

2   Keller Lenkner changed its request for relief in its reply brief to a "declaration that the KL Clients

3   have a contractual right not to be included in the class settlement. . . ." *Id.* ¶¶ 32-34.

4         On November 20, 2020, Judge Green held a hearing and, as with the TRO, denied Keller

5   Lenkner's request for a preliminary injunction.  *Id.* at ¶ 33.  In his Order denying the injunction,

6   Judge Green specifically deferred to this Court and noted that Keller Lenkner's request for

7   declaratory relief was "odd" because Keller Lenkner's clients both "have a right to decline a

8   settlement offer" and, "on the flip side of the coin," "have a right to *accept* a settlement."  *Id.*, Ex.

9   10 at 6 (emphasis in original).

10                         **ARGUMENT**

11   **I.**   **THE MOTION TO INTERVENE SHOULD BE DENIED BECAUSE THE NINE**

12         **MOVANTS' INTERESTS ARE ADEQUATELY REPRESENTED**

13         The Nine Movants seek to intervene and disrupt the Settlement to the detriment of

14   approximately 19 million settlement class members, in order to enable Keller Lenkner to opt out

15   its clients *en masse* and continue executing on its mass arbitration business strategy.  But the Nine

16   Movants may raise any concerns they have with the Settlement under the Federal Rules by filing

17   an objection to the Settlement at the appropriate time.  And the Nine Movants may also simply

18   opt-out of the Settlement, which they seem well equipped to do when the time comes.  *See*

19   *Zepeda v. PayPal, Inc.*, 2014 WL 1653246, at *2-3 (N.D. Cal. Apr. 23, 2014) (holding that

20   intervention was not warranted because putative interveners may object to the settlement or opt

21   out of the class), *objections overruled*, 2014 WL 4354386 (N.D. Cal. Sept. 2, 2014); *see also*

22   *Cody v. SoulCycle, Inc.*, 2017 WL 8811114, at *4 (C.D. Cal. Sept. 20, 2017) (denying

23   intervention of a putative class member where he failed to show that his interests would be

24   impaired and intervention risked compromising the final settlement).

25         A party seeking to intervene under Rule 24(a)(2) must show it "claims an interest relating

26   to the property or transaction that is the subject of the action, and is so situated that disposing of

27   the action may as a practical matter impair or impede the movant's ability to protect its interest,

28   unless existing parties adequately represent that interest."  *Sterrett v. Sonim Techs., Inc.*, 2020

Fenwick & West LLP
Attorneys at Law

1   WL 6342941, at *1 (N.D. Cal. Oct. 29, 2020).

2          Here, the Nine Movants simply cannot show that their protectable interests are not

3   adequately represented by Class Counsel or that their interests will be in any material way

4   impaired.  This Court appointed Class Counsel to represent the putative class after carefully

5   considering six applications for appointment and Class Counsel has acquired intimate knowledge

6   of the facts of this case through discovery.  *See* Order Appointing Interim Class Counsel (Dkt.

7   No. 72) ("The Court is confident that Mr. Girard's and Mr. Siegel's experience in cases with

8   similar claims and their work thus far in this matter will enable them to effectively represent and

9   guide the plaintiffs at this stage of litigation.").  Moreover, the Rule 23 settlement process itself is

10   designed to protect the Nine Movants' interests, including through the objection and opt-out

11   processes.  *See Raquedan*, 376 F. Supp. 3d at 1041-42.

12          The Nine Movants share an "ultimate objective" with Plaintiffs—*i.e.*, receiving monetary

13   relief for their use of paid Intuit products despite their eligibility for the IRS Free File program—

14   and, as such, their interests are presumed to be adequately represented by Plaintiffs.  *See Perry v.*

15   *Proposition 8 Official Proponents*, 587 F.3d 947, 951 (9th Cir. 2009) (applying a presumption of

16   adequate representation where, although intervenors claimed "broader" interests than Plaintiffs,

17   they shared the same objective of "defending the constitutionality of Prop. 8. . .").[2]  The Nine

18   Movants argue that the Parties' request to temporarily enjoin arbitrations demonstrates that the

19   Parties are "directly adverse" to the Nine Movants.  Mot. to Intervene at 9.[3]  But, as in *Perry*,

20   "[t]o the extent that there is disagreement [between intervenors and Plaintiffs]. . . it is best

21   characterized as a dispute over litigation strategy or tactics."  *Id*. at 954.  Here, the Nine Movants

22   ─────────────────────

23   [2] The Nine Movants contend that, pursuant to *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011), their burden to show inadequacy of representation is "minimal."  Mot. to Intervene at 9.  However, the *Citizens* case states that, "[i]f an applicant for

24   intervention and an existing party share the same ultimate objective, a presumption of adequacy of representation arises.  To rebut the presumption, an applicant must make a 'compelling

25   showing' of inadequacy of representation."  647 F.3d at 898 (citations omitted).

26   [3] The Nine Movants' citation of *Gomes v. Eventbrite, Inc.*, 2020 WL 6381343, at *3 (N.D. Cal. Oct. 30, 2020) on that point (Mot. to Intervene at 9) is inapposite.  That case involved intervenors

27   who were seeking to intervene for "the limited purpose of requesting a continuance [of] the hearing on the [Preliminary Settlement] Motion."  *Id.* at *2.  They did so because they were

28   awaiting a pending decision in state court, which would determine whether they would want to join the federal court action.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    may disagree over the strategic or tactical reasons why Class Counsel seeks relief in federal court

2    on behalf of over 19 million Intuit customers, versus pursuing mass-generated arbitrations, but the

3    "ultimate objective" remains the same.  Thus, the Nine Movants' interests are presumed to be

4    adequately represented by Plaintiffs.  Since the Nine Movants have not made a "compelling

5    showing" of inadequacy of representation to overcome this presumption, *see id.* at 951, this Court

6    should deny intervention.

7    **II.    THE COURT SHOULD DENY THE NINE MOVANTS' REQUESTED RELIEF
         BECAUSE THE SETTLEMENT MEETS THE STANDARDS FOR
8        PRELIMINARY APPROVAL**

9        **A.    The Terms Of The Settlement Are Fair, Reasonable, And Adequate**

10       The Settlement is the product of hard-fought, arm's-length negotiations with court-

11   appointed Class Counsel, Cole Decl. ¶ 3, "and thus is 'entitled to an initial presumption of

12   fairness.'"  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017

13   WL 672820, at *10 (internal quotation marks and citation omitted); *see also Rodriguez v. West*

14   *Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (noting that the Ninth Circuit "put[s] a good

15   deal of stock in the product of an arms-length, non-collusive, negotiated resolution").  While the

16   Nine Movants imply that Class Counsel colluded with Intuit (*see, e.g.*, Mot. to Intervene at 13,

17   14), that assertion is reckless and unsubstantiated, and the record is to the contrary.  Indeed, Judge

18   Infante, a well-respected former magistrate judge, declared that the parties were well-represented

19   by "zealous and able counsel" who reached a "fair and practical solution" after a series of

20   intensive arm's-length negotiations.  Decl. of the Hon. Edward A. Infante (Ret.) in Support of

21   Preliminary Approval of Settlement (Dkt. No. 162-3) at ¶ 9.  The Nine Movants' only purported

22   indicator of collusion is the "clear-sailing" provision in the Settlement (Mot. to Intervene at 13),

23   but the Ninth Circuit has expressly noted that clear-sailing provisions do not signal collusion

24   where payments are to be made from a capped settlement fund.  *See Rodriguez*, 563 F.3d at 961

25   n.5.  And the fact that Class Counsel negotiated a settlement after losing a significant motion does

26   not impugn the Settlement's fairness or adequacy (Mot. to Intervene at 13, 15), as litigation

27   setbacks form the backdrop against which all settlements are negotiated.

28       The Settlement provides $40 million in compensation, which the Parties estimate will

FENWICK & WEST LLP
ATTORNEYS AT LAW

result in recovery for participating class members equal to 20% to 50% of the average fees that they paid to use TurboTax online in a year they were eligible to file for free. *See* Motion at 17. The Settlement also provides for injunctive relief that will, *inter alia*, create a legal obligation on Intuit to continue to refrain from "de-indexing" the TurboTax Free File product from internet search results, to take a series of measures alerting taxpayers that they may be eligible to file for free, and to adhere to the FTC's guidelines setting forth best practices for online marketing. *See* Dkt. No. 162-1 at § III (a).

The Nine Movants and *Amici* contend that the Settlement's monetary and non-monetary relief are inadequate, which amounts to a self-serving and highly speculative assertion that they can do better than Class Counsel. *See* Mot. to Intervene at 20-23; Am. Prop. Br. at 7-10.

### 1.    The Settlement Provides Significant Monetary Relief

*First*, the criticisms of the monetary relief ignore that Class Counsel carefully weighed the class members' litigation risk. *See* Motion at 15-16; *see also G. F. v. Contra Costa Cty.*, 2015 WL 7571789, at *8 (N.D. Cal. Nov. 25, 2015) ("Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case." (citation omitted)). Following extensive discovery and communication with Intuit, Class Counsel concluded that class members must overcome "a robust set of defenses." Motion at 15-16.

The Nine Movants nevertheless assert that an average recovery of $28 for participating class members is "not adequate . . . for any individual who is willing to pursue claims in arbitration." *See* Mot. to Intervene at 21. Of course, that presupposes success in arbitration, which is uncertain at best. *See* Chandrasekher & Horton, *Arbitration Nation*, 107 Cal. L. Rev. 1, 55-56 (2019) (noting 33% success rate for consumers in AAA cases). It also conveniently overlooks that any recovery achieved through arbitration will be subject to reimbursement of the initial AAA filing fees and to Keller Lenkner's significant attorneys' fees (which in *CenturyLink* were set at $750 per client for claims settled *before* arbitration). *See* Cole Decl. ¶ 15; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 229 F.Supp.3d 1052, 1066 (N.D. Cal. 2017) (Breyer, J.) ("[E]ven if Plaintiffs were to prevail, they would be required to expend considerable additional time and resources potentially outweighing any

Fenwick & West LLP
Attorneys at Law

additional recovery obtained through successful litigation."). The fact remains that upwards of 19 million class members will have the opportunity to obtain a recovery that equals 20% to 50% of their TurboTax expenditures in a year they were eligible to file for free with the TurboTax Free File Program, without incurring the risk or burden of initiating an arbitration.

Relatedly, the Nine Movants state that "[n]o rational class member would settle for $28 a claim that she paid $200 to initiate where, as here, she is likely to recover far more than $28 in her individual case."[4] *See* Mot. to Intervene at 23; *see also id.* at 22. But the filing fees are irrelevant to the "rational" calculus of class members who brought AAA arbitrations because Keller Lenkner invested those filing fees themselves and can only recoup them from the claimants *from recoveries achieved through arbitration*.[5] *See* Cole Decl. ¶ 17.

Additionally, *Amici* suggest that case law establishes some objective economic benchmark for what constitutes adequate recovery (*see* Am. Prop. Br. at 8-9), but it is well-established law that a settlement representing only a portion of the potential recovery sought by class plaintiffs may be adequate and fair. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), as amended (June 19, 2000). Ultimately, Class Counsel fulfilled its role by evaluating the reasonableness of the Settlement's monetary relief in light of the case's litigation challenges. *See Rodriguez*, 563 F.3d at 965 ("In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value.")

The Nine Movants also make much of the fact that Intuit "offered settlements of six to 15

---

[4] The Nine Movants conveniently omit that, under the Terms, "Intuit will reimburse all [filing, administration, and arbitrator] fees and costs for claims totaling less than $75,000 unless the arbitrator determines the claims are frivolous." *See* Cole Decl. ¶ 35, Ex. 11.

[5] The Nine Movants are also incorrect in suggesting that class members who have pursued (or will pursue) arbitration may have more valuable claims than other class members. *See* Mot. to Intervene at 13, 22. The option to opt-out of the Settlement and pursue claims in arbitration is equally available to all class members. And to the extent that there is variation among class members in the expected value of their claims, the Ninth Circuit has held that such variability is a natural feature of any class action that does not preclude settlement approval. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012) ("It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages—that is why due process requires that individual members . . . be given an opportunity to opt out of the settlement class to pursue their claims separately, as were the class members in this case.")

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    times as much as the proposed class settlement" to certain arbitration claimants.  Mot. to

2    Intervene at 23.  These settlement offers were made to 105 claimants, *see* Cole Decl. ¶ 23, and are

3    in no way indicative or predictive of the settlement amounts that a group of 125,000 claimants,

4    many with deficient claims, could hope to receive.  And, in all events, if individual arbitration

5    claimants believe that they will obtain a better outcome in arbitration with Intuit, they are free to

6    opt out of the Settlement at the appropriate time.

7    **2.      The Settlement Provides Significant Non-Monetary Relief**

8           *Second*, the criticisms of the non-monetary relief fail to recognize that this relief fully

9    addresses the alleged conduct underlying the Nine Movants' and *Amici*'s claims.  *See* Mot. to

10   Intervene at 22; Am. Prop. Br. at 10-11.  *Amici* themselves have sought injunctive relief against

11   Intuit in their separate actions, but tellingly fail to explain how the injunctive relief they seek is

12   superior to the Settlement's relief.  Gringer Decl. ¶¶ 8-14.  In fact, the Settlement provides

13   injunctive relief similar or identical to the relief sought by *Amici*.  *Id.*  Additionally, the Nine

14   Movants and *Amici* emphasize that Intuit has already undertaken or agreed to undertake some of

15   the measures set forth in the Settlement's non-monetary relief.  *See* Mot. to Intervene at 22; Am.

16   Prop. Br. at 10-11.  It is true that Intuit continually takes measures to ensure that its customers

17   fully understand their tax filing options, which include the IRS Free File program.  This has been

18   a longstanding practice of Intuit, including before the ProPublica publications and the present

19   proceedings.  However, this practice does not deprive the injunctive relief of value.[6]  On the

20   contrary, under the Settlement, Intuit would be bound to the measures by a court-approved

21   settlement, which class members can seek to judicially enforce if necessary.  Moreover, the Nine

22   Movants and *Amici* appear to acknowledge that the Settlement's specific, tailored injunctive relief

23   is in many respects different from the measures that Intuit has already undertaken or agreed to

24   undertake.  Again, the Intervenors are second-guessing relief that resulted from extensive

---

25   [6] The Ninth Circuit recently upheld a lower court's finding that the partially duplicative nature of
26   non-monetary settlement relief did not negate that relief's value for the class, even though the
     Ninth Circuit suggested that on the particular facts of that case the relief was not very substantial.
27   *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 n.12 (9th Cir. 2020) ("Objector argues that this
     disclosure is duplicative of the change Facebook had already made to the disclosure language in
28   its Data Policy, and therefore that the Help Center disclosure has no marginal value.  The district
     court did not clearly err by concluding otherwise.")

FENWICK & WEST LLP
Attorneys at Law

negotiations between the Parties and reflects Class Counsel's judgment regarding the measures necessary to address the conduct giving rise to class members' claims.

Finally, *Amici* state in passing, while criticizing the non-monetary relief, that "the email-only notice contemplated [in the Settlement] is an ineffective mode of outreach even for a class notice." Am. Prop. Br. at 11; *see also id.* at 6-7.  *Amici* fail in their duty to mention to this Court that the notice program also provides for notice to be mailed to class members in the event that emails are returned as undeliverable and for publication of the notice on a settlement-dedicated website. *See* Dkt. No. 162-1 at § VI (d)-(e).  And while *Amici* take issue with the notice required by the Settlement, they omit the fact that they aggressively pursued—but failed to obtain— a consumer notice similar to the one required by the proposed settlement in their state court action. Gringer Decl. ¶¶ 9-14.  In any event, this misleading side-swipe at the notice program is without merit, as courts routinely approve settlements that predominantly provide notice to class members via email.  *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 941, 954 (9th Cir. 2015) (finding adequate notice was provided where the "[i]nitial e-mail notice of the settlement was provided to some 35 million class members" and "[n]otice was mailed to more than 9 million class members whose email addresses were invalid such that the email notice 'bounced back.'"); *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1254-55 (C.D. Cal. 2016) (finding that a program relying predominantly on e-mail notices supplemented by postcards provided adequate notice); *Chinitz v. Intero Real Est. Serv.*, 2020 WL 7042871, at *3 (N.D. Cal. Dec. 1, 2020) (approving a program relying predominantly on e-mail notices).  Perhaps more to the point, the class members filed their income taxes through TurboTax *online* and agreed to receive communications about their filings from Intuit via email, which makes email the best means for communicating a notice.  Cole Decl. ¶ 9; *id.* at Ex. 11 at § 7.3.

### 3.    The Settlement Agreement Does Not Foreclose All Further Actions

Nor is there any basis for *Amici*'s assertion that the Settlement "could unnecessarily and inappropriately deprive low-income consumers nationwide of further relief by hindering governmental enforcement actions."[7]  *See* Am. Prop. Br. at 12; *see also id.* at 14-15.  Indeed,

---

[7] *Amici* may also be overstating the societal value of their actions.  In a recent concurring opinion,

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Amici* are not parties to the Settlement and therefore are not releasing any claims against Intuit. The Settlement does not prohibit *Amici* from attempting to seek additional injunctive relief or statutory penalties against Intuit. *See id.* at 14. Likewise, the Parties do not intend for the Settlement to prohibit consumers from cooperating with *Amici* in the development of *Amici*'s claims. *See* Cole Decl. ¶ 11; *see also* Am. Prop. Br. at 15. Additionally, the Settlement does not prohibit the FTC or State Attorneys General from bringing actions against Intuit—though none of those agencies have done so yet, and none of them have objected to the Settlement. And, of course, the Nine Movants and any other class members are free to opt out of the Settlement.

Contrary to *Amici*'s dire warnings, the Settlement provides relief beyond anything *Amici*'s actions against Intuit can achieve. *Amici*'s actions can only benefit California residents, who represent 8.8% of class members. *See* Cole Decl. ¶ 7; Gringer Decl. ¶¶ 6-7. The Settlement will also provide immediate relief to the settlement class (including injunctive relief that will govern Intuit's conduct during the upcoming tax season), whereas it will take several years, at best, before any relief is issued in *Amici*'s actions. Gringer Decl. ¶¶ 15-20. In any event, *Amici* are unlikely to prevail in their actions, as the majority of their claims can only succeed if the court finds that Intuit had a duty to disclose the existence of the IRS Free File Program. *Id.* ¶¶ 17-20. Under California law, Intuit unambiguously had no duty to disclose the existence of the program. *Id.* ¶¶ 18-19. Intuit has already filed a motion for summary adjudication ("MSA") of the duty to disclose issue in the LACA case and the court has stayed discovery, only allowing narrowly-focused discovery on the facts necessary to respond to the MSA. *Id.* ¶ 18. In short, *Amici*'s actions against Intuit are seriously flawed and unlikely to succeed, making the monetary and non-monetary relief provided in the Settlement all the more valuable to class members.

---

Justice Kruger of the California Supreme Court observed that, by "empowering scores of local officials to sue in the name of the State of California," California's Unfair Competition Law "creates an incentive for district attorneys to race each other to the courthouse and to enter settlements that maximize their own counties' recoveries, potentially at the expense of consumers elsewhere in the state." *See Abbott Labs. v. Superior Court of Orange Cty.*, 9 Cal. 5th 642, 665 (2020). Here, LACA raced to file its lawsuit with only the most cursory of pre-complaint investigations, relying almost exclusively on a ProPublica story posted online just days before LACA filed its complaint. *See* Gringer Decl. ¶ 3.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**B.      The Opt-Out Process Ensures Individualized Decisions By Class Members And Orderly Administration Of The Claims Process**

**1.      The Process Acts As A Bulwark Against Keller Lenkner Prioritizing Its Own Financial Interests Over Those Of Its Clients**

The Nine Movants' attacks on the Settlement's opt-out process are a thinly veiled attempt to protect Keller Lenkner's business model, at the expense of the interests of Keller Lenkner's individual clients.  Mot. to Intervene at 16-20.  The opt-out process, like the claims process, is designed to ensure that each class member engages with the settlement information sent to her and makes an individualized, informed decision about whether to accept the settlement.  The opt-out process is similar to many other commonplace transactions:  class members must provide, by way of written request, certain basic identifying information, including their address and a unique identification number ("ID") assigned by the settlement administrator, a statement of their status as a class member and desire to opt out, and the name and case number of the class member's pending arbitration against Intuit (if such is the case).  Dkt. No. 162-1 at § VII(a)(i).  The opt-out request must bear an original or PDF copy of the class member's signature.  *Id.*

The Nine Movants and *Amici* contend that the process of opting out through a personally signed request sent via mail is designed to suppress opt outs.  Mot. to Intervene at 16-20; Am. Prop. Br. at 7.  Additionally, the Nine Movants claim that opting out should instead occur electronically "through counsel," with class member consent evidenced through "electronic signatures."  Mot. to Intervene at 16-20.  These criticisms deliberately ignore that courts have frequently approved settlements with similar opt-out processes, and that Keller Lenkner's behavior and business model make the Settlement's opt-out process particularly appropriate to ensure individual, informed decisions by class members regarding their opt-out rights.  In the *CenturyLink* matter, where Keller Lenkner "gave the same blanket advice to opt out to all 22,000 of its clients," the court emphasized that

> [i]n this case, the requirement that a class member must individually sign is vital, because it ***ensures that the class member is individually consenting to opt out***, and avoids a third party or lawyer representing that they have that class member's authority, without the class member making an informed, individual decision. Acceptance of an attorney-signed opt out is not required in a case involving more than 16,000 purported [] opt outs ***represented by a single small law firm*** [*i.e.*, Keller Lenkner] ***when there exist questions regarding the informed decision of each***

FENWICK & WEST LLP
ATTORNEYS AT LAW

*client* . . .

*CenturyLink*, 2020 WL 3512807, at *3 (emphasis added).

Given its business model and track record (*see* Cole Decl. ¶¶ 14-17), Keller Lenkner is strongly incentivized to execute a mass opt out of all its clients without assessing their individual circumstances, providing individuated legal advice, or taking steps to obtain meaningful client consent. *See* Bundy Decl. ¶¶ 6-9; *see also, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*, 910 F. Supp. 2d 891, 939 (E.D. La. 2012), *aff'd*, *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (noting that mass, unsigned opt outs "are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them"); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *26 (N.D. Ga. Mar. 17, 2020) (noting that technology "makes it easier for third parties and their counsel to file unauthorized mass opt-outs, which are sometimes highly indicative of a conclusion that such counsel did not spend much time evaluating the merits of whether or not to opt-out. . .") (internal quotation marks and citation omitted). Having failed in its gambit to enjoin the Parties from entering into any settlement whatsoever (Cole Decl. ¶¶ 25-34), Keller Lenkner is all but certain to take another bite at the apple by attempting a mass opt out.

Under these ethically fraught circumstances (*see* Bundy Decl. ¶¶ 6-9), the requirement for a personally signed, mailed opt-out request ensures that class members are personally making individual settlement decisions and that their consent is not usurped by Keller Lenkner in pursuit of its own attorneys' fees.[8] *See, e.g.*, *CenturyLink*, 2020 WL 3512807, at *3-4; *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *26 ("[T]he personal signature requirement is not burdensome, and is of particular importance in this case, to ensure that the objection is made in the objector's personal capacity, and not at the behest of others."); *Hallie v. Wells Fargo Bank, N.A.*, 2015 WL 1914864, at *4 (N.D. Ind. Apr. 27, 2015) ("Requiring a

---

[8] The Nine Movants' assurance that "[c]ounsel will not make any settlement decision for any client" (Mot. to Intervene at 24) amounts to saying "just trust us." Keller Lenkner's insistence on an opt-out process where its clients' true level of involvement remains opaque, coupled with its efforts to enjoin the Settlement and its track record of reflexive mass opt outs, suggests that this Court's trust would be misplaced.

Fenwick & West LLP
Attorneys at Law

1    personally signed, individual request for exclusion from class settlement heightens the likelihood

2    that each class plaintiff will make an informed, individualized decision whether to opt out. . .");

3    *In re Syngenta Ag Mir 162 Corn Litig.*, 2018 WL 1726345, at *7 (D. Kan. Apr. 10, 2018) ("To

4    ensure that those who actually may possess a potential claim are in fact the decision-makers, it is

5    more than reasonable to require that they take the very minimal effort required to sign and mail an

6    opt out.") (citation omitted).

### 2.    The Potential Value Of Arbitration Claims Does Not Justify Allowing Keller Lenkner To Reflexively Opt Out All Its Clients

9         The gravamen of the Nine Movants' criticisms of the Settlement is that mass opt outs are

10   justified because Keller Lenkner's clients have more valuable claims than other class members by

11   virtue of their decision to pursue arbitration.  Mot. to Intervene at 22-23.

12        As a threshold matter, the Nine Movants have no standing to speak for Keller Lenkner's

13   approximately 125,000 other clients, whom they do not represent.  Moreover, the Nine Movants'

14   intervention in the proceedings makes clear that they have the ability to opt out individually.

15   Thus, the Nine Movants are really just advocating for Keller Lenkner's financial interest in

16   conducting mass opt outs—an interest that has no bearing on whether this Court should approve

17   the Settlement.

18        This said, the contention that mass opt outs are justified here, which amounts to an attempt

19   by Keller Lenkner to create its own *de facto* class action untethered from the procedural

20   protections of Rule 23 and free from court supervision, fails for at least two reasons.

21        *First*, the Keller Lenkner clients that belong to the settlement class[9] are not situated

22   differently from other class members in any meaningful way.  Indeed, *all* are vulnerable to the

23   same set of legal defenses as other class members and their damages are similar, if not identical,

24   in nature to those of other class members.  *See* Motion at 19-20; Bundy Decl. ¶ 4(c).  Likewise,

25   class members who are not represented by Keller Lenkner also agreed to the Terms containing the

---

[9] The *only* meaningful difference between Keller Lenkner's clients and other settlement class members is that a substantial number of Keller Lenkner's clients have filed frivolous demands, leading Keller Lenkner to withdraw over 8,000 arbitration demands to date.  Cole Decl. ¶ 21.  A number of the clients with frivolous claims were never even TurboTax customers and, as such, are not actually class members.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

arbitration agreement and theoretically have the ability to initiate arbitration against Intuit, which makes them no different from Keller Lenkner's clients.[10]  And as many as 88,785 of Keller Lenkner's clients are not in fact differentiated by the pursuit of claims in arbitration, since Keller Lenkner has failed to pay initial filing fees for those clients and, as such, their demands are not "considered properly filed" under AAA rules.  Cole Decl. ¶ 19; AAA Consumer Arb. R-2.  Moreover, the purported superior value of the claims of Keller Lenkner's clients hinges not on any facts specific to those claims or even on the procedural decision to individually pursue arbitration, but rather on the implied assumption that Keller Lenkner's threat of deluging Intuit with claims triggering a cascade of AAA fees will successfully extract a lucrative settlement.  The assumed success of a scheme that is entirely external to the substance of class members' claims— and whose ethical propriety is dubious—is not a cognizable differentiating factor between claims.

*Second*, the claims of Keller Lenkner's clients are sufficiently differentiated from one another in terms of potential settlement value that a mass opt out would be contrary to Keller Lenkner's ethical obligation to provide individualized advice to its clients.  *See* Bundy Decl. ¶¶ 6-9.  For example, some of Keller Lenkner's clients are susceptible to particularly strong defenses given their TurboTax history (see Motion at 15-16) and some clients are at an earlier stage of their arbitrations than others.  *See* Bundy Decl. ¶ 4(e).  Ironically, the Nine Movants complain of a "one-size-fits-all proposed settlement" (Mot. to Intervene at 23), yet Keller Lenkner seeks a "one-size-fits-all" opt out for its clients, contrary to its ethical obligations.

### 3.   The Settlement Identification Number Helps Ensure Orderly Administration Of The Settlement

Finally, the Nine Movants also object to the requirement that class members opting out provide the ID assigned to them by the settlement administrator.  *Id.* at 18-19.  Yet the ID is

---

[10] California courts routinely approve settlements where class members had a colorable right to pursue arbitration against defendants.  *See, e.g.*, *Lee v. JPMorgan Chase & Co.*, 2014 WL 12580237 (C.D. Cal. Nov. 24, 2014) at *1, 7-9; *Wilson*, 2019 WL 2929988, at *7; *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d at 999.  The fact that putative class members can potentially pursue arbitration has thus not prevented settlement approval nor has it given rise to unique settlement structures favoring mass opt outs of class members.  To the extent that Keller Lenkner wishes to reform class action law to favor individuals with arbitration claims, it would be more appropriate to lobby for legislative reform than to seek *ad hoc* special treatment for its clients before the courts.

FENWICK & WEST LLP
ATTORNEYS AT LAW

necessary for orderly distribution of the settlement funds, as it allows the settlement administrator to prevent mistakes that could arise by relying solely on other identifying information.  Intuit uses a unique number for each TurboTax account and the same customer may have more than one account associated with the same (or more than one) email address across several tax years.  Cole Decl. ¶ 10.  Intuit will provide the settlement administrator with identifying information for all class members and an ID will be created for each class member.  *See id.*; Dkt. No. 162-1 at § VI(c).  The ID will allow the settlement administrator to identify a class member opting out even if that member's address or legal name have changed and no longer match the information in Intuit's records.  Cole Decl. ¶ 10.  The ID also ensures that customers with multiple account numbers will not erroneously be counted as more than one class member.  *Id*.  The court in *CenturyLink* found that the use of IDs was particularly important when, as may occur here, a large number of class members opted out.  2020 WL 3512807, at *5 ("The failure to include . . . settlement identification numbers increases the likelihood of future confusion and litigation regarding who is and is not in the class.")  Thus, the ID number is not some nefarious means for suppressing opt outs, but rather a legitimate tool for orderly settlement administration.

### C.   Enjoining Parallel Proceedings Pending A Valid Opt-Out Will Protect The Settlement Class Without Impairing Class Members' Right To Arbitration

The Nine Movants object to preliminary approval on the ground that it would stay proceedings by class members who have not yet opted out.  However, as the *CenturyLink* court reasoned when staying mass arbitrations orchestrated by Keller Lenkner, a stay is "necessary to properly manage the disposition of this case and enforce the Court's Preliminary Approval Order, including avoiding confusion among class members, ensuring proper notice, and preserving resources."  *CenturyLink*, 2020 WL 869980, at *5 (D. Minn. Feb. 21, 2020).  All of that is equally true in this case.  Specifically, a stay serves several important purposes.  *First*, it avoids inadvertent waiver of rights and facilitates class members' individualized decision-making by requiring a conscious choice between participating in the Settlement and prosecuting a claim separately.  *Second*, it protects Intuit from the possibility of improper double recoveries while the opt-out process is ongoing.  And, *third*, it prevents parties from unnecessarily incurring the costs

1   of arbitration while class members consider whether to participate in the Settlement or proceed in

2   arbitration.  Those costs include millions of dollars in arbitrations fees for cases the Settlement

3   may well resolve.  The Nine Movants offer no persuasive response to any of those points, each of

4   which is sufficient to justify this Court's exercise of its authority under the All Writs Act to enter

5   a stay "in aid of" its jurisdiction.  28 U.S.C. § 1651(a).

6         Indeed, as the Nine Movants ignore, a class settlement is the paradigmatic case for staying

7   parallel actions under the All Writs Act, which confers broad authority to enjoin "persons who,

8   though not parties to the original action or engaged in wrongdoing, are in a position to frustrate

9   the implementation of a court order or the proper administration of justice."  *United States v. N.Y.*

10  *Tel. Co.*, 434 U.S. 159, 174 (1974); *see also, e.g.*, *Makekau v. State*, 943 F.3d 1200, 1205 (9th

11  Cir. 2019).  That includes the power to enjoin proceedings that would "interfere, derogate, or

12  conflict with federal judgments, orders, or settlements."  *In re Volkswagen "Clean Diesel" Mktg.,*

13  *Sales Prac. and Prods. Liab. Litig.*, 229 F. Supp. 3d at 1073 (quoting *Keith v. Volpe*, 118 F.3d

14  1386, 1390 (9th Cir. 1997)).  As courts have repeatedly held, the risk of such interference is

15  especially high in class settlements:  "In complex cases where certification or settlement has

16  received conditional approval, or … where settlement is pending, the challenges facing the

17  overseeing court are such that it is likely that almost any parallel litigation in other fora presents a

18  genuine threat to the jurisdiction of the federal court."  *In re Diet Drugs*, 282 F.3d 220, 236 (3d

19  Cir. 2002).  For that reason, "[t]his type of injunctive relief is commonly granted in preliminary

20  approvals of class-action settlements."  *In re Uponor, Inc., F1807 Plumbing Fitting Prods. Liab.*

21  *Litig.*, 2012 WL 13065005, at *8 (D. Minn. Jan. 19, 2012); *see also, e.g.*, *Hanlon v. Chrysler*

22  *Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) (affirming "temporary approval" of "nationwide

23  settlement" that "stayed … state class actions"), *overruled on other grounds by Wal-Mart Stores,*

24  *Inc. v. Dukes*, 564 U.S. 338 (2011); *Diet Drugs*, 282 F.3d at 236 (collecting examples).

25        Here, the Nine Movants are members of the proposed settlement class who also have

26  pending arbitrations.  If their actions—and those of other Keller Lenkner clients—proceed during

27  the opt-out period, Intuit may be subject to conflicting determinations and improper duplicative

28  recoveries as well as substantial arbitration fees for cases that could ultimately be abandoned.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

Without a stay, class members may also fail to consider the tradeoffs of settling versus proceeding in arbitration and fail to make an informed, individual choice based on their personal circumstances.

The Nine Movants contend that a stay would violate the FAA.  Mot. to Intervene at 10-11.  But the FAA requires only that agreements to arbitrate be enforced "according to their terms." *Volt Info. Scis. Inc. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989); *see also* 9 U.S.C. § 2.[11]  The Terms authorize the Nine Movants to assert claims in individual arbitration (or small claims court) if they so choose.  Nothing in the Terms or the FAA gives the Nine Movants the right to be excluded from a class settlement without affirmatively opting out.

Nor have the Nine Movants identified *any* actual prejudice to their "contractual and statutory rights."  Mot. to Intervene at 9.  To the contrary, their right "to arbitrate can be fulfilled, even if it is deferred in light of the issuance of a temporary stay."  *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013).  As the Nine Movants concede, the stay "would be temporary" (Mot. to Intervene at 10), lifting as soon as they opt out if they so choose.  That is much more limited than the stay in *CenturyLink*, which did not terminate until the court's final approval order.  2020 WL 869980, at *1.  Here, the Nine Movants would be enjoined from arbitrating only until they decide *not* to participate in the settlement by submitting a valid opt-out, at which point they are free to immediately proceed in arbitration.  The stay thus poses no risk of delaying the Nine Movants' arbitrations beyond the time needed for them to make informed choices about *whether* to forgo the proposed settlement and proceed in arbitration.

The Nine Movants note that many stays under the All Writs Act involve litigation rather than arbitration (Mot. to Intervene at 11), but they offer no reason why the right to litigate is less important than the right to arbitrate.  As countless cases show, courts can and do just as readily stay parallel arbitrations under the All Writs Act.  *See, e.g.*, *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914-15 (8th Cir. 2010); *CenturyLink*, 2020 WL 869980, at *6-7; *Uponor*, 2012 WL 13065005, at *8-9; *Allstate*, 929 F. Supp. 2d at 219-20; *Stott v. Capital Fin. Servs., Inc.*,

---

[11] Acting consistently with this law, the AAA has stated that it will "abide by any court order directed to the parties specifying the manner in which the underlying arbitrations should, or should not, proceed."  Cole Decl. ¶ 24.

1   277 F.R.D. 316, 340 (N.D. Tex. 2011).

2         Finally, the Nine Movants say that "courts have specifically rejected the notion that a

3   district court may enjoin arbitration to facilitate administration of a class-action settlement" (Mot.

4   to Intervene at 10-11), but the sole case they cite—*In re Piper Funds, Inc., Institutional Gov't*

5   *Income Portfolio Litig.*, 71 F.3d 298 (8th Cir. 1995)—rests on unique facts not present here.

6   There, a large institutional investor filed an arbitration demand irrevocably electing not to

7   participate in a class action, as required by the applicable arbitration rules, but the district court

8   refused to exclude the investor and enjoined the arbitration pending approval of a class

9   settlement. *Id.* at 299-300.  The Eighth Circuit reversed, granting the investor's "request for

10  exclusion." *Id*. at 304.  Contrary to the Nine Movants' assertion, and in the words of the district

11  court from which the opinion issued, "*Piper Funds* does not stand for the proposition that a

12  settlement class member cannot be temporarily enjoined from arbitration during the notice and

13  opt-out period." *CenturyLink*, 2020 WL 869980, at *6-7.  Keller Lenkner in fact made—and the

14  district court flatly rejected—that very argument in *CenturyLink*, where *Piper Funds* is binding.

15  While *Piper Funds* is not binding on this Court, the *CenturyLink* court's rationale for rejecting

16  Keller Lenkner's argument applies here:  None of the Nine Movants, much less all 125,000 of

17  Keller Lenkner's clients, is a sophisticated institutional party with a multi-million dollar claim

18  who has irrevocably elected not to participate in the class settlement.  To the contrary, they are

19  tens of thousands of individuals who are entitled to make informed, individualized decisions

20  about whether to participate in the Settlement.  *See CenturyLink*, 2020 WL 3512807, at *7.  A

21  temporary stay to allow that to happen and avoid interference with the Settlement is perfectly

22  consistent with *Piper Funds* and with the numerous analogous cases.

23         **D.     The Arbitration Provision Does Not Preclude Preliminary Approval**

24         Finally, the Nine Movants' argument that the arbitration agreements between Intuit and its

25  customers preclude Intuit from entering into a class action settlement is unavailing.  *See* Mot. to

26  Intervene at 9-10.  Intuit is not advancing any type of new "settlement exception" to an arbitration

27  clause or class action waiver.  *Id.* at 9.  Rather, the Settlement presents the settlement class with

28  the opportunity to waive any conflicting contractual rights and accept the settlement or opt-out.

FENWICK & WEST LLP
ATTORNEYS AT LAW

"As with any other contractual right, the right to arbitration may be waived."  *Serv. Emps. Int'l Union, Local 1021 v. Cnty. of San Joaquin,* 202 Cal. App. 4th 449, 459 (2011).  Because a settlement class is not certified until final approval following the opt-out period, any of Keller Lenkner's clients who instead elect to proceed in arbitration "can vindicate that right by opting out of the Settlement Class."  *CenturyLink*, 2020 WL 869980, at *7.

Nothing in the Terms provides the Nine Movants a right to block Intuit from entering into a class settlement or a right to be treated as excluded from a class settlement at the outset without affirmatively opting out.  The Nine Movants, of course, have the right to bring individual arbitrations (as opposed to mass arbitrations coordinated as a *de facto* class action) in accordance with the Terms.  And they have the right—grounded in due process, not the Terms—to opt out of a class settlement to prosecute their claims separately.  *See, e.g.*, *Dukes*, 564 U.S. at 363.  The notion, however, that the Terms' class-action waiver prohibits a class settlement, or otherwise overrides the notice and opt-out procedures dictated by Rule 23, flies in the face of case after case approving class settlements involving arbitration agreements with similar class-action waivers.  *See, e.g.*, *Wilson*, 2019 WL 2929988, at *7 (approving class action settlements where class members were bound by arbitration agreements "that explicitly required arbitration on an individual basis"); *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d at 999 (approving consumer class action settlement where the defendant's terms contained a "contractual arbitration clause … that contains a class action waiver"); *Lee*, 2014 WL 12580237 at *1, 7-9 (same); *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1042 (S.D. Cal. 2015) (same).

The Nine Movants are also wrong to assert that in state court, Intuit "did not dispute that including the Arbitration Claimants in a class settlement breaches the plain meaning of its arbitration agreement."  Mot. to Intervene at 9.  Intuit made the exact same argument there as here:  There is "no case supporting [Movants'] notion that [class-action waivers] confer a right to exclude oneself from a settlement class at the outset to avoid a court-supervised opt-out process."  Opp. to Prelim. Inj. at 15, *Intuit Inc. v. 9,933 Individuals*, No. 20STCV22761 (L.A. Super. Ct. Nov. 6, 2020).

Even on its face, the class-action waiver does not bar Intuit from entering into a class

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    settlement.  Of course, by entering into a class settlement, Intuit would waive its right to enforce

2    the arbitration provision, including the class-action waiver.  But in so doing Intuit would still be

3    acting as an individual defendant, not "as a plaintiff or class member in any purported class or

4    representative proceeding."  Terms § 14 (capitalization omitted).  And only consumers, not Intuit,

5    "waive the right to participate in a class action" under the Terms.  *Id.*  The Nine Movants

6    therefore have it backwards in arguing that the class-action waiver somehow *confers* a right that

7    can be enforced against Intuit.  Mot. to Intervene at 9.

8         The Nine Movants also contend that they "have not waived their right to avoid class

9    proceedings in court," *id.*, but the Settlement does not operate as a waiver of the class members'

10   right to arbitrate since they can simply opt out of the Settlement.[12]  As Judge Green put it when

11   denying Keller Lenkner's motion for a preliminary injunction in Los Angeles Superior Court,

12   Keller Lenkner's position that its clients "have a contractual right to *not* settle their case" is

13   "odd."  Cole Decl., Ex. 10 at 6 (emphasis in original).  "Of course [Keller Lenkner's clients] have

14   a right to decline a settlement offer.  . . .  The existence of a prior contract has nothing to do with

15   it.  And on the flip side of the coin . . . they have a right to *accept* a settlement."  *Id.* (emphasis in

16   original).  Thus, there is no basis in the Terms, or otherwise, for preventing the Settlement from

17   being presented to each class member in accordance with the procedures of Rule 23, so that she

18   makes her own informed decision.

19                                          **CONCLUSION**

20        For the foregoing reasons, Intuit respectfully requests that the Court: (1) deny the Motion

21   to Intervene and the relief requested therein; (2) deny *Amici*'s Motion and the relief requested

22   therein, and (3) grant Plaintiffs' Motion for Preliminary Approval of the Parties' Settlement.

23   _____

24   [12] The Nine Movants cite to wholly irrelevant case law on this point.  Mot. to Intervene at 10.  In
     *Marcotte v. Micros Sys.*, the court had before it competing declarations regarding whether one
25   party had verbally told the other it would not enforce a forum selection clause.  2014 WL
     5280875, at *4 (N.D. Cal. Oct. 14, 2014).  The court found it "doubtful" the party had "freely
26   abandoned its contractual right," which was insufficient to meet the standard of "clear and
     convincing" proof of waiver.  *Id.  United States v. Park Place Assocs., Ltd.* involved a motion to
27   vacate an arbitration award based on the prevailing party's alleged waiver of the right to arbitrate.
     The Ninth Circuit acknowledged the heavy burden of proof to find waiver of arbitration, while
28   holding that the party had not waived its arbitration rights because it "only moved the battle from
     one venue to another."  563 F.3d 907, 921 (9th Cir. 2009).

1

Dated:  December 7, 2020

FENWICK & WEST LLP

2

3

By: _s/ Rodger R. Cole_

Rodger R. Cole

4

Attorneys for Defendant
INTUIT INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26