1   Warren Postman (#33069)                      Keith A. Custis (#218818)
        wdp@kellerlenkner.com                         kcustis@custislawpc.com
2   KELLER LENKNER LLC                           CUSTIS LAW, P.C.
    1300 I Street, N.W., Suite 400E              1999 Avenue of the Stars, Suite 1100
3   Washington, D.C. 20005                       Los Angeles, California 90067
    (202) 749-8334                               (213) 863-4276
4

5   Benjamin Whiting (*pro hac vice*)
        ben.whiting@kellerlenkner.com
6   Ellyn Gendler (#305604)
        ellyn.gendler@kellerlenkner.com
7   KELLER LENKNER LLC
    150 N. Riverside Plaza, Suite 4270
8   Chicago, Illinois 60606
    (312) 741-5220
9

10  *Attorneys for Intervenors*

11

12                     UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
13                        SAN FRANCISCO DIVISION

14                                          )
                                            )
15  IN RE INTUIT FREE FILE LITIGATION       )   Case Nos.:     3:19-cv-02546-CRB
                                            )
16  This Document Relates to: All Actions   )
                                            )
17                                          )   **REPLY IN SUPPORT OF MOTION TO
                                            )   INTERVENE AND IN OPPOSITION TO
                                            )   PRELIMINARY APPROVAL OF
18                                          )   CLASS ACTION SETTLEMENT**
                                            )
19                                          )   **Judge:**      Hon. Charles R. Breyer
                                            )   **Date:**       December 17, 2020
20                                          )   **Time:**       10:00 a.m.
                                            )   **Courtroom:**  6 – 17th Floor
21                                          )

22

23

24

25

26

27

28

1

2

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

    **I.**     Intervention is Appropriate and the Proposed Intervenors Have Standing ..................... 5

    **II.**    The Proposed Settlement Violates the Arbitration Claimants' Contractual and Statutory Rights ...................................................................................................................... 6

    **III.**   The Proposed Settlement Fails to Meet the Rule 23 Requirements ............................. 10

           A.    The Class Does Not Meet the Certification Requirements ................................... 10

           B.    The Proposed Settlement is Unreasonable and Inadequate ................................... 13

    **IV.**   As Predicted, Neither Intuit Nor Interim Class Counsel Will Agree to a Settlement With a Straightforward Opt-Out Process ................................................................................. 20

CONCLUSION ................................................................................................................... 22

1

2

## **TABLE OF AUTHORITIES**

3

**CASES**                                                                                      **PAGE(s)**

4

*Acosta v. Trans Union, LLC,*
   243 F.R.D. 377 (C.D. Cal. 2007) ................................................................... 16, 17

5

6

*Allen v. Bedolla,*
   787 F.3d 1218 (9th Cir. 2015) ............................................................................. 13

7

*Amchem Prod., Inc. v. Windsor,*
   521 U.S. 591 (1997) ............................................................................................. 11

8

9

*Bank of Am. v. UMB Fin. Servs.,*
   618 F.3d 906 (8th Cir. 2010) ................................................................................. 9

10

11

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) .......................................................................... 4, 11

12

*Citizens for Balanced Use v. Mon. Wilderness Ass'n,*
   647 F.3d 893 (9th Cir. 2011) ................................................................................. 6

13

14

*Coleman v. Schwarzenegger,*
   No. C01 1351 TEH, 2007 WL 2765757 (E.D. Cal. Sept. 19, 2007) ...................... 5

15

16

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ............................................................................... 11

17

*Ferrington v. McAfee, Inc.,*
   No. 10-CV-01455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) .............. 6, 16, 17

18

19

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
   55 F.3d 768 (3d Cir. 1995) .................................................................................. 12

20

21

*Gomes v. Eventbrite, Inc.,*
   No. 5:19-CV-02019-EJD, 2020 WL 6381343 (N.D. Cal. Oct. 30, 2020) .............. 5

22

*Haight v. Bluestem Brands, Inc.,*
   No. 613CV1400ORL28KRS, 2015 WL 12830482 (M.D. Fla. May 14, 2015) ...... 17

23

24

*Haight v. Bluestem Brands, Inc.,*
   No. 613CV1400ORL28KRS, 2015 WL 12835994 (M.D. Fla. June 1, 2015) ........ 17

25

26

*Jolly v. Intuit Inc.,*
   No. 20-CV-04728-CRB, 2020 WL 5434503 (N.D. Cal. Sept. 10, 2020) .............. 18

27

*Koby v. ARS Nat'l Servs., Inc.,*
   846 F.3d 1071 (9th Cir. 2017) ............................................................................. 20

28

1

**CASES (cont.)**                                                                     **PAGE(s)**

2

3

*Lusby v. Gamestop Inc.*,
     297 F.R.D. 400 (N.D. Cal. 2013) ................................................................. 15

4

*Martin v. FedEx Ground Package Sys., Inc.*,
     No. C 06-6883 VRW, 2008 WL 11389034 (N.D. Cal. July 8, 2008) .................................. 19

5

6

*In re Mego Fin. Corp. Sec. Litig.*,
     213 F.3d 454 (9th Cir. 2000), *as amended* (June 19, 2000) .................................. 19

7

*Mirfasihi v. Fleet Mortg. Corp.*,
     356 F.3d 781 (7th Cir. 2004) ................................................................. 18

8

9

*In re MyFord Touch Consumer Litig.*,
     No. 13-CV-03072-EMC, 2018 WL 10539267 (N.D. Cal. June 7, 2018) .......................... 18

10

11

*O'Connor v. Uber Techs., Inc.*,
     201 F. Supp. 3d 1110 (N.D. Cal. 2016) ...................................................... 16

12

13

*In re Painewebber Ltd. P'ships. Litig.*,
     No. 94 CIV 8547 SHS, 1996 WL 374162 (S.D.N.Y. July 1, 1996) ............................ 9

14

*Perkins v. LinkedIn Corp.*,
     No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ........................ 15

15

16

*Pine v. A Place for Mom, Inc.*,
     No. C17-1826 TSZ, 2019 WL 6683511 (W.D. Wash. Dec. 5, 2019) ....................... 16

17

*Pine v. A Place for Mom, Inc.*,
     No. C17-1826 TSZ, 2020 WL 707793 (W.D. Wash. Feb. 12, 2020) ..................... 16

18

19

*In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.* (*In re Piper Funds*),
     71 F.3d 298 (8th Cir. 1995) .................................................................. 9, 22

20

21

*Rodriguez v. W. Publ'g Corp.*,
     563 F.3d 948 (9th Cir. 2009) ................................................................. 19

22

*Roes, 1-2 v. SFBSC MGMT., LLC*,
     944 F.3d 1035 (9th Cir. 2019) ............................................................ 10, 11

23

24

*Ross v. Convergent Outsourcing, Inc.*,
     323 F.R.D. 656 (D. Colo. 2018) ............................................................. 6

25

26

*Saeyoung Vu v. Fashion Inst. of Design & Merch.*,
     No. CV 14-08822 SJO (EX), 2015 WL 13545194 (C.D. Cal. Dec. 14, 2015) .............. 17

27

*Staton v. Boeing Co.*,
     327 F.3d 938 (9th Cir. 2003) ................................................................. 10

28

*Stern v. New Cingular Wireless Servs., Inc.*,
  No. SACV09-1112-CAS, 2010 WL 11530896 (C.D. Cal. Nov. 22, 2010) ........................... 16

*In re TD Ameritrade Accountholder Litig.*,
  266 F.R.D. 418 (N.D. Cal 2009) ................................................................................... 17

*True v. Am. Honda Motor Co.*,
  No. EDCV07-287-VAPOPX, 2009 WL 838284 (C.D. Cal. Mar. 25, 2009) ....................... 15

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002) ........................................................................................... 5

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
  19 F.3d 1291 (9th Cir. 1994) ......................................................................................... 22

*Zepaeda v. U.S.I.N.S.*,
  753 F.2d 719 (9th Cir. 1983) ........................................................................................... 5

**STATUTES**

15 U.S.C. § 15 ....................................................................................................................... 17

Cal. Civil Code § 1780 .......................................................................................................... 17

FED. R. CIV. P. 23 .................................................................................................................. 18

U.S. CONST. amend. V ............................................................................................................. 3

**OTHER AUTHORITIES**

Addendum to Free File (Eighth) Mem. of Understanding (Dec. 26, 2019) .............................. 19

Federal Trade Commission, *.com Disclosures How to Make Effective Disclosures
  in Digital Advertising,* (March 2013) ............................................................................ 19

FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of
  Settlement Campaigns* (September 2019) ....................................................................... 19

Intuit's Mem. Supp. Mot. Summ. Adjudication, TurboTax Free Filing Cases,
  JCCP No. 5067 (L.A. Super. Ct. July 13, 2020) ............................................................ 19

Letter from Warren Postman, *In re: CenturyLink Sales Pracs. and Sec. Litig.*,
  No. 0:17-md-02795-MJD-KMM (D. Minn. June 29, 2020), ECF No. 631 ...................... 22

Mem. of Law & Order*, In re: CenturyLink Sales Pracs. and Sec. Litig.*,
  No. 0:17-md-02795-MJD-KMM (D. Minn. June 29, 2020), ECF No. 758 ...................... 21

MODEL RULES OF PRO. CONDUCT (AM. BAR ASS'N 2020) ......................................................... 22

N.D. Cal. Proc. Guidance for Class Action Settlements ......................................................... 18

iv

1

**<u>INTRODUCTION</u>**

2   The class settlement proposed by Intuit and interim class counsel is truly extraordinary.

3   Interim class counsel filed their class-action complaint last year, but the Ninth Circuit compelled

4   the proposed class to arbitration.  There currently is no class litigation, and no chance of class

5   litigation, against Intuit.  How rare is it for a corporate defendant to settle with class counsel after

6   compelling the class to arbitration?  After an extensive search for such settlements in this District,

7   Arbitration Claimants' counsel found exactly <u>zero</u> cases where a corporate defendant compelled all

8   the claims in a putative consumer class to arbitration and then settled with the class anyway.

9   Neither Intuit nor interim class counsel cite such a case either.

10   Why is this case breaking remarkable new ground?  It is not because Intuit faces any risk

11   from the class, was concerned about a thirteenth hour Supreme Court reversal of the Ninth Circuit,

12   or suddenly took pity on the consumers it defrauded.  Intuit's ploy is as transparent as it is improper.

13   In addition to various governmental actions, tens of thousands of individual consumers are pursuing

14   arbitrations against Intuit (the "Arbitration Claimants"), and Intuit is desperate to avoid them.  What

15   Intuit wants to buy in this settlement is the ability to reduce exposure to these pending arbitrations.

16   In fact, though the Arbitration Claimants make up less than one percent of the class, Intuit has said

17   it will not proceed with the settlement if those arbitrating against it are not included in the settlement

18   and immediately enjoined.

19   Class actions are designed to resolve the claims of an entire group that warrants the same

20   treatment, not to be a device to impede the parallel proceedings of 0.8% of a group in exchange for

21   bestowing a windfall on class plaintiffs and counsel who have already lost all leverage.  Because

22   this settlement is grounded in Intuit's improper purpose, it is not surprising that the terms violate

23   the rights of the Arbitration Claimants and fail to meet well-established requirements for approval

24   of a class settlement.  As a threshold matter, the settlement violates the Arbitration Claimants' right

25   to resolve claims in arbitration rather than in court, and the immediate stay of arbitration on which

26   Intuit premises the entire settlement is a direct violation of the Federal Arbitration Act ("FAA").

27   Moreover, the proposed settlement violates a host of this District's key requirements for

28   class settlements.  Interim class counsel are fatally conflicted and the class plaintiffs are attempting

to release claims they are unable to assert and have not attempted to value.  The settlement would sweep in countless people not allowed to submit a claim.  The consideration offered is an order of magnitude lower than what arbitrating consumers have been offered.  The non-monetary relief is merely a re-promise of what Intuit already said it will do.  And class counsel fail to provide basic, required answers about how they valued the claims being released in the settlement.  To take one particularly stark example: while the settlement releases claims for a six-year-period, class counsel assign zero value to any claim class members have against Intuit for more than a single year. Counsel's justification?  Class members who paid Intuit in multiple years "arguably should have known they would be charged in the subsequent year(s)."  Mot. for Prelim. Approval of Class Action Settlement and to Distribute Notice to the Class at 14, ECF No. 162 ("Prelim. Approval Mot.").  But that argument misunderstands the entire theory of the class plaintiffs' own case:  the class allegations are not that consumers thought they were getting a free service and were secretly charged money; the allegations are that Intuit falsely told consumers, year after year, that they had to pay for tax-filing services when they did not.  This cursory justification for assigning zero value to large swaths of class members' claims is endemic to class counsel's evaluation of the settlement.

Intuit and class counsel attempt to brush aside the settlement's flaws by blithely suggesting that class members can "simply opt out."  But an opt out process is required in every class settlement proposed under Rule 23(b)(3), so its mere existence cannot excuse the parties from meeting the requirements for settlement approval.  Moreover, the opt-out process here is anything but simple; it is transparently designed to make it harder for class members to opt out and retain their rights than it is to remain in the settlement and lose them.  Intuit and class counsel do not even attempt to explain why a physical "wet-ink" signature is required over an electronic "DocuSign" signature universally accepted in modern law and business.  Nor can the parties dispute that numerous class members will be unable to opt out at all because the ID artificially required to opt out will be sent to an old email address or deleted by a spam filter.  Remarkably, the parties' only defense of this untenable result is to claim that "the ID is necessary for orderly distribution of settlement funds." Def. Intuit Inc.'s Opp'n to Mot. to Intervene and Mot. for Leave to File Br. of Amici Curiae at 19–20, ECF No. 188 ("Intuit Opp'n"); *see also* Pls.' Reply in Further Support of Mot. for Prelim.

2

Approval of Class Action Settlement and in Resp. to Mot. to Intervene and Br. of Amici Curiae at 13–14, ECF No. 188 ("Pls. Reply") (the settlement ID "will facilitate the accurate and orderly distribution of claim awards").  To state the obvious, parties who opt out will not be involved in the "distribution of settlement funds."  And more remarkable still, class members who do submit a claim and will receive "distribution of settlement funds" are <u>not</u> required to submit a settlement ID.

Interim class counsel ultimately admit, as they must, that the settlement process is designed to make it harder for class members to escape the settlement than to remain in it.  Pls. Reply at 10.  They defend this result by asserting that Due Process requires higher burdens for opting out than are required to release class members' rights in a settlement. *Id.* at 10.  The argument does not fare well if examined.  The Due Process Clause protects people from being "deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.  Inclusion in a class action deprives class members of their property (a legal claim), so courts have long recognized that this deprivation can be justified only if class members have an easy way to avoid the deprivation.  To require additional burdens just to avoid a deprivation of property turns Due Process on its head.

The parties' make-weight arguments reflect an effort to avoid the self-evident purpose of the opt out restrictions—to interfere with the Arbitration Claimants' arbitrations.  Tellingly, Intervenors made clear in their opening brief that they would withdraw their objections if Intuit and class counsel would agree to a less burdensome opt-out process, but the parties showed they are unwilling to accept such an alternative.  Under such a process, undersigned counsel would ensure that every Arbitration Claimant is provided the Court-approved settlement notice, update each client individually about the status of his or her arbitration, and offer counsel's advice on how to proceed.  Each Arbitration Claimant would then make an individual decision and counsel would communicate that client's individual decision to the Court.

Intuit will not accept this process because imposing a more burdensome process is one of the <u>primary purposes</u> of the settlement.  But because Intuit cannot admit that, and because the opt-out requirements are not defensible on their own terms, Intuit is reduced to asserting that it is "all but certain" that undersigned counsel will engage in rampant fraud on the Court by "usurp[ing]" clients' rights to decide whether to opt out in violation of their representation that they will obtain

3

an individual decision from each client.  Such a serious accusation should be accompanied by some evidence, but Intuit offers none.  And Intuit's concern for its litigation adversaries is plainly motivated by tactical and economic considerations rather than a desire to ensure that Keller Lenkner's clients maximize the value of their claims against Intuit.  Intuit's attacks are particularly rich given that Intuit and interim counsel—whose interests are now aligned—tell the Court that their proposed settlement should be granted a "presumption of fairness."  Mot. for Prelim. Approval of Class Action Settlement and to Distribute Notice to the Class at 12, ECF No. 162 ("Prelim. Approval Mot."); Intuit Opp'n at 10.  And Intuit and the lead plaintiff are both allowed to speak to the Court though counsel.  Indeed, interim counsel signed the very settlement agreement at issue on behalf of the lead plaintiff.  Nobody is demanding that Intuit's counsel produce a wet-ink signature from Intuit's executives, or that class counsel obtain a wet-ink signature from the lead plaintiff, in order to prove that members of this Court's bar are not committing fraud.  Yet, when it comes to undersigned counsels' efforts to protect the rights of their clients, Intuit asks this Court—based on no evidence—to adopt a presumption of fraud.  This Court should not credit such self-serving smears and should ask what process will best protect the consumers' rights and further the intent of the absent class members it has a duty to protect.

Intuit would have this Court hold that even though some class members have already commenced arbitrations, have been advised by their individually retained counsel of the proposed settlement and their rights, and have made an individual decision that they do not want to participate in the settlement, that decision should be overridden because they did not submit a physical wet-ink signature or could not find a settlement ID that was sent to the wrong address or deleted by a spam filter.  This Court should not indulge such procedural gamesmanship in service of a class process that Intuit promised the Arbitration Claimants it would not employ.

## ARGUMENT

Pre-certification settlements are subject to heightened scrutiny because they present a natural opportunity for "collusion or other conflicts of interest."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  The deal Intuit negotiated with defeated class counsel does not withstand any level of inquiry, let alone the heightened scrutiny required here.

4

1    **I.      Intervention is Appropriate and the Proposed Intervenors Have Standing**

2              Interim class counsel argue the Intervenors lack standing to challenge the proposed

3    settlement because they can "follow the opt out procedure."  Pls. Reply at 2–3.  But that response

4    cannot suffice here, where Intervenors are objecting that the opt-out procedure itself is a violation

5    of their rights.  Intervenors contend that the opt-out process is an attempt to entrap them in a

6    settlement and that this effort is particularly improper because the settlement in which they have

7    been included is riddled with flaws.  Moreover, the settlement would immediately enjoin

8    Intervenors' arbitrations, in violation of their contractual and statutory rights, before they even have

9    the chance to navigate the opt-out procedures.  That alone is reason for intervention, *Zepaeda v.*

10   *U.S.I.N.S.*, 753 F.2d 719, 727–28, 728 n.1 (9th Cir. 1983), and requires intervention now, *United*

11   *States v. City of Los Angeles*, 288 F.3d 391, 398–99 (9th Cir. 2002).

12             Intuit's position is that the class counsel it chose to negotiate with adequately represent the

13   Intervenors' interests because class counsel and the Intervenors are pursuing the same objective.

14   Intuit Opp'n at 8.  That assertion is incorrect on its face.  Even setting aside the gross deficiencies

15   of the proposed settlement, class counsel here seek to <u>enjoin</u> the very arbitrations Intervenors are

16   trying to pursue.  The mere fact that plaintiffs have not pursued the same claims as Intervenors

17   establishes inadequacy of representation.  *See Gomes  v. Eventbrite, Inc.*, No. 5:19-CV-02019-EJD,

18   2020 WL 6381343, at *3 (N.D. Cal. Oct. 30, 2020) (finding proposed intervenors had "more than"

19   met "minimal burden" to show interests "may be" inadequately protected where, among other

20   issues, plaintiffs negotiated a settlement releasing intervenors' rights without contacting their

21   counsel and did not amend complaint to include additional claims); *Coleman v. Schwarzenegger*,

22   No. C01 1351 TEH, 2007 WL 2765757, at *3 (E.D. Cal. Sept. 19, 2007) (concluding intervenor's

23   interests were not adequately represented where, although they "overlap[ped]" with plaintiff

24   classes', were also "distinctly different").  And the plaintiffs' attempt to obtain an injunction against

25   Intervenors makes them <u>directly adverse</u>.  Class counsel and Intuit apparently think that Intervenors

26   should not mind their arbitrations being halted, because they could eventually move forward once

27   class notice is sent, an opt out is submitted, and a waiting period lapses. Pls. Reply at 24–25; Intuit

28   Opp'n at 22.  But Intervenors do not <u>want</u> to delay their arbitrations in order to further a class

1   process they want no part of. Class counsel and Intuit cannot eliminate this direct conflict in

2   positions by claiming that Intervenors should want something else. Intervenors easily exceed their

3   "minimal" burden to show inadequate representation. *Citizens for Balanced Use v. Mon.*

4   *Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011).

5        Finally, interim class counsel are wrong to suggest that the Intervenors are improperly

6   asserting the rights of others. Pls. Reply at 2. The Intervenors are included in the class definition

7   and are asserting their own interests in not being ensnared in a settlement rife with inadequacies.

8   That many of these inadequacies also burden the rest of the class simply reflects that class

9   settlements impact the rights of the whole class. *See, e.g.*, *Ross v. Convergent Outsourcing, Inc.*,

10  323 F.R.D. 656, 659 (D. Colo. 2018) (denying approval where arguments from "proposed

11  intervenors raise[d] questions about whether the settlement is 'fair, reasonable, and adequate'" and

12  fairly negotiated); *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399, at *5

13  (N.D. Cal. Apr. 6, 2012) (denying final approval based on one objector's objections).

14  ## II.    The Proposed Settlement Violates the Arbitration Claimants' Contractual and Statutory Rights

15       In disputing that the settlement violates the Arbitration Claimants' contractual rights, Intuit

16  largely talks past the argument. To see why, imagine that Intuit signed an agreement with each

17  Arbitration Claimant stating "Intuit promises never to use a court proceeding to release a customer's

18  claims unless the customer affirmatively agrees to waive this provision." The proposed settlement

19  would clearly violate that promise, because it would purport to release customers' claims in court

20  rather than arbitration without her affirmative consent. But the Terms promise the very same thing,

21  and the proposed settlement violates them for the same reason. The Terms contain an arbitration

22  provision in which Intuit promises to resolve "any dispute" with consumers "by binding arbitration

23  rather than in court." Terms of Service ¶ 14, Ex. A to Decl. of Warren Postman, ECF No. 178-1

24  ("Terms"). That promise cannot be revoked without the affirmative consent of both parties.

25  Forcing consumers to participate in a class settlement process in this Court, and taking silence as a

26  waiver of that right, is the very thing Intuit said in its Terms it would <u>not</u> do.

27

28

1      Strikingly, Interim class counsel are silent on the violation of the claimants' contractual

2 rights.  And though the Intervenors and Arbitration Claimants have raised this argument both here

3 and in a related state court action, Intuit has never explained how the Terms allow it to resolve

4 disputes with consumers in court without consumers' consent.  Intuit attacks a strawman by

5 claiming it is not bound by the class-action waiver it imposed on consumers.  Intuit Opp'n at 24–25.

6 But the Intervenors are not saying that Intuit has breached the <u>class-action waiver</u>; their argument

7 is that Intuit is breaching its explicit obligation not to resolve consumers' claims "in court."  Terms

8 ¶ 14.  Intuit also asserts that "[n]othing in the Terms give movants the right to be excluded without

9 affirmatively opting out."  Intuit Opp'n at 24.  But that is <u>precisely</u> what the Terms do: the Terms

10 say that no dispute will be resolved in court, and that right cannot be eliminated through silence.

11      Intuit's final response is that the self-actuating settlement process does not impose a waiver

12 on class members of their right to avoid a resolution of claims in court because class members can

13 "simply opt out."  *Id*.  But that merely concedes that the settlement imposes an additional obligation

14 on consumers that they must satisfy to keep <u>a right they already have</u>.  Intuit cannot make

15 consumers jump through an additional hoop to retain their contractual rights by claiming the jump

16 will not be difficult.  And, moreover, by requiring a handwritten or printed letter to opt out, along

17 with a wet-ink signature and a unique settlement ID number, all sent by snail mail to the settlement

18 administrator, Intuit has intentionally made opting out difficult.  *Infra* at 13.  Intuit has reaped a

19 significant benefit based on its position that arbitration is the required forum for consumers to

20 resolve their claims.  Saying that court is now the required forum for each class consumer—unless

21 they can navigate all the opt-out requirements—is exactly what Intuit promised not to impose.[1]

22      The settlement also violates Arbitration Claimants' statutory rights under the FAA by

23 enjoining their pending arbitrations until after class notice is sent, the consumers go through the

---

[1] Intuit asserts that this argument is "simply wrong" because courts "routinely approve class action settlements where the parties have agreed to arbitration and a class action waiver."  Intuit Opp'n at 5.  But none of the cases Intuit cites even purports to address the conflict between a class settlement and a contract forbidding the resolution of claims in court, and there is no indication that this argument was even <u>raised</u> in those cases.  A court's failure to consider an argument that was never raised to it does not say anything about the merits of the argument.

7

settlement's burdensome opt out procedures, and the parties are given a waiting period during which they can "challenge" the opt out. Settlement Agreement at 17, ECF No. 162-1. Both Intuit and interim class counsel claim that such an injunction can be based on the All Writs Act.[2] But the All Writs Act allows an injunction of parallel proceedings only when agreeable to the usages and principles of law, and enjoining arbitrations would <u>violate</u>, not be agreeable to, consumers' statutory rights under the FAA. Mot. to Intervene at 10–11.

Intuit sidesteps the FAA's command that arbitration agreements be enforced and argues instead that an anti-arbitration injunction is necessary because it will serve "several important purposes." Intuit Opp'n at 20. But each claim falls apart upon inspection. The lead purpose of an injunction, according to Intuit, is to "avoid[] inadvertent waiver of rights and facilitate[] class members' individualized decision-making"—in other words, it is for the good of the Arbitration Claimants to pause the arbitrations. Intuit Opp'n at 20. Intuit has been trying to stay and enjoin these arbitrations since March in every forum possible, and with no luck. Mot. to Intervene at 5–6. It strains credulity to think that Intuit's main reason to ask for the injunction here is for the best interests of those who have brought arbitrations against it. And nothing about being given the choice to continue an arbitration <u>before</u> a class member decides to participate in a settlement would prejudice the class member. The next "important purpose" Intuit claims is to avoid a double recovery. *Id.* But there is zero chance of a double recovery—if a consumer settles her case, Intuit can end any arbitration she brings, and if she arbitrates to a final decision, it can deny her a settlement.[3] Intuit's last "important purpose" is the real one: Intuit does not want to pay the arbitration fees it promised to pay. *Id.* But Intuit offers no authority to show why saving Intuit

---

[2] Interim class counsel also argue that the Court has "[a]uthority to enjoin those who do not opt out from continuing to litigate." Pls. Reply at 22. But Intuit and interim class counsel are not asking to enjoin arbitrations once it is known if an arbitrating consumer will participate in the settlement. Rather, they are asking to enjoin <u>all</u> arbitrations, and forcing those consumers to undertake the opt-out process, just to earn back the right to arbitrate that they already had.

[3] It is hard to accept that Intuit actually believes this argument. Twenty-three Arbitration Claimants have already resolved their claims with Intuit through settlements. Does Intuit truly contend that these individuals can recover <u>again</u> through the class settlement? If class members who have already released their claims can still recover in the settlement, that is yet another flaw in the settlement design that should be corrected, not a justification for enjoining arbitrations.

1  from its contractual obligations is a reason to utilize the All Writs Act.  And Intuit never responds

2  to Intervenors' argument that requiring Intuit to pay fees it contractually promised to pay would

3  not deprive this Court of jurisdiction or constitute an irreparable harm.  Mot. to Intervene at 11 n.6.

4  These three reasons—the purported benefit to consumers of having their arbitrations halted,

5  the illusory risk of double recovery, and the specter of fees Intuit already agreed to pay—are the

6  only grounds on which Intuit relies to invoke the rare power of the All Writs Act to enjoin tens of

7  thousands of pending arbitrations.[4]  Although Intuit and interim class counsel cite various cases to

8  justify enjoining arbitrations, there is a world of difference between (1) enjoining an arbitration

9  where a party alleged it was not obligated to arbitrate and (2) enjoining arbitrations without any

10  party arguing that the arbitrations were improper just to avoid paying arbitration costs.  For

11  example, in *Bank of America*, the court stayed arbitrations while it reviewed whether a party was

12  subject to the arbitration agreement (turns out, it was not).  *Bank of Am. v. UMB Fin. Servs.*, 618

13  F.3d 906, 914 (8th Cir. 2010).  Another court enjoined arbitrations pursued after class members'

14  claims were released in a class settlement.  *In re Painewebber Ltd. P'ships. Litig.*, No. 94 CIV 8547

15  SHS, 1996 WL 374162, at *5 (S.D.N.Y. July 1, 1996).  Here, Intuit's arguments that the arbitrations

16  are improper have already been rejected.  Mot. to Intervene at 5–6.  Intuit is not defending the

17  injunction here on the ground that the arbitrations are improper.  Rather, Intuit wants the arbitrations

18  enjoined because it does not want to pay the arbitration fees it owes so that the arbitrations can

19  proceed.[5]  That is the very fact pattern addressed by *In re Piper Funds*, which made clear that the

20  "contractual and statutory right to arbitrate may not be sacrificed on the altar of efficient class

21  management."  *In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.* (*In re Piper*

22  *Funds*), 71 F.3d 298, 303 (8th Cir. 1995).[6]

23  _____

24  [4] Intuit also says the Arbitration Claimants whose arbitrations it seeks to enjoin have demonstrated no prejudice, Intuit Opp'n at 22, though Intuit does not even try to explain how "prejudice" relates

25  to an analysis of contractual and statutory rights.

26  [5] Interim class counsel attack a strawman when it claims that Intervenors believe no arbitration ever could be stayed.  Pls. Reply at 24-25.  Arbitrations can be stayed when they purportedly proceed in

27  violation of contractual rights; they cannot be stayed to further class litigation.

28  [6] Intuit attempts to distinguish *In re Piper Funds* by noting that the claimant had "elect[ed] not to

1

### III.     The Proposed Settlement Fails to Meet the Rule 23 Requirements

2          Courts are rightly more careful when asked to certify a class solely for purposes of

3   settlement.  *Roes, 1-2 v. SFBSC MGMT., LLC*, 944 F.3d 1035, 1049–50, 1050 n.13 (9th Cir. 2019);

4   *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).   On the truly unique facts here—a

5   defendant choosing to enter into a $40 million class settlement after the risk of class liability was

6   already eliminated—the reason for heightened scrutiny is even more apparent.   The proposed

7   settlement fails to satisfy any level of review, let alone the increased scrutiny warranted here.[7]

8          In their briefs, Intuit and interim class counsel do not dispute that including the more

9   valuable claims of the Arbitration Claimants in the settlement, enjoining the pending arbitrations,

10   and imposing a host of conditions on opting out were express conditions of the deal.  Instead, they

11   point to inapposite cases in which an isolated feature of the proposed settlement was accepted by a

12   court without the host of other red flags and obvious reverse auction apparent in this settlement.  In

13   the context here, it is clear that the settlement class would place interim class counsel in a conflicted

14   position and designate the lead plaintiffs to settle the claims if class members they do not adequately

15   represent.   Moreover, the aggregate burdens imposed on opting out, the fact that the settlement

16   would release the claims of millions who are not allowed to participate in the settlement, the failure

17   of class counsel to explain their assessment of the settlement, and the lack of meaningful injunctive

18   relief combine to make clear that the settlement terms are unreasonable, unfair, and inadequate.

19          ### A.   The Class Does Not Meet the Certification Requirements

20          Interim class counsel are fundamentally conflicted.   Intuit wants to avoid the tens of

21   thousands of arbitrations pending against it and <u>concedes</u> that claimants in those arbitrations can

22   expect higher recoveries and are pursuing broader claims than other class members.  But interim

23   _____

24   participate in a class action, as required by the applicable arbitration rules."  Intuit Opp'n at 23.
But that just shows why an injunction is improper here—the district court there erred because it

25   enjoined the arbitration for someone who had a contractual and statutory right to arbitrate.

26   [7] The amicus brief filed by the Office of the Los Angeles City Attorney and the Office of the County
Counsel of Santa Clara is yet another compelling reason for skepticism—although Intuit assures

27   the Court that the deal here is fair because it was accepted by vanquished class counsel that were
given a clear-sailing provision to seek $10 million in fees, public servants without any economic

28   stake in the settlement have concluded otherwise.

class counsel represent a non-existent class, and are not involved with pursuing arbitrations at all (save the single arbitration they filed on the eve of signing the settlement). In negotiating the proposed settlement, Intuit and interim class counsel traded off the valuable claims of those pursuing individual arbitration to resuscitate valueless class claims.[8] That tradeoff is the very definition of inadequacy.[9] *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (holding that the class representative is not adequate under Rule 23 if "the named plaintiffs and their counsel have any conflicts of interest with putative class members"); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947 (noting that courts must watch for signs that class counsel and representatives have permitted their own interests to outweigh those of the class); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").

Intuit attempts to downplay the direct conflict between the scope and value of the Arbitration Claimants' claims and those of the absent class members who are not pursuing arbitrations. Intuit Opp'n at 18 ("[Arbitration Claimants are] not situated differently from other class members in any meaningful way."). But Intuit cannot dispute that the Arbitration Claimants have received settlement offers to date that are an order of magnitude more than the settlement offer, and Intuit's own declarant notes that the individuals who have actively pursued arbitration, unlike the absent class members, can expect a "premium." *See* Decl. of Stephen M. Bundy ("Bundy Decl. II") ¶ 4.g, ECF No. 191; Decl. of Stephen M. Bundy ("Bundy Decl. I") ¶ 3.f, ECF No. 191-2. The Arbitration Claimants are situated differently than the rest of the class for two other reasons as well—the Arbitration Claimants bring colorable antitrust claims that the class plaintiffs do not,

---

[8] Interim class counsel submitted a declaration from Prof. Ventry—apparently asserting that he is an expert on the fairness of settlements under Rule 23—who declares that the monetary relief is significant for absent class members. Decl. of Dennis J. Ventry, Jr. Ventry ¶ 12, ECF No. 188-1. The reason? Because "if the settlement does not go forward the [non-Arbitration Claimants] stand to receive nothing." *Id.*

[9] When combined with a clear-sailing provision, the conflict is even starker. *See Roes, 1-2*, 944 F.3d at 1049 (overturning settlement approval where agreement included clear-sailing agreement for fees from settlement funds, among other flags).

1   and tens of thousands of Arbitration Claimants have a contract claim for reimbursement of fees that

2   class plaintiffs also are not pursuing.  Mot. to Intervene at 7.

3         Remarkably, though Intuit alleges that the Arbitration Claimants are sufficiently similar to

4   the other class members (thus making class settlement appropriate), it claims, in the very next

5   paragraph, that Arbitration Claimants' are so different from each other that Keller Lenkner is

6   violating its ethical obligations by seeking "a 'one-size-fits-all' opt out for its clients."  Intuit Opp'n

7   at 19.  This is a remarkable inversion of the facts.  Keller Lenkner has agreed to represent a small

8   fraction of the class based on an individual assessment that each client's claims are worth far more

9   than $28.  Keller Lenkner has informed each of its clients about the settlement and advised each

10  client.  Suppl. Postman Decl. ¶ 7-8.  And in the small number of cases in which a client is mistaken

11  about having a valid claim or has chosen not to continue pursuing an arbitration in light of the

12  proposed settlement, Keller Lenkner has withdrawn from the representation at no cost to the client.

13  *See id.* ¶ 9.  The fact that, after this individualized process, tens of thousands of clients continue to

14  prefer arbitrating their claims to being included in the settlement simply reflects the inadequacy of

15  the settlement for those clients.  On the other hand, Intuit is not at all concerned about the one-size-

16  fits-all payment of $28 that will be offered to every Arbitration Claimant in the settlement.  That is

17  not surprising.  Intuit, as a for-profit corporation, should not be expected to look out for the interests

18  of its adversaries in litigation.  But for the same reason, Intuit cannot be taken seriously when it

19  claims to be worried that Keller Lenkner will not recover as much money for the Arbitration

20  Claimants as the $28 they can seek in the settlement.

21        Throughout their briefs, Intuit and interim class counsel suggest that certification of the

22  class cannot be challenged because class members like the Arbitration Claimants may "simply opt

23  out."  *See, e.g.*, Intuit Opp'n at 2–3.  But the opt-out procedure does not absolve parties of the

24  requirements necessary to certify a class.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.*

25  *Liab. Litig.*, 55 F.3d 768, 809 (3d Cir. 1995) ("[T]he right of parties to opt out does not relieve the

26  court of its duty to safeguard the interests of the class and to withhold approval from any settlement

27  that creates conflicts among the class.").  Every class certified under Rule 23(b)(3) must include an

28  opt out right, but courts still must evaluate whether a proposed settlement is fair, adequate, and

1   reasonable. *See, e.g.*, *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015). Here, the class plainly

2   sacrifices the interests of one subgroup of the class with broader and more valuable claims to benefit

3   the remainder of the class. Moreover, the opt-out process is itself inadequate because it is designed

4   to impede opt outs. Indeed, interim class counsel <u>admit</u> that the settlement makes it easier to

5   participate in the settlement than to opt out because the settlement was designed to "encourage[]"

6   participation over opt outs. Pls. Reply at 10. That bias illustrates why class counsel are conflicted,

7   and it is an independent ground for denying approval; it certainly does not justify the conflict.

8        **B.  The Proposed Settlement is Unreasonable and Inadequate**

9        Intervenors and Amici detailed a host of provisions in the proposed settlement that courts

10   have regularly held to be improper. Each one alone should give the Court pause, but when taken

11   together, they render the proposed settlement a veritable checklist of improper settlement terms.

12           **1.  The opt-out process is unjustifiably burdensome**

13        Intuit and class counsel repeatedly attempt to justify the flaws of the settlement by assuring

14   the Court that anyone who dislikes the settlement can "simply" opt out.[10] Yet despite relying so

15   heavily on the opt-out process, the parties offer little justification for the obstacles they place in the

16   way of class members who want to opt out.

17        <u>A "wet ink" signature requirement is indefensible</u>: Perhaps the most remarkable part of

18   Intuit and class counsel's briefs is the complete lack of argument as to why opt-out requests must

19   be signed with a <u>physical</u> signature rather than, for example, a DocuSign electronic signature. As

20   detailed in Intervenors' opening brief, both federal and state law require that such electronic

21   signatures be accepted as the equivalent of physical signatures. Mot. to Intervene at 17. And

22   although Intuit and interim class counsel argue that a physical signature is better than no signature

23   at all, Pls. Reply at 9 & n.9; Intuit Opp'n at 16–17, neither party even attempts to explain why they

---

[10] *See, e.g.*, Intuit Opp'n at 8 (movants "may also simply opt out"); *id*. at 25 (no waiver because claimants "can simply opt out"); *id*. at i (opt-out process is fair); *id*. at 2 (claimants "may, of course, opt out"); *id*. at 13 (claimants are "free to opt out"); *id*. at 15 ("And, of course, [claimants] are free to opt out"); Pls. Reply at 14 ("Opting out is the simple solution…"), *id*. at 18 (claimants can always "opt out" to pursue claims); *id*. at 25 (injunction passes muster because it "merely requires that Movants opt out").

1    prefer a physical signature over an electronic one.  Intuit and class counsel prefer a physical

2    signature either (1) because it is less convenient than an electronic signature and will therefore chill

3    class members from opting out or (2) because they are worried that fraudsters will engage in the

4    widespread fabrication of DocuSign signatures, but will nonetheless be incapable of signing class

5    members' names with a pen.  The former explanation is decidedly more likely than the latter.

6            <u>A settlement ID requirement will make it impossible for many class members to opt out and</u>

7    <u>is wholly unrelated to the opt-out process</u>: Intervenors' opening brief explained that the class

8    notices containing each class member's settlement ID would fail to reach numerous class members

9    because they would be sent to an old email address or deleted by a spam filter.  As a result, requiring

10   class members to submit a settlement ID before opting out would make it impossible for many class

11   members to opt out.  In response, neither Intuit nor interim class counsel attempt to argue that each

12   class member will actually receive their settlement ID number, effectively conceding that the opt-

13   out requirements will make it impossible for some class members to opt out.  A class settlement in

14   which some class members will not be <u>allowed</u> to opt out should be a complete non-starter.

15           Remarkably, the entire reason for a unique settlement ID, according to both Intuit and

16   interim class counsel, is to assist with the distribution of claim funds.  *See* Intuit Opp'n at 19-20

17   ("[T]he ID is necessary for the orderly distribution of settlement funds"); Pls. Reply at 13-14 (the

18   settlement ID "will facilitate the accurate and orderly distribution of claim awards").   This

19   explanation is plain pretext.  A consumer who opts out will not be receiving funds in the first place;

20   and the ID allegedly needed for the "orderly distribution" is not even a requirement to make a claim.

21           <u>The settlement is improperly designed to "encourage" participation over opting out</u>:

22           Intervenors' opening brief pointed out that the settlement allows claims to be submitted

23   online, without a signature, and without a settlement ID number, while imposing a physical

24   submission, physical signature, and inclusion of an ID number to opt out.  Unable to dispute that

25   this process makes it easier to submit a claim than to opt out of the settlement, interim counsel

26   makes the remarkable argument that Due Process requires <u>higher</u> burdens to opt out of the

27   settlement than to release one's rights in the settlement.  *Id.* at 10.  Therefore, class counsel admit,

28   the settlement was designed to "encourage" the submission of claims whereas a higher showing is

1    needed before a class member can opt out.  That of course turns Due Process on its head.  Due

2    Process <u>protects</u> absent class members from having their claims released in a class settlement.

3    *See Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 413 (N.D. Cal. 2013) (denying preliminary approval

4    based in part on concerns that releasing claims of class members who never received notice violated

5    due process) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999)).  It does not justify

6    imposing higher burdens on opt outs.  *See True v. Am. Honda Motor Co.*, No. EDCV07-287-

7    VAPOPX, 2009 WL 838284, at *9 (C.D. Cal. Mar. 25, 2009) (denying settlement approval because

8    "[o]pting out should be as convenient as remaining a part of the class").

9            **2.  The settlement would impose obligations on class members who are not
                 allowed to submit a claim.**

10           As Intuit and interim class counsel do not dispute, the settlement's attestation requirement

11   ensures that a significant number of consumers subject to the settlement will nevertheless be unable

12   to benefit in any way from the settlement.  While the class includes all individuals eligible for IRS

13   free-filing products who paid to use TurboTax, the proposed settlement limits claims only to those

14   who attest that they "expected [Intuit's product] to be free."  Settlement Agreement at 63.  That

15   requirement excludes class member who fell victim to Intuit's scheme to hide the free tax-filing

16   services despite their eligibility, and thus never expected to file taxes for free *specifically because*

17   of Intuit's deception.  Moreover, it would exclude class members who want to bring the antitrust

18   claims asserted in arbitration, for the consumer's expectations are irrelevant to those claims.[11]

19           As interim class counsel note, attestation can be appropriate in some circumstances.  *See*

20   Pls. Reply at 4 n.3.  In particular, attestation is appropriate when used to ensure that claimants are

21   members of the class or were in fact injured by the defendant's conduct, as can be seen in the cases

22   cited by interim class counsel.[12]  But here, the attestation serves to prohibit known class members

---

[11] The attestation requirement also highlights why the release is overly broad.  Interim class counsel
say the attestation requirement is necessary because it "separates those consumers who were misled
by Intuit's challenged practices from those who were not."  Pls. Reply at 4.  But being misled is not
a requirement for the antitrust claims.  Counsel here acknowledges that the antitrust claims, though
purportedly included in the release, are not one of the class suit's "challenged practices."

[12] *See, e.g.*, *Perkins v. LinkedIn Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *9 (N.D. Cal.

1   from making any claim at all; they are thus left navigate the burdensome opt-out procedures just to

2   keep the rights they already have.[13]

3       **3.  The parties have failed to adequately justify the settlement's monetary**
          **consideration**
4

5       The proposed settlement offers an estimated $10 million payout to class counsel with no

6   class, and a one-size-fits-all payout estimated to be about $28 per class member.  *See* Prelim.

7   Approval Mot. at 16–17.[14]  This structure fails to account for the unique circumstances of the

8   Arbitration Claimants—who paid more than the expected recovery in fees just to <u>file</u> arbitrations

9   at Intuit's insistence (fees Intuit promised to reimburse).  Nor does it include countless other

10  necessary considerations: claims for more than one tax year, punitive or statutory damages under

11  different state consumer-fraud regimes, meritorious antitrust claims, and so on; it does not even

12  provide the potential total exposure to show just how big a discount this is.  Those flaws alone

13  should foreclose settlement approval.  *See O'Connor v. Uber Techs., Inc.,*, 201 F. Supp. 3d 1110,

14  1131 (N.D. Cal. 2016) (denying preliminary approval, in part, because "the Settlement Agreement

15  ─────────────

16  Feb. 16, 2016) (claim form required claimants to attest merely that they were "injured" in some
    way by defendant's conduct); *Stern v. New Cingular Wireless Servs., Inc.*, No. SACV09-1112-CAS
17  (AGRx), 2010 WL 11530896, at *4 (C.D. Cal. Nov. 22, 2010) (in suit alleging company had added
    unnecessary charges on customers' wireless bills, claim form required class member to aver that
18  they did not know about the charge and the knowledge would have affected their decisions to
    purchase service).

19  [13] Remarkably, interim class counsel embrace this point, stating that providing no compensation to
20  many class members is necessary so the "settlement fund will not be depleted by claims that <u>likely</u>
    would not have survived adversarial testing."  Pls. Reply at 4 (emphasis added).  That is not the
21  point here, where even the most robust antitrust claims will be lost.  In any case, the proper course
    in this situation is to define the class more narrowly.  Be that as it may, the proposed settlement
22  withholds monetary relief from class members with meritorious damages claims—an untenable
    structure. *See Ferrington*, 2012 WL 1156399 at *6 (denying final approval where settlement
23  waived claims for all consumers who had been tricked into purchasing additional software but
24  provided compensation only for those consumers who had never downloaded the software); *Acosta*,
    243 F.R.D. at 388 (cannot provide relief to only certain class members); *Pine v. A Place for Mom,*
25  *Inc.*, No. C17-1826 TSZ, 2019 WL 6683511, at *3 (W.D. Wash. Dec. 5, 2019), *amended in part*,
    No. C17-1826 TSZ, 2020 WL 707793 (W.D. Wash. Feb. 12, 2020) (declining to certify settlement
26  class that included subclass who would be treated differently in claims process).

27  [14] Interim class counsel attempt to paint a prettier picture, valuing the per-member settlement value
    at "up to $75," Pls. Reply at 3, but even their opening brief concedes that number is not realistic.
28  *See* Prelim. Approval Mot. at 16–17.

1   at the eleventh hour folds in new claims and class members at the expense of litigation pending in

2   other courts, while attributing almost no value to those claims, in order to induce Uber to settle the

3   cases at bar").[15]  The settling parties' attempts to excuse these flaws do not pass muster.

4          <u>First</u>, Intuit tries to minimize the significance of the settlements it has offered other

5   Arbitration Claimants—six to 15 times the amount of the proposed settlement, before preliminary

6   hearings, Postman Decl. ¶ 19—by saying an arbitrating consumer would still need to pay filing fees

7   and attorney's fees.  *See* Intuit Opp'n at 11.  This is misleading; Intuit's contract obliges it to

8   reimburse class members' arbitration filing fees.  Terms ¶ 11.  And it omits that both consumer-

9   fraud statutes and federal antitrust law allow a prevailing consumer to collect attorney's fees.  *See,*

10  *e.g.*, Cal. Civil Code § 1780(e); 15 U.S.C. § 15.  Yet the proposed settlement ascribes no value to

11  the reimbursement claims and could settle claims for less than what many claimants paid to bring

12  those claims at all.  That is unreasonable under any standard.  *See, e.g.*, *In re TD Ameritrade*

13  *Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal 2009) (rejecting settlement for which a

14  significant subclass received no benefit); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 387–89

15  (C.D. Cal. 2007) (rejecting settlement that "wantonly compromise[d] the claims" of a significant

16  subclass).[16]

17         <u>Second</u>, class counsel do not adequately explain why they valued the class's claims based

18  on just one year while releasing claims for six years.  Class counsel assert that "eligible free-filers

19  who paid a TurboTax fee in more than one year . . . arguably should have known they would be

20  charged in the subsequent year(s)."  Prelim. Approval Mot. at 14.  That makes no sense.  <u>Of course</u>

---

21
22  [15] *See also Ferrington*, 2012 WL 1156399 at *8–10 (denying approval of a settlement which labeled
     meritorious claims for a subgroup of class members as worthless, and assigned no consideration to
23  those claims); *Saeyoung Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX),
     2015 WL 13545194, at *6 (C.D. Cal. Dec. 14, 2015) (denying preliminary approval because the
24  "one-size-fits-all approach…is 'grounds to doubt' the settlement's fairness"); *Haight v. Bluestem*
     *Brands, Inc.*, No. 613CV1400ORL28KRS, 2015 WL 12830482, at *11 (M.D. Fla. May 14,
25  2015), *report and recommendation adopted*, No. 613CV1400ORL28KRS, 2015 WL 12835994
     (M.D. Fla. June 1, 2015) (denying preliminary approval because amended settlement agreement
26  bargained away all but one claim for each class member).

27  [16] The better explanation for why active consumers pursuing arbitration are yielding far better
     settlements than what Intuit has offered the class is the one offered by Intuit's own expert—
28  consumers engaged in arbitration can command an arbitration "premium."  Bundy Decl. I, ¶ 4.g.

1    the defrauded consumers knew they would be charged to file taxes.  That is the problem—Intuit

2    told these customers, <u>every year</u>, they were ineligible for free filing.  The class allegations are not

3    that consumers thought they were getting a free service and secretly charged money; the allegations

4    are that consumers thought they had to pay for filing when they did not.  That interim class counsel

5    would so illogically abandon five-sixths of the value of this case is a deeply troubling red flag.

6        <u>Third</u>, after illogically discounting their case by over 80%, interim class counsel dismiss

7    class members' antitrust claims as "conclusory."  *See* Pls. Reply at 15.  But this Court already found

8    the claims colorable, *Jolly v. Intuit Inc.*, No. 20-CV-04728-CRB, 2020 WL 5434503, at *5 (N.D.

9    Cal. Sept. 10, 2020), and settling counsel cannot ascribe zero value to colorable claims without

10   explanation.  *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004).

11       <u>Fourth</u>, interim class counsel argue that Intervenors have the "burden of demonstrating that

12   different states' laws would in fact apply" to class members' claims such that those individuals

13   could seek statutory penalties.  Pls. Reply at 19.  That is backwards.  Interim class counsel do not

14   and cannot dispute that the Arbitration Claimants have brought these claims or that the settlement

15   will release them.  Interim class counsel bear the burden of explaining why the claims released in

16   the settlement have zero value.  Fed. R. Civ. P. 23(e)(2).

17       <u>Finally</u>, in continued disregard of this District's guidelines, the parties <u>still</u> have not said

18   what Intuit's maximum exposure to consumer fraud-claims may be (let alone antitrust damages).

19   *See* N.D. Cal. Proc. Guidance for Class Action Settlements § 1.e.  Intuit's assertion that "litigation

20   risk" can justify lower monetary consideration, Intuit Opp'n at 11, is simply a platitude unless and

21   until the parties explain the discount.[17]  Courts routinely deny settlement approval on this ground.[18]

---

22

23   [17] Intuit has said the class contains 19,000,000 consumers, who each paid about $100 in fees per
     year, and that the class goes back about six years.  Assuming class members on average paid to file

24   taxes in just three of those years, the potential exposure for this class—for the fraud claims alone—
     is over <u>$5 billion</u>.  At that level, the $40 million settlement represents a remarkable 99.2% discount.

25   [18] *See In re MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2018 WL 10539267, at *1

26   (N.D. Cal. June 7, 2018) (denying preliminary approval of settlement that failed to estimate
     maximum damages, noting that "[t]he Court cannot evaluate the fairness of the settlement without

27   understanding the maximum likely verdict value of the claims asserted"); *Martin v. FedEx Ground
     Package Sys., Inc.*, No. C 06-6883 VRW, 2008 WL 11389034, at *8 (N.D. Cal. July 8, 2008)

28

#### 4. The proposed non-monetary consideration adds virtually nothing to Intuit's existing commitments

Interim class counsel ask the Court to ignore the inadequacy of the settlement's monetary consideration because the settlement purportedly offers "substantial injunctive relief." Pls. Reply at 3. But the non-monetary "relief" Intuit offers is simply a re-promise of actions it already has pledged to do.[19] And not just "voluntarily": Intuit signed an agreement with the federal government committing not to de-index the Free File Program's website.[20] It claims in court filings <u>as a defense to the claims here</u> that it already sends reminder emails to previous Free File users and discloses the Free File Program on its website.[21] And Intuit must already comply with the law.[22]

While the Free File disclosure may be sent via the "best practicable" means, Pls. Reply at 7, it remains undisputed that most class members will not receive or view it.[23] Interim class counsel note that the email notice will be "supplemented" by digital marketing, Pls. Reply at 8, but interim class counsel do not say that this marketing will disclose the Free File Program, and they have not provided the marketing materials for this Court's review.

---

(same). The cases upon which Intuit relies look to the very analysis that the parties have failed to provide here. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964–65 (9th Cir. 2009) (comparing the proposed settlement amount to the total potential damages calculated by the parties); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000) (same).

[19] Interim class counsel's Prof. Ventry states that Intuit's non-monetary changes will benefit the taxpayers. Ventry Decl. ¶¶ 10-11. But even so, Intuit has already promised to provide these benefits. That the benefits Intuit previously promised are good for consumers cannot show that the settlement involving the same injunctive relief is adequate.

[20] *See* Addendum to Free File (Eighth) Mem. of Understanding (Dec. 26, 2019), available at http://zpr.io/HifUn.

[21] *See* Intuit's Mem. Supp. Mot. Summ. Adjudication at 7, 10, *TurboTax Free Filing Cases*, JCCP No. 5067 (L.A. Super. Ct. July 13, 2020).

[22] *See* FTC's ".*com Disclosures*" at 1 (2013) ("This document provides FTC staff guidance concerning … the laws the FTC enforces."), http://zpr.io/HifU6. Remarkably, the proposed settlement does not even bind Intuit to this promise: Intuit will follow the FTC's guidelines only to the "extent practicable." Settlement Agreement at 18.

[23] *See* FTC Staff Report, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, 30 (2019) (finding that settlement emails are opened by only 14% of recipients), https://kl.link/3lnghg2.

19

Reply in Support of Motion to Intervene and in Opposition to Preliminary Settlement Approval; Case No: 3:19-cv-02546-CRB

Intuit admits, as it must, that it has already committed to most of the non-monetary relief proposed by the settlement. *See* Intuit Opp'n at 13. But Intuit claims that the injunctive relief here is "substantial" because it previously could break its commitments with impunity, whereas now it cannot. *Id.* In other words, Intuit now <u>really</u> promises to do what it has already promised. This Court should not credit non-monetary relief that does "not obligate [the defendant] to do anything it was not already doing." *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (rejecting class settlement that would require class members to release damages claims where the non-monetary consideration consisted of action the defendant undertook pre-settlement "for its own business reasons (presumably to avoid further litigation risk)").

## IV.   As Predicted, Neither Intuit Nor Interim Class Counsel Will Agree to a Settlement With a Straightforward Opt-Out Process

Remarkably, interim class counsel complain that the Arbitration Claimants have opposed the settlement but "offer no alternative." Pls. Reply at 1. Yet an entire section of Intervenors' brief offered an alternative: Intervenors will withdraw their objections if the parties would agree to a reasonable opt-out process. Mot. to Intervene at 24–25 ("IV. Arbitration Claimants Would Not Object to a Settlement with a Less Burdensome Opt-Out Process").

But Intuit will not agree to a common sense opt-out process that lets consumers "simply opt out" of the class-wide settlement. Intuit's desperate attempts to explain why only further confirm what the company is unwilling to admit: on of the primary goals of the settlement is to interfere with Arbitration Claimants' arbitrations.

First, just as Intervenors predicted, Intuit and class counsel attack a strawman and argue that the litany of opt-out requirements imposed by the deal are necessary to prevent counsel from engaging in an unauthorized "mass attorney opt-out." *See, e.g.*, Intuit Opp'n at 1; Pls. Reply at 14. *But see* Mot. to Intervene at 24 ("In state court, Intuit has emphasized that counsel may not make a settlement decision for their clients or effectuate a 'mass opt out.' But those arguments attack an obvious strawman."). As undersigned counsel explained in their opening brief and will repeat here:

If a class is certified that includes the Arbitration Claimants, undersigned counsel will ensure that every Arbitration Claimant is provided the Court-approved

20

1

2

3

4

settlement notice. Postman Decl. ¶ 30. Counsel will update each client individually about the status of his or her arbitration and offer counsel's advice on how to proceed. *Id.* And each client will make an individual decision. *Id.* For each client who chooses to participate in the settlement, counsel will assist that client in submitting a claim (and will waive any right to attorneys' fees). *Id.* ¶ 31. For each client who chooses not to participate in the settlement, counsel will communicate that client's individual decision to the Court. *Id.* ¶ 32.

5

Mot. to Intervene at 24-25. In short, counsel will obtain an individual decision from each client

6

and communicate that decision to the court.[24] Counsel will not make any decision for a client.

7

Counsel will simply communicate their clients' wishes to the Court. Intuit enjoys that assistance

8

from counsel in this Court. The lead plaintiffs enjoy that assistance from counsel—indeed,

9

interim class counsel signed the class settlement on behalf of the lead plaintiffs. The Arbitration

10

Claimants should enjoy the same assistance from the counsel they retained.

11

Intuit has no good argument for why duly retained counsel cannot communicate the

12

wishes of a client to a court. Intuit thus resorts to the claim that counsel will commit rampant

13

fraud on this Court by violating the commitments made above and in the opening brief. *See, e.g.*,

14

Intuit Opp'n at 16 ("Keller Lenkner is all but certain to take another bite at the apple by

15

attempting a mass opt out."); *id* at 17 (arguing that a signature is required to avoid "unauthorized"

16

opt-outs and to ensure that the clients' consent "is not usurped by Keller Lenkner"). That is a

17

remarkably serious allegation. When asserting that a member of the bar is "all but certain" to

18

commit a federal crime, it is reasonable to expect some <u>actual evidence</u> to support the claim.

19

_____

20

21

22

23

24

25

26

27

28

[24] Intuit has no basis to assert what advice Keller Lenkner has shared or will share with its clients, which is one of the multiple reasons courts do not entertain arguments from parties that their adversary's counsel is inadequately representing their adversary. Mem. of Law & Order at 20, *In re: CenturyLink Sales Pracs. and Sec. Litig.*, No. 0:17-md-02795-MJD-KMM (D. Minn. June 29, 2020), ECF No. 758 ("If Keller failed to inform, consult with, and provide competent representation to its clients, those actions harmed Keller's clients, not CenturyLink. Keller's clients, not CenturyLink, have standing to raise these allegations."). Intuit attempts to paper over this inadequacy by asking Professor Bundy to make a host of false assumptions about Keller Lenkner's representation of its clients and then opine that this fictitious representation would be unethical. But Prof. Bundy has no better basis to understand or opine on Keller Lenkner's advice to its clients than Intuit, and his assumptions are false. Ironically, while Prof. Bundy attacks Keller Lenkner based on the inaccurate assertion that it has offered "one-size-fits-all" advice, he takes no issue with the fact that interim class counsel are recommending a one-size-fits-all payout for <u>every</u> class member—including the arbitrating claimants and including class members who cannot even make a claim.

21

1    But in lieu of any evidence of fraud, Intuit cites only the District of Minnesota's decision

2    in *CenturyLink*, in which the Court declined to accept Keller Lenkner's request to opt out through

3    a single letter clients who had individually chosen to be excluded from the settlement.  Letter

4    from Warren Postman, *In re: CenturyLink Sales Pracs. and Sec. Litig.*, No. 0:17-md-02795-MJD-

5    KMM, ECF No. 631.  That request was modeled on a letter granted effect by an earlier case in

6    that district and endorsed by the Eighth Circuit in *In re Piper Funds*, 71 F.3d at 304.  However,

7    the Court denied that request and directed that any opt-out requests should be submitted with an

8    electronic signature of the client.  Keller Lenkner then complied with that directive and submitted

9    over 11,000 opt-out requests from its clients, which the Court accepted as valid.  Suppl. Postman

10   Decl. 10.  If this Court denies Intuit's attempt to require a wet ink signature for opt outs, it would

11   be bizarre to suggest that Intuit's counsel committed fraud on the Court.  For the same reason,

12   that the *CenturyLink* court denied a request from Keller Lenkner is an absurd fact on which to

13   base the accusation that Keller Lenkner is "all but certain" to commit fraud.[25]

14   Intuit and interim class counsel beg this Court to overlook the numerous flaws in the

15   settlement because dissatisfied class members can "simply opt out."  But when asked to give

16   Arbitration Claimants the same right to rely on counsel as enjoyed by Intuit and the class plaintiffs,

17   the parties have refused.  This double standard only highlights that Intuit's goal is not looking out

18   for best of interests of the consumers who brought arbitrations, but to extinguish their rights.

## CONCLUSION

20   For the reasons stated above, the motion to intervene should be granted and the motion for

21   preliminary approval should be denied.

---

22   [25] Intuit continues its smears by asserting that Keller Lenkner, which is retained on a contingency

23   basis, has an impermissible financial interest in recommending that its clients pursue their
     arbitrations instead of dropping them.  *See* Intuit Opp'n at 6–7.  But <u>any</u> firm paid on a contingency

24   fee is compensated based on the success of its clients in the action brought by counsel.  And courts
     and the legal profession have recognized that the model is not only permitted, but valuable, because

25   it allows those who typically could not afford representation to vindicate their rights.  *See In re
     Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994); *see also* MODEL

26   RULES OF PRO. CONDUCT r. 1.5(a)(8) (AM. BAR ASS'N 2020).  That Intuit believes Intervenors'

27   counsel will earn substantial fees by pressing the ongoing arbitrations is in fact an admission of
     what Intervenors know to be true: the Arbitration Claimants' claims are both valuable and

28   meritorious.  *See* Mot. to Intervene at 13–14.

22

1

2   Dated: December 11, 2020                    Respectfully submitted,

3

4
                                                 /s/Warren Postman
5   Keith A. Custis (#218818)                    Warren Postman (#330869)
      kcustis@custislawpc.com                      wdp@kellerlenkner.com
6   CUSTIS LAW, P.C.                             KELLER LENKNER LLC
    1999 Avenue of the Stars                     1300 I Street, N.W., Suite 400E
7   Suite 1100                                   Washington, D.C.  20005
    Los Angeles, California 90067                (202) 749-8334
8   (213) 863-4276
9                                                Benjamin Whiting (*pro hac vice*)
                                                   benjamin.whiting@kellerlenkner.com
10                                               Ellyn Gendler (#305604)
                                                   ellyn.gendler@kellerlenkner.com
11                                               KELLER LENKNER LLC
                                                 150 N.  Riverside Plaza, Suite 4270
12                                               Chicago, Illinois 60606
                                                 (312) 741-5220
13
14                                               *Attorneys for Intervenors*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reply in Support of Motion to Intervene and in Opposition to Preliminary
Settlement Approval; Case No: 3:19-cv-02546-CRB