IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELE ARENA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTUIT INC., et al.,<br><br>    Defendants. | Case No. 19-cv-02546-CRB<br><br>**ORDER AND OPINION DENYING MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

A group of Plaintiffs brought a putative class action against Intuit, Inc., alleging that Intuit induced them into paying for its tax preparation services when they were entitled to use Intuit's free-filing option. The Court previously denied Intuit's Motion to Compel Arbitration, but the Ninth Circuit reversed. Plaintiffs, with support from Intuit, eventually moved for preliminary approval of a proposed settlement. The settlement would award claimants who expected to file for free, but ended up paying roughly $100 per year they filed, an estimated $28 assuming a 5% participation rate. It would also require Intuit to take various steps to inform consumers of the free file option.

In the meantime, many Intuit customers had filed individual arbitration demands against Intuit, exposing Intuit to multiple fees for each arbitration, leaving aside potential liability on the merits. The proposed settlement included a procedure by which these and other class members could opt out, and was contingent on the Court immediately enjoining individual arbitrations and any other parallel proceedings until the class member involved in those proceedings opted out. Some of the arbitration claimants moved to intervene in opposition to the proposed settlement, and the Court granted their motion on December 14, 2020. On December 17, 2020, the Court held a hearing and issued an order denying the

motion for preliminary approval. The Court delayed issuing an opinion at the parties' request. Because the parties have been unable to reach a settlement to date, the Court now provides its reasoning for denying the motion. The facts and reasoning set forth below were applicable when the Court issued its December 17, 2020 order:[1]

The Court denies the motion for preliminary approval because the proposed settlement is not fair, reasonable, and adequate under Rule 23(e)(2) of the Federal Rules of Civil Procedure. In particular, the proposed settlement provides class members with inadequate compensation and sets forth opt out procedures that unduly burden all class members, but especially those who have already begun to pursue claims through arbitration.

## I.     BACKGROUND

Intuit owns TurboTax, an online tax preparation service. Complaint (dkt. 1) ¶ 1. In 2002, Intuit and other tax preparation services agreed with the Internal Revenue Service to provide low-income taxpayers and active military members the option to file their taxes for free. Id. ¶¶ 15–16, 20. In exchange, the government promised to not enter the tax preparation software and e-filing services market. Id. ¶ 17. By staying out of that market, the government helps Intuit maintain its status as the dominant provider of e-filing services for all taxpayers, so long as Intuit offers free services to low-income taxpayers. Id. But Plaintiffs allege that instead of steering eligible taxpayers to its free-filing option, or simply letting customers find their way to it, Intuit misleadingly channeled free-filing eligible taxpayers to its paid services. Id. ¶ 3.

On May 12, 2019, Plaintiffs sued Intuit on behalf of themselves and other similarly situated individuals. Id. ¶ 47. They asserted claims for breach of contract and violations of various state consumer protection laws. Id. ¶¶ 62–110. On August 19, 2019, the Court appointed Daniel C. Girard of Girard Sharp LLP and Norman E. Siegel of Stueve Siegel Hanson LLP (collectively, "interim class counsel") as co-lead interim class counsel under

---

[1] The Court notes that the parties have not advised the Court of any material change beyond their failure to reach a settlement.

Rule 23(g)(3) of the Federal Rules of Civil Procedure. See Order Appt. Interim Class Counsel (dkt. 72).[2]

On October 28, 2019, Intuit moved to compel arbitration. See Mot. to Compel (dkt. 97). Intuit's terms of service ("Terms") contained an arbitration clause stating:

> "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify . . . WE EACH AGREE THAT ANY AND ALL DISPUTES MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING."

Sun Decl. (dkt. 97-3) ("Terms") at 4. On March 12, 2020, the Court denied Intuit's Motion to Compel Arbitration. See Order Denying Mot. to Compel (dkt. 141). But in August 2020, the Ninth Circuit reversed, holding that the arbitration clause must be enforced. See Dohrmann v. Intuit, Inc., 823 F. App'x 482 (9th Cir. 2020).

Plaintiffs had moved for class certification in January 2020, see Mot. to Certify Class (dkt. 116), but the parties have not fully briefed that motion, and the Court is yet to certify any class in relation to this case. Given the Ninth Circuit's ruling and the arbitration clause's prohibition on class arbitration, Plaintiffs' only path to obtaining class relief from this Court is via a settlement with Intuit (or, less likely, after a successful appeal to the U.S. Supreme Court).[3]

### A. The Proposed Settlement

On November 12, 2020, Plaintiffs moved for preliminary approval of a settlement agreement with Intuit. See Mot. for Preliminary Approval (dkt. 162); Settlement

---

[2] Under Rule 23(g)(3), "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."

[3] Plaintiffs have indicated that they may file a petition for writ of certiorari. See Hearing Tr. (dkt. 206) at 30–31. Plaintiffs have also asserted that their arguments against the enforceability of the arbitration clause resemble those implicated by Henry Schein, Inc. v. Archer and White Sales, Inc., 141 S. Ct. 107 (2020) (granting a petition for writ of certiorari). See Hearing Tr. at 30. After this Court's hearing on the motion for preliminary approval, the Supreme Court dismissed the writ of certiorari in Henry Schein as improvidently granted. See 141 S. Ct. 656 (2021).

3

Agreement (dkt. 162-1).  The proposed settlement class "consists of all persons within the United States who, from January 1, 2015 to November 20, 2020, paid to use TurboTax online in a year in which they were eligible to file for free with the TurboTax Free File Program."  Mot. for Preliminary Approval at 6.  But the proposed settlement class is narrower with respect to any monetary award, because in filing a claim for such an award, class members must sign an attestation that they paid a fee to Intuit when they "expected" to file for free.  Id. at 7.  The parties nonetheless estimate that the proposed class includes 19 million people.  Id. at 6.

Under the proposed settlement, Intuit would pay a fixed sum of $40 million in exchange for the release of all claims that were or could have been asserted in this case.  Id.  "Notice and administrative expenses, as well as attorneys' fees, expense reimbursements and service awards approved by the Court, [would] be deducted from the settlement amount."  Id. at 6–7.  Class Counsel would seek "25% of the fund in attorneys' fees and reimbursement of litigation expenses," and each class representative would receive a $10,000 "service award."  Id. at 7.  The balance of approximately $28 million would be paid to settlement class members who, as discussed above, must sign an attestation that they paid a fee to Intuit when they "expected" to file for free.  Id. at 7, 16.  Class members who timely submit a valid claim would receive a "pro rata" cash award from the remaining pool, and class counsel expect that between 1% and 10% of settlement class members would submit claims.  Id. at 8.  Any unclaimed distributions would be paid to the settlement class members "who accepted or elected to receive a pro rata payment" until the settlement administrator determines that further distributions are not economically feasible.  Id. at 8–9.  Intuit asserts that "participating class members are expected to recover 20% to 50% of the average fees a taxpayer paid to use TurboTax online in a year they were eligible to file for free."  Intuit Opp. to Mot. to Intervene (dkt. 189) at 3.  On average, class members paid approximately $100 in filing fees in a given tax year.  Mot. for Preliminary Approval at 16.  At the "midpoint" of the estimated participation rate, each class member who files a claim "would receive about $28."  Mot. for Preliminary

4

1 Approval at 17.

2   Under the proposed settlement, Intuit would also modify certain business practices. Mot. for Preliminary Approval at 7. As long as Intuit participates in the IRS Free File Program, "for up to three years," Intuit would:

1. "[A]dhere, to the fullest extent practicable, to the Federal Trade Commission's guidelines for online marketing";
2. "[D]isclose the existence of the IRS Free File Program and qualifications to file for free . . . on one or more webpages maintained as part of, and accessible from the homepage of, the intuit.turbotax.com domain, and provide information on how to participate in the [program], and . . . maintain a publicly available webpage on the same domain setting forth the forms and schedules not covered in the TurboTax free edition";
3. "[C]reate a minimum of three blog posts each tax filing season . . . on its commercial website informing consumers about the IRS Free File Program and linking to it";
4. "[S]end a minimum of six email reminders to returning IRS Free File Program . . . customers," until a customer "files their taxes" or "unsubscribes" from such emails; and
5. Not engage "in any practice that would cause the landing page" for the Free File Program "to be 'de-indexed' from organic internet search results."

Id. at 7–8.[4] In this sense, the proposed settlement would provide non-monetary relief to class members who, though eligible to file for free, did not expect to file for free and thus could not submit a claim.

  The proposed Notice to the Settlement Class would also advise class members regarding the free file program. Id. at 8. Notice would be delivered to the email addresses that Intuit has on file, though a settlement class member who requests a mailed copy "or whose email address is no longer valid or otherwise results in a bounce-back message" would receive a mailed copy at the address that Intuit has on file. Id. at 9. Notice would also be available on a settlement website. Id.

  The proposed settlement provides an opt out procedure for class members who wish neither to file a claim nor to be bound by the settlement. Such class members must

---

[4] The fifth promise to not de-index would have little, if any, practical effect because Intuit has already agreed with the IRS to not engage in such de-indexing. See Hearing Tr. at 39.

> send a written request to the Settlement Administrator providing their name, address, telephone number, e-mail address, and [wet-ink] signature; their unique identification number assigned by the Settlement Administrator; a statement that they are a member of the Settlement Class and wish to be excluded; and, if the [class member] has already filed an arbitration or lawsuit against Intuit, the relevant case name and number.

Id. at 10.[5]

The settlement comes with two contingencies. Intuit would "have the right to terminate the Settlement" if either "[1] the number of valid and timely opt-outs exceeds an amount agreed upon [by] Class Counsel and Intuit in a confidential side letter," which the parties would share with the Court, or [2] "the Court does not enjoin the commencement [or pursuit] of any additional actions or proceedings." Id.; see also id. at 21. To that end, Plaintiffs have requested that upon preliminarily approving the proposed settlement, the Court "temporarily" enjoin class members from commencing or pursuing "related proceedings," including arbitrations, until they have opted out of the settlement. Id. at 21. That injunction would go into effect immediately if the Court granted Plaintiffs' Motion for Preliminary Approval. See Proposed Order (dkt. 162-1) Ex. A at 8.

### B. Related Arbitration Proceedings

The proposed settlement comes with certain unusual circumstances. Namely, tens of thousands of Intuit customers have already begun individually arbitrating analogous claims against Intuit. A total of approximately 9,000 customers filed demands for individual arbitration against Intuit with the American Arbitration Association (AAA) either on October 1, 2019, shortly before Intuit moved to compel arbitration, or January 28, 2020, while the parties were litigating whether Plaintiffs' claims must be arbitrated. See Postman Decl. (dkt. 178) ¶ 5. On March 11, 2020, the day before the Court denied Intuit's Motion to Compel Arbitration, another 31,000 customers filed arbitration demands. Id. More individual customer arbitration demands followed the Ninth Circuit's August 2020

---

[5] The proposed settlement also provides for an objection procedure through which Settlement Class Members may oppose final approval of the settlement. See Mot. for Preliminary Approval at 10–11.

6

ruling that the arbitration clause must be enforced: on October 9, 2020, approximately 17,000 additional customers filed demands for arbitration, and on October 23, 2020, approximately 70,000 more customers did the same. Id.

These arbitration claimants have retained the same law firm, Keller Lenkner LLC. They are all pursuing (1) consumer fraud claims under either their home state or California law, and (2) federal antitrust claims. Id. ¶¶ 6–9. Their claims arise from the same allegations that Plaintiffs' assert: Intuit deceptively "steered" them away from "the free option and toward its paid products." Id. ¶ 23. They pursue public injunctive relief along with damages and attorneys' fees amounting to an average of approximately $2,700. Id. ¶¶ 7, 9.

The individual arbitrations have had significant financial consequences for Intuit, with more costs on the horizon. AAA requires consumer claimants to pay an initial filing fee (or submit a hardship-based waiver request) and respondents to pay slightly larger filing fees. Id. ¶ 11; Costs of Arbitration, Effective Nov. 1, 2020 (dkt. 178-3); Costs of Arbitration, Effective Sept. 1, 2018 (dkt. 178-4). The relevant rules in place before November 1, 2020, required claimants to pay a $200 filing fee and the relevant business (here, Intuit) to pay a $300 filing fee for each arbitration. See Costs of Arbitration, Effective Sept. 1, 2018. The relevant rules in place after November 1, 2020 require claimants to pay a $50 filing fee and Intuit to pay a $75 filing fee for each arbitration. See Costs of Arbitration, Effective Nov. 1, 2020. In addition to its own filing fees, Intuit would be liable for a large chunk of the claimants' fees: Intuit's Terms state that Intuit will pay arbitration fees for claimants who are unable to do so, and "reimburse all such fees and costs for claims totaling less than $75,000 unless the arbitrator determines the claims are frivolous." Terms ¶ 14. And, from Intuit's perspective, it gets worse. In addition to these filing fees, AAA rules provide that the business (here, Intuit) must pay additional case management and arbitrator compensation fees for each arbitration. See Costs of Arbitration, Effective Nov. 1, 2020; Costs of Arbitration, Effective Sept. 1, 2018.

Roughly 37,000 claimants who filed arbitration demands in March 2020 and earlier

have collectively paid millions of dollars in AAA filing fees, advanced by Keller Lenkner; Intuit has paid millions in fees relating to those demands under protest, Postman Decl. ¶¶ 12–13, and appears obligated under the Terms to reimburse the fees paid by many claimants.[6]  As of now, Intuit will also have to pay tens of millions in case management and arbitrator compensation fees.  Id. ¶¶ 14–15.  Intuit has made settlement offers to 101 of the individual arbitration claimants reflecting Intuit's calculation of their full out-of-pocket damages, and twenty-three of the claimants have accepted Intuit's offers.  See id. ¶ 19.

In short, Intuit faces massive costs associated with the individual arbitrations, even before considering potential liability on the merits.  Although Intuit questions whether Keller Lenkner is looking out for its clients' best interests, see Intuit Opp. to Mot. to Intervene at 6, the parties do not dispute that these individual arbitrations expose Intuit to enormous fees and costs.  Intuit has acknowledged the bargaining advantage enjoyed by the arbitration claimants, who can effectively "threaten" Intuit "into paying $3,000 in arbitration fees, for a $100 claim."  Hearing Tr. at 64.  It is unclear whether Intuit considered this possibility when Intuit drafted the arbitration clause or litigated its enforceability.

Before AAA, Intuit has objected to the claimants' arbitration demands, the fees that Intuit must pay AAA, and AAA's neutrality.  Postman Decl. ¶ 43.  Intuit has also argued that its Terms of Service and AAA rules give Intuit the right to face the arbitration claimants' claims in small-claims court, rather than arbitration.  Id. ¶ 44.  AAA determined that Intuit's arguments raised questions of arbitrability, and that under the arbitration clause, individual arbitrators must decide such questions.  Id. ¶ 45; Postman Decl. Ex. I (dkt. 178-9) at 17, 29–30, 35–36, 39–40, 48–50, 57–58.  Thus, AAA determined that the individual arbitrations would go forward.

On June 12, 2020, Intuit sued "several thousand" arbitration claimants in California

---

[6] Intuit notes that Keller Lenkner withdrew roughly 8,300 of these initial demands.  Intuit Opp. to Mot. to Intervene at 7.  And the 88,786 October 2020 arbitration claimants have (to the Court's knowledge) not yet paid their filing fees.  Id.

8

Superior Court. Postman Decl. ¶ 50; Case No. 20 STCV 22761 Order Denying Intuit Mot. for Preliminary Injunction (dkt. 178-10) at 1. Intuit sought a declaration that Intuit may choose to face their claims in small claims court, an order enjoining the arbitrations, a declaration that the claimants seek "de facto" class arbitration barred by Intuit's Terms, and a declaration that California Senate Bill 707 (which imposes sanctions on a party that drafted a consumer arbitration agreement, then fails to pay the fees necessary to proceed under such an agreement) is preempted by the Federal Arbitration Act. Postman Decl. ¶ 50. On September 2, 2020, Intuit sought a preliminary injunction staying the arbitrations. See id. ¶ 51. On October 8, 2020, the Superior Court denied Intuit's motion and held that the arbitrations must proceed. See Case No. 20 STCV 22761 Order Denying Intuit Mot. for Preliminary Injunction at 16. On October 26, 2020, Intuit appealed the Superior Court's decision, and on October 27, 2020, Intuit filed a petition for a writ of supersedeas from the California Court of Appeal. Postman Decl. ¶¶ 53, 54. The Court is unaware of any material developments regarding the petition.

On October 28, 2020, the arbitration claimants asked the Superior Court to enjoin Intuit from agreeing to a settlement with Plaintiffs that includes the arbitration claimants and that burdens their right to opt out. Id. ¶ 56. Before the Superior Court ruled on that motion, Intuit and Plaintiffs' counsel agreed to a preliminary settlement, and Plaintiffs' counsel filed the Motion for Preliminary Approval at issue here. Id. ¶ 57. On November 20, 2020, the Superior Court orally denied the arbitration claimants' motion as moot given the proposed settlement agreement, stating that the Superior Court would not interfere with this Court's proceedings. Id. ¶ 59; Superior Court Hearing Tr. (dkt. 178-11) at 5.

### C. Recent Procedural History

On November 30, 2020, nine arbitration claimants ("Intervenors") moved to intervene under Rule 24 of the Federal Rules of Civil Procedure. See Mot. to Intervene (dkt. 177) at 8. On December 14, 2020, the Court granted that motion. See Order Re Mot. to Intervene & Amicus Br. (dkt. 199) at 2.

Also on November 30, 2020, the Los Angeles City Attorney's Office (LACA) and

County Counsel for the County of Santa Clara (SCCC) moved to file a joint amicus brief opposing the proposed settlement and to participate in oral argument. See Mot. to File Amicus Br. (dkt. 176). On December 14, 2020, the Court granted that motion as well. See Order Re Mot. to Intervene & Amicus Br. at 1.

On December 14, 2020, the Court received a letter from the Attorneys General of New York, Tennessee, Florida, Illinois, New Jersey, North Carolina, Pennsylvania, Texas, and Washington. See AG Letter (dkt. 198). The letter noted that, in its opposition to Intervenors' motion to intervene and Amici's motion for leave to file an amicus brief, Intuit "twice remark[ed] that State Attorneys General have not intervened in this action or objected to the settlement." Id. The letter clarified that "a lack of affirmative action taken by the Attorneys General does not indicate approval of this settlement." Id.

On December 17, 2020, the Court held a hearing and issued an order denying the motion for preliminary approval. See Order Denying Mot. for Preliminary Approval (dkt. 202). The Court explained that an opinion would follow in due course. Id. In the meantime, Plaintiffs, Intuit, and Intervenors unsuccessfully attempted to settle. See Minute Entry (dkt. 213). The Court now provides its opinion.

## II.     LEGAL STANDARD

"'[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" Allen v. Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008)). Nevertheless, Rule 23(e) of the Federal Rules of Civil Procedure requires courts to approve any class action settlement. "[S]ettlement class actions present unique due process concerns for absent class members." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). As such, "the district court has a fiduciary duty to look after the interests of those absent class members." Allen, 787 F.3d at 1223 (collecting cases).

To approve a proposed settlement before a class has been certified, the Court must determine that it "will likely be able to . . . approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B); see also Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir.

2003) (explaining that to approve a settlement agreement reached prior to class certification, the court must assess "whether a class exists" and "whether a proposed settlement is fundamentally fair, adequate, and reasonable") (citation omitted). Thus, if the proposed settlement does not satisfy Rule 23(e), the Court must deny Plaintiffs' motion for preliminary approval regardless whether the proposed class could be certified.

Rule 23(e) is responsive to the peculiar nature of class actions, which may result in absent class members unwittingly releasing claims against a defendant to facilitate a settlement. Courts have "long recognized" that class action settlements "present unique due process concerns for absent class members." In re Bluetooth Headset Prods. Liability Litig., 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted). For example, there is always the risk that class counsel will "collude" with defendants, "tacitly reducing the overall settlement in return for a higher attorney's fee." Id. (citation omitted). That is why Rule 23(e) of the Federal Rules of Civil Procedure permits class actions to be settled "only with the court's approval." Fed. R. Civ. P. 23(e).

Further, a court may give such approval "only after a hearing and only on finding that" the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Whether a proposed settlement is fair, reasonable, and adequate depends on factors that "will naturally vary from case to case." In re Bluetooth, 654 F.3d at 946. But courts "generally" must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

Id. (quoting Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004)).

When a "settlement agreement is negotiated prior to formal class certification, consideration of these eight Churchill factors alone is not enough." Id. (emphasis in original). Before class certification, "there is an even greater potential for a breach of

11

fiduciary duty owed the class during settlement." Id.  And because "[c]ollusion may not always be evident on the face of a settlement," courts must examine whether there are "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." Id. at 947.

Courts need not assess all these fairness factors at the preliminary approval stage. See Alberto v. GMRI, Inc., 252 F.R.D. 652, 665 (E.D. Cal. 2008). Rather, "the preliminary approval stage [i]s an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." In re High-Tech Empl. Antitrust Litig., 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citing Manual for Complex Litigation (Fourth) § 21.632).  At this stage, "[p]reliminary approval of a settlement is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'" Ruch v. AM Retail Grp., Inc., 2016 WL 1161453, at *7 (N.D. Cal. Mar. 24, 2016) (quoting In re Tableware, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).

## III.   DISCUSSION

The Court concludes that the proposed settlement does not satisfy Rule 23(e) because it is not fair, reasonable, and adequate.  Therefore, the Court denies Plaintiff's motion for preliminary approval.  The Court need not consider whether it would likely be able to certify the proposed class, or subsidiary issues like whether the proposed class satisfies Rule 23(a)'s four initial requirements, Rule 23(g)'s adequacy of counsel requirement, and Rule 23(b)(3)'s predominance requirement.

At every step of the Court's Rule 23(e) analysis, the Court bears in mind the stakes for different members of the proposed class.  First, the arbitration claimants, like Intervenors, would be subject to an immediate injunction and must opt out of the settlement to continue pursuing their arbitration claims.  These claimants may benefit from the settlement if the $28 they would recover by filing a claim exceeds their expected net

recovery through arbitration. Given Intuit's weak bargaining position in the arbitration proceedings, it would likely be economically irrational for arbitration claimants with legitimate claims to participate in the proposed settlement. Thus, the proposed settlement's primary effect on arbitration claimants is to stall their arbitrations until they comply with the proposed opt out procedures. And if arbitration claimants both fail to opt out of the settlement and fail to file a settlement claim, they get nothing. Second, there are class members who may recover via government enforcement actions against Intuit. Whether the proposed settlement harms these people depends on whether it could preclude or limit their recovery in government enforcement actions—a complex question that the parties and Amici dispute. See, e.g., Amicus Br. (dkt. 176-1) at 11–15; Plaintiffs' Opp. to Mot. to Intervene (dkt. 188) at 4. Third, there is the rest of the class. Because the Ninth Circuit has held that Plaintiffs' claims against Intuit must be arbitrated, there is no realistic way for these class members to recover in Court or as a class except via settlement, the remote possibility of a successful appeal to the U.S. Supreme Court notwithstanding. Under the proposed settlement, these class members could either submit a claim, opt out and pursue individual arbitrations, or get nothing.

The proposed settlement, when considered in context, does not fall "within the range of possible approval." Ruch, 2016 WL 1161453, at *7. In these unique circumstances, "the amount offered in settlement" is plainly inadequate, and many class members have justifiably had a negative "reaction" to the proposed settlement's opt out procedures, which expose a significant segment of the class to undue burdens. See In Re Bluetooth, 654 F.3d at 946. These considerations persuade the Court that the proposed settlement would be unfair to a portion of the class, inadequate as to the entire class, and thus not susceptible to approval under Rule 23(e).

### A. Adequacy of the Settlement Award

As discussed above, the proposed settlement would provide $28 million in monetary compensation for claimants who attest that the paid Intuit a fee after they "expected" to file for free. Mot. for Preliminary Approval at 7, 16. Class members paid

13

approximately $100 in filing fees in a given tax year. Id. at 16. At the "midpoint" of the estimated settlement participation rate, claimants "would receive about $28." Id. at 17.

That monetary compensation is inadequate for several reasons.

First, the Court is unable to conclude that the compensation is adequate relative to Intuit's potential exposure. This is due in part to Plaintiffs' failure to provide a definite estimate of that exposure. Admittedly, the Northern District of California's Procedural Guidance for Class Action Settlements indicates that a motion for preliminary approval should state "the potential class recovery if plaintiffs had fully prevailed on each of their claims," N.D. Cal. Proc. Guidance for Class Action Settlements, available at https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (updated December 5, 2018), and this guideline does not apply here, where Plaintiffs' loss at the Ninth Circuit means there is no potential for class recovery in court. That said, given that the proposed settlement would bar arbitration and other parallel proceedings arising from the same claims, and may preclude participation in state enforcement actions, see Plaintiffs' Opp. to Mot. to Intervene at 4 (acknowledging this "possibility"), it is difficult to evaluate the proposed settlement's fairness without a concrete estimate of Intuit's potential exposure in those proceedings. The Court is left to do a back-of-the-envelope calculation: for a projected class of 19 million people, who paid an average of $100 per-year for at least one year, a conservative estimate of Intuit's potential liability is $1.9 billion. See Amicus Br. at 8. Under the proposed settlement, class members would recover just 1.5% of that, and neither Plaintiffs nor Intuit has pointed to a case involving a comparably low recovery in similar circumstances.

Second, as measured by settlement claimants' expected recovery, the damages award is plainly inadequate. Such recovery would constitute just 28% of damages for class members who paid to file for one year, and less for those who paid to file for multiple years.[7] The motion for preliminary approval rests this low recovery on Intuit's supposed

---

[7] As discussed below, the Court rejects the premise that class members could have suffered harm for no more than one year.

14

"robust set of defenses." Mot. for Preliminary Approval at 15. Needless to say, the Court is dubious given Intuit's apparent deception of eligible customers and applicable consumer protection law. In short, Intuit is a massive company that dominates the tax-filing space; it has no excuse, financial or otherwise, for undercompensating this class to avoid facing claims in arbitration.

As to both Intuit's potential exposure and the settlement claimants' expected recovery, Intuit argues that $28 is better than nothing, and without a settlement, many class members will get nothing. See Hearing Tr. 63. That is the wrong way of approaching the question. The Court need not evaluate the settlement's fairness in a judicial vacuum. Despite the Ninth Circuit's decision to enforce the arbitration clause, class members' individual claims still have value, as evidenced by (among other things) Intuit's willingness to settle in exchange for the release of those claims. The value of those claims is not negated by class members' inability to pursue them in this forum without a settlement given the availability of other forums, including arbitral forums. Thus, it remains worthwhile for the Court to compare the proposed compensation with awards in other cases, and in relation to the harm that class members suffered.

It also bears emphasizing that here, that harm is significant. Mostly low-income class members suffered at least $100 in damages. For class members who paid filing fees over multiple years, the harm was much more. And for a family or individual with limited disposable income, $100-per-year can have a material effect. It might be the difference in whether someone can pay rent for a month or buy groceries for a week. A small award, like $28, may also be meaningful to these same low-income class members. But it will not mean much. Otherwise, more than an estimated 5% of the class would participate in the settlement.[8]

Third, the proposed settlement fails to account for obvious and important

---

[8] This deficiency cannot be cured by a higher-than-expected participation rate, because as the number of claimants goes up, the $28 million pie will be split among more people, leading to a lower award per claimant. See Mot. for Preliminary Approval at 16–17.

differences among large groups of class members. Strangely, the proposed settlement provides for the same award regardless whether a class member paid fees for more than one year. Plaintiffs' argument that "eligible free-filers who paid a TurboTax fee in more than one year . . . arguably should have known they would be charged in the subsequent year," Mot. for Preliminary Approval at 14, hardly resolves the matter. Plaintiffs have characterized this action as "a bait-and-switch case." Hearing Tr. at 32. A person induced into paying for services that the person initially expected to get for free, and who continues to pay for those services annually, can trace the cumulative harm suffered back to the initial deception. Without that deception, the person would have known they could file for free from the start, and presumably would have done so each year. The proposed settlement also fails to account for arbitration fees already paid by class members; fees that Intuit appears obligated to reimburse. See supra Part I.B; Hearing Tr. at 64. Neither Plaintiffs nor Intuit have explained how releasing Intuit's liability for those fees would be fair to class members who brought claims in arbitration after Intuit insisted on proceeding in that forum.

The proposed settlement's non-monetary relief cannot overcome these inadequacies, and the Court may not trade-off the interests of some class members for others. Plaintiffs have pointed out that the proposed settlement would secure what Plaintiffs characterize as "very important injunctive relief" for the class. Hearing Tr. at 27. But this injunctive relief cannot make up for an apparent shortfall in monetary compensation when class members suffered financial harm. Similarly, Intuit has argued that Keller Lenkner represents the interests of roughly 125,000 class members, but that without a settlement here, "950,000 or more" class members who might otherwise participate in the proposed settlement would "get nothing." Hearing Tr. at 63. Rule 23(e) does not permit the Court to conduct this sort of utilitarian balancing. Indeed, the Court may not approve a proposed settlement when certain class members' interests have been elevated above others. See In re Bluetooth, 654 F.3d at 947. If class actions are to work—and people not before the Court are to be bound by settlements—the Court must

16

vigorously look out for all class members, not to mention large segments of the class. See Hanlon, 150 F.3d at 1026. Because the full scope of relief must be fair and adequate for all involved, see Fed. R. Civ. P. 23(e), the proposed settlement does not satisfy Rule 23(e).

### B. Fairness and Reasonableness of the Opt Out Procedures

As discussed above, pre-class certification settlements are subject to heightened scrutiny. See In re Bluetooth, 654 F.3d at 946. And here, where there is good reason to think that the proposed settlement will seriously burden many arbitration claimants (and perhaps others who could benefit from government enforcement actions), the Court must be especially wary of unequal treatment among class segments. See id. at 946–47. To that end, any settlement here must permit class members to opt out in a manner that is straightforward and respectful of their existing claims. The proposed settlement falls short in this regard as well.

The proposed opt out procedures contain several troubling features. Intervenors argue that the opt out process is unduly burdensome because it requires (1) a "wet-ink" (not electronic) signature, (2) opt outs to be mailed in hard copy (though claims may be filed online), (3) a unique settlement ID, even though such an ID is not required to participate in the settlement, and (4) a case number for parallel proceedings, even though many arbitration claimants have not yet been assigned a case number. Mot. to Intervene at 16–19, 24. Intervenors also point out that the opt out procedure does not permit opting out through counsel. Plaintiffs argue that these procedures are common, and that permitting opt out through counsel could result in class members not making individualized decisions regarding their best interests. See Plaintiffs' Opp. to Mot. to Intervene at 9–14.

The Court concludes that the opt out requirements in the proposed settlement are unduly burdensome given the unique circumstances of this litigation. Setting aside the dispute about mass opt outs through counsel—which the Court need not resolve—requiring these class members to opt out by mailing a hard copy letter with a "wet-ink" signature serves little purpose but to burden those who wish to opt out. In a world where Intuit can not only administer settlement claims electronically, but also facilitate safe, legal

17

tax-filing electronically, Intuit can assuredly process opt outs electronically. If electronic signatures are enough for Intuit and the IRS during tax season, they should be enough for Intuit here.

Other class action settlements featuring wet-ink signature and mail-in requirements show why such requirements are inappropriate here. For example, this Court approved an opt out procedure requiring class members to mail "a signed, written request" during the Volkswagen clean diesel litigation. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. MDL 2672 CRB (JSC), 2017 WL 672727, at *10 (N.D. Cal. Feb. 16, 2017). Those class members, however, would be opting out of a settlement that awarded claimants consistent with their full "possible recovery" if they proceeded to litigate—typically at least thousands of dollars. Id. at *19. Similarly, another Northern District of California court approved opt out procedures requiring class members to "personally sign" their opt out statements "in ink." del Toro Lopez v. Uber Techs., Inc., No. 17-CV-06255-YGR, 2018 WL 5982506, at *21 (N.D. Cal. Nov. 14, 2018). Those class members would be opting out of a settlement that awarded roughly $23,800 per class member. del Toro Lopez v. Uber Techs., Inc., No. 17-CV-06255-YGR Mot. for Preliminary Approval (dkt. 33) at 19. In both instances, opting out would be financially risky at best and economically irrational at worst. And in those circumstances, relatively burdensome procedures would promote careful deliberation before class members made a choice that could haunt them financially.

Here, the inverse is true. For tens of thousands of class members who are arbitrating claims against Intuit, opting out is the obvious financial choice. For everyone else, missing out on an expected $28 will not materially change their lives. That does not mean class members should be encouraged to opt out without deliberation, or (necessarily) that counsel should be able to opt out arbitration claimants en masse. But it does mean that class members should not face onerous burdens that, in this context, appear designed to

suppress opt outs.[9]

The opt out procedures are still more troubling given that the proposed settlement is contingent on the Court issuing an immediate injunction. "A court's preliminary approval of a proposed class settlement—in and of itself—has no effect on parallel actions." 4 Newberg on Class Actions § 13:19 (5th ed. 2011). But sometimes, proposed preliminary orders seek "so-called antisuit injunctions." Id. Usually such injunctions, if granted, halt parallel litigation in other federal and state courts. See id. Such injunctions raise serious concerns. "[P]erhaps most importantly, at the preliminary stage of a class action settlement, the court has not given notice to the class, not heard objections to the settlement, not weighed the settlement's strengths and weaknesses in an adversarial setting, and likely not finally certified a class." Id. Thus, although courts sometimes "simply sign the moving parties' proposed preliminary approval order without focusing on the fact that they are thereby enjoining parallel litigation," issuing such an injunction at the preliminary approval stage "would be an extraordinary measure best reserved for extraordinary circumstances." Id.

These same concerns apply here. Given Congress's instruction that the Court respect the enforceability of arbitration agreements, see 9 U.S.C. § 2, it makes no difference that many of the affected proceedings would be individual arbitrations, not court cases. The proposed immediate injunction would halt all parallel proceedings until class members complied with the onerous opt out procedures described above. To the extent that "extraordinary" circumstances could support enjoining parallel proceedings, that is not the case here, where the circumstances caution against interfering with proceedings brought by tens of thousands of class members before a class has been finally certified, or

---

[9] Plaintiffs and Intuit rely heavily on In re CenutryLink Sales Practice Litig. See 2020 WL 869980 (D. Minn. Feb. 21, 2020); 2020 WL 3512807 (D. Minn. June 29, 2020). That out-of-district case does not persuade the Court to approve this settlement. There, the opt out procedure did not require a wet-ink signature or a case number for parallel proceedings like arbitrations. See Order Preliminarily Approving Class Settlement at 5, In re CenutryLink Sales Practice Litig. No. 17-md-02795-MJD-KKM (Jan. 24, 2020), ECF No. 528. And the District of Minnesota discussed the importance of individual signatures in response to Keller Lenkner's attempt to submit a "mass opt out" list, 2020 WL 3512807, at *2, *3, an issue this Court need not reach.

a settlement finally approved. Those class members have an obvious, non-speculative incentive to opt out of the settlement and continue proceeding through arbitration.[10] Thus, although enjoining parallel proceedings may ultimately be necessary to achieve a global resolution of this controversy, the Court declines to do so at this stage, in these unique circumstances.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary approval is denied.

**IT IS SO ORDERED.**

Dated: March 5, 2021



CHARLES R. BREYER
United States District Judge

---

[10] The Court need not decide whether it has power to enjoin the parallel arbitrations. See Mot. to Intervene at 10 (citing 9 U.S.C. § 2).